**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins
Andrew Lencyk
55 Broadway, 10th Floor
New York, NY 10006
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: shopkins@zlk.com
Email: alencyk@zlk.com

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen
Jonathan Stern
275 Madison Avenue, 40th Floor
New York, NY 10006
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: jstern@rosenlegal.com
Email: lrosen@rosenlegal.com

*Co-Lead Counsel for Lead Plaintiffs*
*Gulzar Ahmed and the Allegheny County*
*Employees' Retirement System*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MARK WINTER, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

STRONGHOLD DIGITAL MINING, INC., GREGORY A. BEARD, RICARDO R. A LARROUDÉ, WILLIAM B. SPENCE, B. RILEY SECURITIES, INC., COWEN AND COMPANY, LLC, TUDOR, PICKERING, HOLT & CO. SECURITIES, LLC, D.A. DAVIDSON & CO., COMPASS POINT RESEARCH & TRADING, LLC, and NORTHLAND SECURITIES, INC.,

Defendants.

Case No. 1:22-cv-03088-RA

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS


I. SUMMARY OF THE ACTION ..... 1

II. JURISDICTION AND VENUE ..... 6

III. PARTIES ..... 6

A. Co-Lead Plaintiffs ..... 6

B. Stronghold Digital Mining ..... 7

C. The Individual Defendants ..... 7

D. The Underwriter Defendants ..... 8

E. Relevant Non-Parties ..... 11

IV. ADDITIONAL SUBSTANTIVE ALLEGATIONS ..... 13

A. The Rise of Cryptocurrencies and Cryptocurrency Mining ..... 13

B. Stronghold Company Overview: Stronghold Enters the Bitcoin Mining Industry with Power to be Supplied By The Company's Own Power Generation Facilities ..... 17

C. Prior to the IPO, Stronghold Entered into Bitcoin Miner Purchase Agreements to Build its Miner Fleet ..... 18

D. Stronghold Highlights in the Offering Materials Total Hash Rates that Were Unachievable Due to Delays and Non-Shipment of MinerVa Miners ..... 19

V. UNDISCLOSED MATERIALLY ADVERSE CONDITIONS AND TRENDS THAT EXISTED PRIOR TO AND AT THE TIME OF THE IPO ..... 21

A. MinerVa, Stronghold's Largest Supplier of Bitcoin Miners, Is Unable To Ship Miners to Stronghold ..... 21

B. Stronghold Misrepresented Both the Hash Rate Capacity of the MinerVa MV7 Miners it Purchased and the Company's Ability to Reach 2,100 PH/s By December 2021 ..... 27

VI. STRONGHOLD GOES PUBLIC BY MEANS OF THE MATERIALLY FALSE AND MISLEADING OFFERING MATERIALS ..... 32

A. Disclosure Obligations Under the Securities Act ..... 33

B. Stronghold Falsely Stated that MinerVa Was Delivering Bitcoin Miners According to the Timeline and Quantities Stated in the Offering Materials ..... 36

C. Stronghold's Offering Materials Misleadingly Touted Expected Hash Rates for Both Stronghold's Entire Mining Operations and for the Individual MinerVa MV7 Mining Machines ..... 40

VII. POST-IPO EVENTS ..... 42

D. Stronghold Downplays Delays in Deliveries from MinerVa, While Reassuring Investors that Deliveries are Incoming ..... 42

E. Stronghold Amends its Financing Agreement Due to the MinerVa Miner Delivery

Delays But Continues to Assure Investors that Deliveries are Incoming ........................ 46

F. Defendants' March 29, 2022 Acknowledgments Regarding Shipments of Miners From MinerVa ........................ 47

G. Defendants' March 29, 2022 Acknowledgment That Stronghold Had Not Met Total Hash Rate Goals ........................ 50

VIII. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ........................ 51

IX. CLASS ACTION ALLEGATIONS ........................ 52

X. COUNT I ........................ 54

XI. COUNT II ........................ 56

XII. COUNT III ........................ 57

XII. PRAYER FOR RELIEF ........................ 58

XIII. JURY TRIAL DEMANDED ........................ 58

Court-appointed Co-Lead Plaintiffs Gulzar Ahmed ("Ahmed") and the Allegheny County Employees' Retirement System ("ACERS," and collectively with Ahmed, "Co-Lead Plaintiffs"), by and through their undersigned counsel, bring this action pursuant to Sections 11, 12, and 15 of the Securities Act of 1933 (the "Securities Act") individually and on behalf of all persons or entities other than defendants who purchased common stock issued by Stronghold Digital Mining, Inc. ("Stronghold" or the "Company") pursuant to or traceable to the false and misleading, negligently-prepared Offering Materials (defined below) for the Company's Initial Public Offering (the "IPO" or "Offering") that commenced on October 20, 2021 and closed on October 22, 2021.

Co-Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Co-Lead Plaintiffs' information and belief is based on the investigation of their undersigned Counsel, which included, among other things, review and analysis of: (i) Stronghold's public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) Stronghold's other public statements, including press releases and investor call transcripts and recordings; (iii) reports of securities and financial analysts, news articles, and other commentary and analysis concerning Stronghold, its suppliers, and the industry in which it operates; and (iv) interviews with confidential witnesses ("CWs"), consisting of former Stronghold employees, as further described below. Counsel's investigation into the matters alleged herein is continuing, and many relevant facts are known only to, or are exclusively within the custody or control of, the defendants. Co-Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. SUMMARY OF THE ACTION

1. Co-Lead Plaintiffs bring this federal securities action pursuant to Sections 11, 12,

and 15 of the Securities Act individually and on behalf of all persons or entities other than defendants who purchased Class A common stock issued by Stronghold pursuant to or traceable to the Company's October 19, 2021 Registration Statement[1] and corresponding Prospectus[2] issued in connection with the IPO.

2. This action asserts strict liability claims under Sections 11, 12, and 15 of the Securities Act against Stronghold, certain Stronghold officers and directors, and the underwriters of the IPO.[3] Plaintiffs expressly disclaim any assertions of fraud or intentional or reckless conduct involving scienter.

3. Stronghold is a Bitcoin mining company. It wholly-owns and operates two coal refuse power generation facilities in Pennsylvania, which it operates to power its fleet of Bitcoin mining computers ("mining machines" or "miners").

4. On July 27, 2021, the Company filed with the SEC its first registration statement to sell shares of the Company in its IPO. After several amendments to this registration statement (Registration No. 333-258188), on October 19, 2021, the Company filed with the SEC its final amendment to the Registration Statement.

5. On October 19, the SEC declared the Registration Statement effective – meaning the Company could begin their IPO on the Nasdaq market.

6. On October 21, 2021, the Company filed with the SEC its Prospectus for the IPO on Form 424B4.

---

[1] "Registration Statement" refers to the final amended registration statement filed by Stronghold with the U.S. Securities and Exchange Commission ("SEC") on Form S-1/A on October 19, 2021 (Registration No. 333-258188), which was signed by each of the Individual Defendants (defined below).

[2] "Prospectus" refers to the prospectus filed by Stronghold on Form 424B4 with the SEC on October 21, 2021 for the IPO (Registration No. 333-258188).

[3] The Section 12 claims are not alleged against any of the Individual Defendants.

7. The Registration Statement and related Prospectus are referred to herein collectively as the “Offering Materials”.

8. In the IPO, the Company sold 7,690,400 shares of Class A common stock at a price of $19.00 per share. The Company received net proceeds of approximately $132.5 million from the Offering. The proceeds from the IPO were purportedly to be contributed to Stronghold LLC in exchange for Stronghold LLC Units, and Stronghold LLC would purportedly use the net proceeds for general corporate purposes, including for acquisitions of miners and power generating assets.

9. Unbeknownst to investors, however, and in violation of the Securities Act, the Offering Materials contained untrue statements of material fact and/or omitted to disclose material facts required to be stated therein.

10. First, the Offering Materials were materially false and misleading in that they touted agreements for the purchase of miners and delivery schedules therefor that Stronghold had made with Bitcoin miner suppliers, including MinerVa Semiconductor Corp. (“MinerVa”), Stronghold’s largest supplier of miners, while omitting to disclose that these delivery quantities and deadlines were unachievable—including the first scheduled delivery, which was scheduled for less than two weeks after the IPO. Stronghold was aware from continuous communications with MinerVa, prior to and through the IPO, that MinerVa’s Chinese assembly facility for the miners was plagued by power outages and curtailments, and that the miners were not being assembled and thus would not meet the delivery schedule. This delivery delay was compounded by the fact that MinerVa had not yet even sourced adequate component parts for any significant number of miners, making it impossible for MinerVa to meet the delivery schedule for the MinerVa model MV7 miners Stronghold had purchased. Thus, the stated delivery schedule was false and misleading.

11. Second, Stronghold made false and/or misleading statements in the Offering

Materials as to the computing power, or "hash rate," the Company expected from each of the MinerVa MV7 miners it had purchased, as well as false and/or misleading statements regarding Stronghold's ability to reach a total hash rate of 2,100 petahash per second (PH/s) across the Company's entire mining operations by December 31, 2021. Specifically, in its Offering Materials, Stronghold falsely and misleadingly represented that the MinerVa MV7 miners it had purchased would each perform at a hash rate of 100 TH/s, while omitting to state that the 100 TH/s hash rate was, in fact, an unrealistic and impracticable maximum rate that was not achievable in real-world conditions, and that the Company had actually internally anticipated the MinerVa MV7 miners would operate at only 90% of the 100 TH/s figure stated in the Offering Materials, or 90 TH/s. Furthermore, Stronghold only acknowledged its internal expectation of 90 TH/s per MinerVa miner to investors in March 2022 when it revealed that the MinerVa miners were plagued by performance issues such that they ran at actual hash rates of just 50% to 70% of the 100 TH/s hash rate claimed in the Offering Materials, or 50 to 70 TH/s. Indeed, due in part to the rushed and inadequate assembly conditions, the quality and operational performance of the MinerVA MV7 miners was extremely poor, and approximately one in three of the miners was so defective as to be completely non-operational.

12. Stronghold's misrepresentations and omissions of then-present facts about the MinerVa MV7 miners also made it impossible for the Company achieve its target of generating a total combined hash rate of 2,100 PH/s across both of the Company's two mining data centers by December 31, 2021. As the Company later revealed, Stronghold's fleet of miners had only reached a total combined hash rate of 800 PH/s by year-end 2021, less than 40% of the Company's stated expected hash rate for that timeframe.

13. As a result of the foregoing, the Offering Materials made false and/or misleading

statements as to Stronghold's financial condition and omitted to state that Stronghold would experience significant losses. Defendants' positive statements in the Offering Materials about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

14. On March 29, 2022, after the NASDAQ market closed, Stronghold announced its fourth quarter and full year 2021 financial results for the year ending December 31, 2021. The Company reported a net loss of $0.52 per share for the quarter, well below analyst estimates of $0.04 earnings per share, as Stronghold's Chief Executive Officer acknowledged that "[o]ver the past few months, we have significant headwinds in our operations which have materially impacted recent financial performance." In particular, the Company acknowledged that "MinerVa[‘s] deliveries have been well short of the timelines in the contract" as "to-date we have only received approximately 3300 out of the 15,000 miners originally ordered from MinerVa that were scheduled for delivery by December, as they have continually fallen short of contractual and communicated delivery timelines." Consistent with its statement in November 2021 that "[w]e talk to MinerVa every day," Stronghold acknowledged that, although it "continues to have active dialogue with MinerVa regarding its delivery schedule and operational capabilities," and continued to be "in near constant contact" with MinerVa, the Company cannot "provide an update or a timeline on future deliveries, or if the Company can expect any future deliveries" of the MinerVa miners. Stronghold later disclosed that, by March 31, 2022, the Company had recognized an impairment totaling $12,228,742 on the remaining miners it had not received from MinerVa.

15. The next day, March 30, 2022, the Company's stock price fell as much as $3.28 per share, or 32%, to close at $6.97 per share, on trading volume of 6,192,200 shares, almost ten times the trading volume of 632,200 shares traded on March 28, 2022.

16. Since the commencement of this action, Stronghold stock has traded as low as $4.78 per share, a more than 75% decline from the $19.00 per share IPO price.

17. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Co-Lead Plaintiffs and other Class members have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

18. The claims asserted herein arise under and pursuant to Sections 11, 12, and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l, and 77o.

19. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 22 of the Securities Act (15 U.S.C. § 77v).

20. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), as Stronghold maintains its corporate headquarters at 595 Madison Avenue, 29th Floor, New York, New York 10022.

21. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

### A. Co-Lead Plaintiffs

22. Co-Lead Plaintiff Gulzar Ahmed, as set forth in his Certification and Loss Chart previously filed and incorporated herein by reference (ECF Nos. 15-1 and 15-2), purchased Stronghold Class A common stock pursuant and/or traceable to the Offering Materials and has been damaged thereby.

23. Co-Lead Plaintiff Allegheny County Employees Retirement System ("ACERS"), as set forth in its Certification and Loss Chart previously filed and incorporated herein by reference (ECF Nos. 19-2 and 19-3), purchased Stronghold Class A common stock pursuant and/or traceable to the Offering Materials, including 2,480 shares directly from the Underwriter Defendants on October 20, 2021 at the IPO price of $19.00 per share, and has been damaged thereby.

**B. <u>Stronghold Digital Mining</u>**

24. Stronghold Digital Mining, Inc., founded in 2021, describes itself as a vertically-integrated cryptocurrency mining company. Stronghold is organized under the laws of the State of Delaware and headquartered at 595 Madison Avenue, Floor 28, New York, New York. Since October 20, 2021, the Company's Class A common stock shares have traded on the NASDAQ Global Market under the ticker symbol "SDIG". Stronghold owns and operates two power generation facilities—one located at 2151 Lisbon Road, Kennerdell, Pennsylvania (the "Scrubgrass Plant", "Scrubgrass Data Center", or simply "Scrubgrass") and one located at 1001 Industrial Road, Nesquehoning, Pennsylvania (the "Panther Creek Plant", "Panther Creek Data Center", or simply "Panther Creek").

**C. <u>The Individual Defendants</u>**

25. Defendant Gregory Beard ("Beard") is, and was at all relevant times hereto, Stronghold's Chief Executive Officer ("CEO"), President, and Co-Chairman of the Company's board of directors. Beard has held all three roles since March 2021 and is a co-founder of the Company. Defendant Beard signed the Company's false and misleading Registration Statement.

26. Defendant Ricardo Larroudé ("Larroudé") was Stronghold's Chief Financial Officer ("CFO") at all relevant times hereto. Larroudé served as CFO from March 2021 until he was succeeded by Matthew J. Smith, on April 18, 2022. Larroudé authorized defendant Beard to

sign the Company's false and misleading Registration Statement on his behalf, pursuant to power of attorney.

27. Defendant William Spence ("Spence") is, and was at all relevant times hereto, Co-Chairman of the Company's board of directors. Defendant Spence has served as Co-Chairman since March 2021, and is a co-founder of the Company. Spence authorized defendant Beard to sign the Company's false and misleading Registration Statement on his behalf, pursuant to power of attorney.

28. Defendants Beard, Larroudé, and Spence are collectively referred to as the "Individual Defendants."

29. As the Individual Defendants each participated in the preparation of and signed the Registration Statement and Prospectus comprising the Offering Materials, they, and Defendant Stronghold, are strictly liable for the materially false and misleading statements contained and/or incorporated therein. By virtue of their positions with the Company, the Individual Defendants possessed the power and authority to control the contents of Stronghold's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and market investors.

**D. The Underwriter Defendants**

30. Defendant B. Riley Securities, Inc. ("R. Riley") served as an underwriter and joint book-running manager for the Company's IPO. In the Offering, B. Riley underwrote the sale of 3,062,786 shares of the Company's Class A common stock to investors in the IPO, exclusive of the over-allotment option.

31. Defendant Cowen and Company, LLC ("Cowen") served as an underwriter and joint book-running manager for the Company's IPO. In the Offering, Cowen underwrote the sale

of 2,382,687 shares of the Company's Class A common stock to investors in the IPO, exclusive of the over-allotment option.

32. Defendant Tudor Pickering Holt & Co. Securities, LLC ("Tudor") served as an underwriter for the Company's IPO. In the Offering, Tudor underwrote the sale of 466,105 shares of the Company's Class A common stock to investors in the IPO, exclusive of the over-allotment option.

33. Defendant D.A. Davidson & Co. ("Davidson") served as an underwriter for the Company's IPO. In the Offering, Davidson underwrote the sale of 310,291 shares of the Company's common stock, exclusive of the over-allotment option.

34. Defendant Compass Point Research & Trading, LLC ("Compass Point") served as an underwriter for the Company's IPO. In the Offering, Point Research underwrote the sale of 232,718 shares of the Company's common stock to investors in the IPO, exclusive of the over-allotment option.

35. Defendant Northland Securities, Inc. ("Northland") served as an underwriter for the Company's IPO. In the Offering, Northland underwrote the sale of 232,718 shares of the Company's common stock to investors in the IPO, exclusive of the over-allotment option.

36. Defendants B. Riley, Cowen, Tudor, Davidson, Compass Point, and Northland are referred to herein as the "Underwriter Defendants."

37. Per the Underwriting Agreement, each Underwriter Defendant agreed, severally and not jointly, to purchase from the Company the number of shares of Class A common stock each Underwriter Defendant had underwritten for sale, with the option to purchase up to an additional 1,003,095 shares over allotments.

38. As part of their due diligence responsibilities as underwriters, prior to the IPO, the

Underwriter Defendants: (i) assisted in the preparation and presentation of Stronghold "road show" materials designed to induce investment in the Company; (ii) had access to diligence materials on the Company, including, *inter alia*, confidential corporate information concerning Stronghold's business operations unknown to the investing public; and (iii) consulted with Company management regarding the Registration Statement.

39. Pursuant to the Securities Act, the Underwriter Defendants are liable for the materially false and misleading statements in the Offering Materials. The Underwriter Defendants assisted Stronghold and the Individual Defendants in planning the IPO and were required to conduct an adequate and reasonable due diligence investigation into the business and operations of Stronghold.

40. In addition to reviewing internal corporate documents, agents of the Underwriter Defendants met with Stronghold's lawyers, management, and top executives and made joint decisions regarding: (i) the terms of the IPO, including the price at which Stronghold shares would be sold to the public; (ii) the strategy to best accomplish the IPO; (iii) the information to be included in the Offering Materials; and (iv) what responses would be made to the SEC in connection with its review of the Offering Materials. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Stronghold's management and top executives, the Underwriter Defendants knew of, or in the exercise of reasonable, diligent care should have known of, Stronghold's existing problems as detailed herein.

41. The Underwriter Defendants negligently allowed the Offering Materials to contain materially false and misleading statements and/or omissions and failed to act in a reasonable manner to prevent the Offering Materials from containing materially misleading statements and/or preventing the materially misleading Offering Materials from being disseminated.

42. On this basis, the Underwriter Defendants are liable for the false and misleading statements in Offering Materials.

**E. Relevant Non-Parties**

43. Non-party MinerVa purports to be a manufacturer of cryptocurrency miners with operations in China and Canada. Stronghold and MinerVa entered into a purchase agreement on April 2, 2021, wherein Stronghold was to receive 15,000 model MV7 cryptocurrency miners, with a total terahash equal to 1.5 million terahash for a total purchase price of $73,387,500. Based on this purchase agreement, MinerVa was set to be Stronghold's largest supplier of miners at the time of the Stronghold IPO. Under MinerVa's purchase agreement, MinerVa was to ship no less than 2,500 miners to Stronghold for delivery by October 31, 2021, no less than 5,000 miners by November 30, 2021, no less than 5,000 by December 31, 2021, and the remaining 2,500 (*i.e.*, all 15,000 miners on order) by January 2022.

44. Non-party WhiteHawk Finance LLC ("WhiteHawk") is a subsidiary of WhiteHawk Capital Partners, LP. On June 30, 2021, Stronghold and WhiteHawk entered into a capital financing agreement (the "WhiteHawk Finance Agreement") to fund Stronghold's purchase of miners from MinerVa.

45. Non-party Charlie Talcott ("Talcott") is, and was at the time of the IPO, Stronghold's Vice President of Operations. As VP of Operations, Talcott oversaw, *inter alia*, the deployment of Stronghold's Bitcoin miners at the Scrubgrass and Panther Creek Data Centers, in large part by overseeing and managing Stronghold's Data Center Technicians and third-party contractors. According to CW-3, Talcott often accompanied Defendants Beard and Larroudé when the latter two visited Panther Creek, and CW-3 believed that Talcott reported to Defendant Beard.

46. Non-party David Buchinski ("Buchinski") was employed by Stronghold as the Data Center Operations Manager for the Panther Creek Data Center at the time of the IPO through at least May 2022. CW-1, CW-2, and CW-3 all stated that Buchinski, as manager for Panther Creek, oversaw Stronghold's team of Data Center Technicians in deploying the Company's miners into mining operations, and that Buchinski reported to Talcott. According to CW-1 and CW-2, Buchinski communicated directly with MinerVa regarding the procurement of MinerVa's miners, and Buchinski had access to a software dashboard to monitor the performance metrics of Stronghold's fleet of miners at Panther Creek.

47. Non-party CW-1 was a Data Center Technician employed by Stronghold, primarily assigned to work at the Company's Data Center at Panther Creek, from early-to mid-October 2021 until CW-1 left Stronghold in May 2022. As a Data Center Technician, CW-1 and CW-1's team were jointly responsible for deploying Bitcoin miners that Stronghold had purchased by putting them into active mining operation. This process required unboxing the miners from their shipping boxes, placing them into modified shipping containers colloquially termed "pods" to house the miners while operating, and hooking up the miners to power and internet sources, following which CW-1 and the team were responsible for monitoring and troubleshooting the miners in operation. CW-1 reported to Buchinski, who in turn reported to Talcott.

48. Non-party CW-2 was a Senior Data Center Technician employed by Stronghold, primarily assigned to work at the Company's Data Center at Panther Creek, from early-to mid-October 2021 until CW-2 left Stronghold in July 2022. As a Senior Data Center Technician on the same team as CW-1, CW-2 was responsible for deploying Bitcoin miners that Stronghold had purchased by putting them into active mining operation This process required unboxing the miners from their shipping boxes, placing the miners into cans to house the miners while operating, and

hooking up the miners to power and internet sources, following which CW-2 and the team were responsible for monitoring and troubleshooting the miners in operation. CW-2 reported to David Visintainer, a fellow Data Center Technician who soon took on a management role within the Data Center Technician team at Panther Creek, who in turn reported to Buchinski, who reported to Talcott.

49. Non-party CW-3 was a Data Center Technician, primarily assigned to work at Stronghold's Data Center at Panther Creek, from October 11, 2021 to May 2022. As a Senior Data Center Technician on the same team as CW-1 and CW-2, CW-3 was responsible for deploying Bitcoin miners that Stronghold had purchased by putting them into active mining operation This process required unboxing the miners from their shipping boxes, placing the miners into cans to house the miners while operating, and hooking up the miners to power and internet sources, following which CW-3 and the team were responsible for monitoring and troubleshooting the miners in operation. CW-3 reported concurrently to several individuals, including Buchinski, Visintainer, and Lewellyn Frantz, a Data Center Technician who rose to a supervisor-management role within the team of Data Center Technicians at Panther Creek. CW-3 confirmed that Visintainer and Frantz ultimately reported to Buchinski.

## IV. ADDITIONAL SUBSTANTIVE ALLEGATIONS

### A. The Rise of Cryptocurrencies and Cryptocurrency Mining

50. A cryptocurrency is a digital or virtual currency, generally not issued by any central governmental authority, that utilizes blockchain technology to record transactions made using the cryptocurrency in a public ledger.[4] In 2009, a person or group of people using the pseudonym

[4] https://www.investopedia.com/terms/c/cryptocurrency.asp

Satoshi Nakamoto released the first ever cryptocurrency—Bitcoin.[5] Satoshi Nakamoto designed the Bitcoin platform to have a limited supply of 21 million Bitcoins.[6] Since 2009, numerous cryptocurrencies have been created but Bitcoin remains the most popular, with a market capitalization of over $387 billion as of September 1, 2022.[7]

51. Bitcoin utilizes blockchain technology to process transactions. A blockchain is a set of connected "blocks" which form an online, publicly-accessible ledger of transactions. Each block contains a set of transactions that have been independently verified by each member of the network.[8] The Bitcoin network verifies and validates transactions via a process called "proof of work", which requires that computers compete to solve a complex cryptographic puzzle by providing a solution known as a "hash".[9] As Stronghold indicated in its Offering Materials, solving this puzzle "essentially requires random guesswork" and therefore computers must "generate millions of guesses", or hashes, "to arrive the correct answer." (Oct. 19, 2021 Form S-1/A at 9; Oct. 21, 2021 Form 424B4 at 9).

52. Once a computer provides the correct hash, transactions within the current block are verified, and the block is thus completed and added to the blockchain.[10] As a reward for verifying transactions and contributing to the blockchain, the operator of the computer with the winning solution is given newly-minted Bitcoin.[11] This verification process is commonly referred to as "Bitcoin mining" because of the speculative nature of working toward Bitcoin rewards. While many computers compete to guess the correct solution for any given block, only one computer can

---

[5] https://money.usnews.com/investing/articles/the-history-of-Bitcoin
[6] https://www.investopedia.com/tech/what-happens-Bitcoin-after-21-million-mined/
[7] https://data.nasdaq.com/data/BCHAIN/MKTCP-Bitcoin-market-capitalization.
[8] https://www.investopedia.com/terms/c/cryptocurrency.asp.
[9] https://www.coinbase.com/learn/crypto-basics/what-is-mining.
[10] *Id.*
[11] https://www.forbes.com/advisor/investing/cryptocurrency/Bitcoin-mining/.

ultimately provide the solution and thereby earn the new Bitcoin reward.[12]

53. Initially, the Bitcoin network rewarded miners with 50 Bitcoin for each newly-minted block on the blockchain.[13] The number of Bitcoin the network rewards for each new block halves every four years, leaving the reward today at just 6.25 Bitcoin per block.[14] Therefore, the number of Bitcoin in circulation is increasing as rewards are paid to mining operators, and the last Bitcoin will theoretically be minted in 2140 as the network reaches the intended cap of 21 million Bitcoin.[15]

54. When Bitcoin was introduced in 2009, it was valued at zero U.S. dollars.[16] As the supply of Bitcoin has steadily risen, it has been outpaced by the demand as investors speculate on the future value of Bitcoin as a cryptocurrency asset. Bitcoin's first big gain occurred in 2013, when it rose from $13 at the start of the year to over $1,100 by December 2013.[17] Bitcoin exploded again in 2017, rising from $1100 in January to nearly $20,000 by December 2017.[18] Bitcoin finally eclipsed the $20,000 mark in late 2020 and, on the back of the surge in momentum behind cryptocurrencies, reached a peak of $67,617 on November 8, 2021.[19] Bitcoin has remained volatile, with the value declining from $60,692 at the close of Stronghold's IPO on October 22, 2021, to $47,466 on March 29, 2022, to $20,127 by September 1, 2022.[20]

55. The meteoric rise in the price of Bitcoin from 2017 through 2021 enticed many

---

[12] https://www.coinbase.com/learn/crypto-basics/what-is-mining.
[13] https://www.investopedia.com/tech/what-happens-Bitcoin-after-21-million-mined/#citation-9.
[14] https://www.investopedia.com/tech/what-happens-Bitcoin-after-21-million-mined/#citation-9
[15] https://www.coinbase.com/learn/crypto-basics/what-is-mining
[16] https://www.investopedia.com/articles/forex/121815/Bitcoins-price-history.asp
[17]https://www.sofi.com/learn/content/Bitcoin-price-history/#:~:text=Bitcoin%20Price%20in%202013%3A%20%2413%2D%20%241%2C100&text=Starting%20at%20%2413%20in%20the,price%20peaked%20out%20at%20%241%2C100
[18] *Id.*
[19] *Id.*
[20] https://finance.yahoo.com/quote/BTC-USD/history/

individuals and entities, including Stronghold, to enter the Bitcoin mining market. However, according to JP Morgan, the average cost of operations to mine one Bitcoin has recently ranged from $13,000 to $24,000 for a single Bitcoin.[21] The exorbitant cost of mining Bitcoin comes from running high-end computers constantly in an attempt to solve the nodes on a pending block to be rewarded with Bitcoin. Recently, United States Senators have begun looking into crypto-mining companies, including Stronghold, asking them to detail their energy consumption over concerns that mining cryptocurrency is impacting climate change.[22]

56. The more computing power a mining operator has, the more likely it is to be first to provide the correct hash and win the Bitcoin reward.[23] As a result, the latest Bitcoin mining machines use application-specific integrated circuits ("ASICs") specifically built and programmed for Bitcoin mining.[24] These ASIC machines are referred to in the cryptocurrency mining industry as "miners".[25] The "hash rate", or rate at which a miner can generate hashes, is the primary measurement of the amount of computing power a given mining machine has.[26] Given that Bitcoin mining involves many miners competing to provide the correct hash, Bitcoin mining is usually a large-scale commercial operation done by companies such as Stronghold using data centers containing multiple miners.[27] The intense competition between many miners competing to provide the correct hash has also led some mining operators to pool their mining machines (creating a "mining pool"), wherein the operators combine their hash rate to improve their odds of solving a block on the blockchain and thereby earn the Bitcoin rewards, which are then shared amongst the

---

[21] https://wp.decrypt.co/wp-content/uploads/2022/07/JPM_Flows___Liquidity_St_2022-07-13.pdf
[22] https://www.cnbc.com/2022/07/18/democrats-crypto-miners-should-report-more-energy-usage-info.html.
[23] https://www.forbes.com/advisor/investing/cryptocurrency/Bitcoin-mining/.
[24] *Id.*
[25] https://www.investopedia.com/tech/how-does-Bitcoin-mining-work/.
[26] https://www.forbes.com/advisor/investing/cryptocurrency/Bitcoin-mining/.
[27] *Id.*

pool operators.[28]

57. Because guessing millions of hashes requires significant computer processing power, the primary expense for operating miners is the cost of electricity to keep the miners running and to cool the machines, similar to the cost of owning a large data center.[29] As a result, many mining operations are often located near energy sources like power plants, dams, oil and gas wells, solar farms, or geothermal sources.[30]

58. In order to mine Bitcoin, miners must have a power source and internet connection, and, like most computers, the miner must be protected from the elements. As companies like Stronghold recognize, providing enough power for miners to operate, at as low of a cost of electricity as possible, is key to profitability of Bitcoin mining operations.

**B. Stronghold Company Overview: Stronghold Enters the Bitcoin Mining Industry with Power to be Supplied By The Company's Own Power Generation Facilities**

59. Stronghold was incorporated in Delaware on March 19, 2021. The Company describes itself as a "vertically integrated crypto asset mining company currently focused on mining Bitcoin". (Oct. 19, 2021 Form S-1/A at 1; Oct. 21, 2021 Form 424B4 at 1.)

60. As a "vertically integrated crypto asset mining company", Stronghold owns its own sources of power to power its fleet of Bitcoin miners (*i.e.*, Scrubgrass and Panther Creek). At the time of the IPO, Stronghold stated that it "wholly-own[s] and operate[s] a low-cost, environmentally-beneficial coal refuse power generation facility that [the Company had] upgraded in Scrubgrass Township, Pennsylvania (the Scrubgrass Plant)", with plans to later acquire a second power generation facility, the Panther Creek Plant, as well as an unnamed Third Plant. (*Id.*).

[28] *Id.*
[29] https://www.coinbase.com/learn/crypto-basics/what-is-mining.
[30] https://www.forbes.com/advisor/investing/cryptocurrency/Bitcoin-mining/.

Stronghold houses its miners on the same premises as its power generation facilities "to maximize efficiency and to minimize cost", "driving among the lowest costs of crypto asset production in [the] industry." (*Id.* at 2).

61. As a result of owning its own power generation facilities, Stronghold stated in its Offering Materials that the Company's "net cost of power … of approximately $18 per megawatt-hour ("MWh"), after accounting for [Renewable Energy Credits] and waste coal tax credits, is amongst the lowest compared to … publicly traded peer companies." *(Id.)* The Company added that "[t]his $18 per MWh corresponds to less than $3,000 per Bitcoin equivalent", indicating that Stronghold could mine one Bitcoin at a cost of electricity less than $3,000 at a time when Bitcoin was valued at $60,692 per Bitcoin. *(Id.)*.

### C. Prior to the IPO, Stronghold Entered into Bitcoin Miner Purchase Agreements to Build its Miner Fleet

62. At the time of the IPO, Stronghold possessed a fleet of "approximately 3,000 miners with hash rate capacity of approximately 185 PH/s" composed of miners manufactured by Bitmain Technologies Ltd. ("Bitmain"), Canaan Creative, Inc. ("Canaan"), and MicroBT Electronics Technology Co., Ltd. ("MicroBT"). (Oct. 19, 2021 Form S-1/A at 8; Oct. 21, 2021 Form 424B4 at 8.) In the Offering Materials, Stronghold touted its plan to build up its fleet of miners:

> through the execution of definitive agreements since April 1, 2021 with three suppliers to purchase approximately 26,150 additional miners with a total hash capacity equal to over 2,500 PH/s. Approximately 72% of these miners are scheduled to be delivered in 2021, with the next batch scheduled for delivery in October 2021, 21% are scheduled to be delivered in the first quarter of 2022, and the remaining 6% are scheduled to be delivered during the remainder of 2022.

63. Stronghold's largest purchase agreement, by far, was with miner manufacturer MinerVa. MinerVa was to provide 15,000 of the aggregate 26,150 total additional miners Stronghold had entered into agreements to purchase by the end of 2021. As described in the

Offering Materials:

> [o]n April 2, 2021, the Company entered into a purchase agreement (the "Minerva Purchase Agreement") with Minerva Semiconductor Corp ("Minerva") for the acquisition of 15,000 of their MV7 ASIC SHA256 model cryptocurrency miner equipment (miners) with a total terahash to be delivered equal to 1.5 million terahash (total terahash).

(Oct. 19, 2021 Form S-1/A at F-18; Oct. 21, 2021 Form 424B4 at F-18).

64. According to the Offering Materials, Stronghold was to pay the $73 million purchase price owed to MinerVa in installments, and had already prepaid 80% of the purchase price, with the final 20% payment being due "one month before the shipping date":

> The price per miner is $4,892.50 for an aggregate purchase price of $73,387,500 to be paid in installments. The first installment equal to 60% of the purchase price, or $44,032,500, was paid on April 2, 2021, and an additional payment of 20% of the purchase price, or $14,677,500, was paid June 2, 2021. The remaining 20% is still owed and is scheduled to be made one month before the shipping date. The seller anticipates shipping no less than 15,000 miners by January 2022. Anticipated delivery quantities and timeframe will be no less than 2,500 miners by October 31, 2021, no less than 5,000 miners by November 30, 2021, no less than 5,000 by December 31, 2021, and the remaining 2,500 by January 2022. The aggregate purchase price does not include shipping costs, which are the responsibility of the Company and shall be determined at which time the miners are ready for shipment.

(Oct. 19, 2021 Form S-1/A at F-18; Oct. 21, 2021 Form 424B4 at F-18.)

## D. <u>Stronghold Highlights in the Offering Materials Total Hash Rates that Were Unachievable Due to Delays and Non-Shipment of MinerVa Miners</u>

65. As a Bitcoin mining company, Stronghold sets and reports goals for key industry metrics. The total hash rate capacity, which represents the combined computing power of the Bitcoin mining machines of a fleet of miners, is the most important metric used in the bitcoin mining industry because it allows companies to project the profitability of bitcoin mining operations. As total hash rate capacity rises, so too does a mining fleet's ability to mine Bitcoin and thus generate a profit from mining activities. CW-1 and CW-2 each confirmed that hash rate

is the most important metric used to measure miner performance.

66. At the time of the IPO, Stronghold stated that it operated "approximately 3,000 crypto asset mining computers (known as 'miners') with hash rate capacity of approximately 185 petahash per second ('PH/s')".[31] (Oct. 19, 2021 Form S-1/A at 1; Oct. 21, 2021, Form 424B4 at 1.) Defendants stated in the IPO Offering Materials that the Company's agreements to purchase 26,150 additional miners would bring its "total hash rate capacity to over 2,100 PH/s by December 2021 and to over 8,000 PH/s by December 2022," a 1,000% growth rate in just two months following the IPO and a growth rate of over 4,000% in just one year, respectively. (*Id.*). Approximately 71%, or 1,500 PH/s, of the 2,100 PH/s hash rate capacity goal for December 2021 was to come exclusively from the MinerVa miners.

67. In relation to miners from MinerVa, Stronghold stated in its Offering Materials that it had "entered into a purchase agreement with a seller for the acquisition of 15,000 of their MV7 ASIC SHA256 model cryptocurrency miner equipment (miners) with a total terahash to be delivered equal to 1.5 million terahash (total terahash)." (Oct. 19, 2021 Form S-1/A at F-18; Oct. 21, 2021 Form 424B4 at 105.) By representing that the 15,000 model MV7 miners from MinerVa would output a total of 1.5 million terahash per second (TH/s), the Company asserted that each of the 15,000 MinerVa miners had an output of 100 TH/s. With MinerVa MV7 miners constituting a majority of Stronghold's new miner purchases at the time of the IPO, the combined hash rate of the MV7s was critical for the Company to reach its stated expected total combined hash rate for its entire mining operation.

---

[31] Given that modern Bitcoin mining machines can each generate trillions of hashes per second, the hash rate of an individual miner is often represented in TeraHashes per second ("TH/s", with one TeraHash equivalent to 1 trillion hashes). The combined hash rate of a fleet of miners is often represented in PetaHashes per second ("PH/s", equivalent to 1,000 TH or 1 quadrillion hashes) or ExaHashes per second ("EH/s", equivalent to 1,000 PH or 1 quintillion hashes).

## V. UNDISCLOSED MATERIALLY ADVERSE CONDITIONS AND TRENDS THAT EXISTED PRIOR TO AND AT THE TIME OF THE IPO

### A. MinerVa, Stronghold's Largest Supplier of Bitcoin Miners, Is Unable To Ship Miners to Stronghold

68. In September 2021 through at least October 2021, power cuts and outages resulted in numerous slowed or closed factories across China due to a surge in demand for Chinese-manufactured products as the world economy reopened post-pandemic. These power outages and cuts also led to increases in the price of coal used to generate electricity. However, because Chinese regulators did not let Chinese utilities raise rates enough to cover the rising cost of coal, utilities either shut down or were slow to operate their power plants for sufficient hours to meet demand. (*See* Keith Bradsher, *Power Outages Hit China, Threatening the Economy and Christmas* (Sept. 27, 2021, updated Oct. 13, 2021, https://www.nytimes.com/2021/09/27/ business/economy/china-electricity.html) ("High demand and soaring energy prices" have forced "factories to shut down;" "[p]ower cuts and even blackouts have slowed or closed factories across China in recent days")).

69. Unbeknownst to the investing public, the facility where MinerVa assembled the MinerVa MV7 miners to be sent to Stronghold was the subject of the power curtailments in the period leading up to the IPO. As Stronghold would later acknowledge, prior to and at the time of the IPO, the power outages prevented the assembly and shipping of MinerVa MV7 miners to Stronghold, rendering it impossible to meet the delivery schedule represented in the Offering Materials.

70. As a result of MinerVa's manufacturing facilities in China being shut down or inoperable, and MinerVa's inability to source adequate component parts, Minerva could not ship miners to Stronghold and, at the time of the IPO, was already significantly behind the schedule set forth in the Offering Materials. Indeed, contrary to Defendants' representation in the Offering

Materials that MinerVa was to deliver "***no less than***" ***7,500*** miners by October 31, 2021, at the time of the IPO, MinerVa had not shipped ***any*** miners, making it impossible for MinerVA to deliver the miners by the October 31 deadline. By the end of November 2021, MinerVa had only delivered 240 miners and, as discussed below, according to confidential witnesses approximately one-third of MinerVa's miners were defective.

71. As part of the team of Data Center Technicians at Stronghold, CW-1, CW-2, and CW-3 were intimately involved in unboxing miners that Stronghold had purchased, including those from MinerVa, and putting them into operation within pods with internet and power connections. CW-3 recalled that, at the start of CW-3's employment on October 11, 2021 and just nine days before the IPO, there were no MinerVa miners on site at Panther Creek. CW-2, a Senior Data Center Technician on the same team, similarly recalled that miner deliveries and deployments were behind schedule at the Panther Creek Data Center, and Stronghold did not have the miners it planned to have as of the IPO. Thus, Stronghold's stated total hash rate for year-end 2021 was misleading and lacked any reasonable basis.

72. MinerVa's shipment delays were knowable at the time of the IPO because Defendants followed the progress of the MinerVa MV7 production and assembly extremely closely given how critical it was to Stronghold's business—indeed, 15,000 of the 26,150 miners Stronghold had under purchase agreement at the time of the IPO, or approximately 53%, were to be supplied by MinerVA. As Defendant Beard acknowledged during a November 30, 2021 conference call, he and Stronghold's executive leadership "talk to MinerVa every day."

73. CW-1 confirmed that the Individual Defendants had regular video conference calls on Zoom and/or Microsoft Teams, and sometimes had audio-only phone calls, with MinerVa to obtain updates about the status of production and shipments. CW-1 recalled that his own

participation in these calls began around the end of 2021, but was aware that regular calls had been occurring for some time prior thereto, because the discussions when he joined those calls referenced prior regular calls between Stronghold and MinerVa. CW-2 corroborated that these calls occurred, having recalled discussions around the Panther Creek workplace based on the content of these calls. CW-1 stated that Stronghold management participated in these calls, including Defendant Beard, Talcott, Buchinski, and later certain data technicians such as David Visintainer, Lewellyn Frantz, CW-1, and representatives from the Scrubgrass facility were also on the calls. The MinerVa representatives on those calls included co-CEO Marc Ma (a/k/a Chong Ma), and CW-1 recalled that MinerVa's other co-CEO was also on those calls, along with other MinerVa representatives. According to CW-1, topics on these calls included updates on MinerVa's shipping delays, problems encountered therewith, MinerVa's inability to produce miners at all, and product quality problems with the miners it was producing. Notably, CW-2 recalled hearing Defendant Spence "cussing MinerVa out" for the delays, and CW-1 also recalled "shouting" matches between MinerVa and Stronghold leadership relating to the MinerVa miner delays.

74. Moreover, CW-1 and CW-3 confirmed that prior to and throughout the relevant period alleged herein, Stronghold closely monitored the number of miners received and their performance, and tracked receipts of miners from suppliers using Excel and/or Google Sheets spreadsheets shared via Stronghold's Microsoft Teams application. CW-1 and CW-3 additionally recounted that Stronghold monitored the performance of the miners once they were plugged in to power and internet via a reporting dashboard, named Foundry, showing the total hash rate for Stronghold's fleet of miners and the individual hash rate of each miner on each day of operation. Senior management, including Talcott, Buchinski, Jeff Campbell (Stronghold's Lead Engineer), and the Individual Defendants had access to the Foundry reporting dashboard.

75. Further, according to CW-1, Defendant Larroudé visited the Panther Creek facility at least once per month from October to December 2021 and more frequently in 2022. CW-3 corroborated having seen Larroudé on site at Panther Creek giving tours to investors, and added that Larroudé was also seen visiting Scrubgrass. CW-1 also saw Defendant Beard visit Panther Creek during the October to December 2021 timeframe, and that during these visits, Beard would conduct tours, sometimes accompanied by Larroudé, and take pictures and videos of the miners that were in operation. Moreover, as CW-1 recalled, Beard would often be joined on his tours by Buchinski. Thus, Larroude and Beard would have seen the number of miners received and/or installed at Panther Creek, spoken to Buchinski about the miners, and paid particular attention to the miners given their importance in generating Bitcoin mining revenue for Stronghold at this critical phase of ramping up mining operations. CW-1 also recalled that Talcott visited the Panther Creek facility during mid-to-late October 2021, and that Talcott had acknowledged during that visit that although MinerVa had sold Stronghold a large quantity of miners, in fact MinerVa did not have that many miners at all, and could not provide the miners on the timeframe represented or needed by Stronghold.

76. Defendants also later acknowledged that they were "aware of the other facilities" that MinerVa had been "trying to move their assembly operations to" "outside of mainland China" due to production constraints, but without success. On a November 30, 2021 analyst conference call, Defendant Beard acknowledged that "they [MinerVa] still need to figure out their assembly issues."

77. Further compounding the problem, at the time of the IPO, MinerVa had not yet even sourced adequate component parts for any significant number of miners to be able to achieve the delivery schedule Stronghold touted to investors in the Offering Materials. Indeed, on October

21, 2021, the very date of the Prospectus filing, as Stronghold told investors of the delivery dates for the 15,000 miners, beginning with 2,500 to be delivered within just ten days by October 31, China-based company AGM Group Holdings Inc. ("AGM") announced that it "agreed to supply MinerVa Semiconductor Corp. ('MinerVa') with 25,000 units of its 100 TH/S MinerVa MV7 ASIC to build the MinerVa family of crypto miners," indicating MinerVa did not have the necessary parts to even construct the miners Stronghold had ordered. Subsequently, on November 4, 2021, industry press reported that the ASIC units were ordered from AGM by MinerVa, "which is then bound to ship" the units as part of "its latest generation of miner equipment to … Stronghold Digital." AGM, meanwhile, had only been in the ASIC chip-making business since September 2021.[32] Thus, while Stronghold's Offering Materials touted the delivery schedule indicating substantial amounts of miners that would be delivered by the end of October 2021, in fact the situation was disastrous and there was no feasible way the MinerVa miner deliveries would be achieved as the Offering Materials represented.

78. Moreover, the fact that the remaining 20% payment for the MinerVa miners had not yet been made by Stronghold as of the October 21, 2021 Prospectus filing, despite the fact that that payment was due "one month before the shipping date," demonstrates it was knowable by Defendants at the time of IPO that MinerVa would not meet the schedule set forth in the Offering Materials, which called for deliveries to *arrive* by October 31, 2021.[33]

---

[32] AGM was quickly involved in a patent lawsuit in China by Bitcoin mining hardware manufacturer Canaan, against HighSharp, AGM's chip design partner, alleging that the chips and hardware made by the chip designer were based on designs previously patented by Canaan. *See* https://www.theblock.co/linked/123299/canaan-agm-Bitcoin-miner-patent-lawsuit.

[33] Oct. 19, 2021 Form S-1/A Registration Statement at F-18; Oct. 21, 2021 Form 424B4 at F-18. Stronghold's Offering Materials did not indicate whether the remaining 20% payment was due after the first shipment of miners, the last shipment of miners, or some other shipment. Thus there was no indication from the four corners of the Offering Materials when that payment was actually due. On November 30, 2021, Stronghold filed its Form 10-Q for the Third Quarter ended September 30, 2021, wherein it acknowledged in a note on "Subsequent Events" that it made

79. The financing for the remaining 20% payment was provided to Stronghold by WhiteHawk pursuant to a financing agreement and promissory note entered into on June 30, 2021. The agreement had a term of 24 months (the "WhiteHawk Financing Agreement") and the loan was collateralized by the MinerVa miners. As part of the WhiteHawk Financing Agreement, Stronghold also entered into a Stock Purchase Warrant agreement with WhiteHawk whereby the Company issued 63,092 warrants to WhiteHawk, enabling the latter to purchase shares of Class A common stock of Stronghold. Given that the WhiteHawk Financing Agreement provided that Stronghold would receive the subject MinerVa MV7 miners consistent with the schedule set forth in the Offering Materials, Stronghold closely followed the deliveries and delays of the MV7 miners for the additional reason that such deliveries were important to its financing agreement with WhiteHawk. MinerVa's failures to adhere to that delivery schedule forced Stronghold to have to amend the WhiteHawk Financing Agreement on December 31, 2021, in exchange for, *inter alia*, paying WhiteHawk an amendment fee of $250,000 to extend the schedule through the end of April 2022.

80. In addition, according to the Offering Materials, shipping costs under the Company's purchase agreement with MinerVa were "the responsibility of the Company and shall be determined at which time the miners are ready for shipment." (Oct. 19, 2021 Form S-1/A at 104; Oct. 21, 2021 Form 424B4 at 105.) Given that it was Stronghold's responsibility to pay for shipment when the miners were ready, Stronghold should have been aware at the time of the IPO that it had not yet paid for such shipments, that therefore the miners had not shipped, and that they could not possibly be delivered by October 31, 2021.

---

the final payment to MinerVa on October 26, 2021, indicating that the payment was due ahead of the *initial* shipment of miners, which, as alleged herein, was a shipment that arrived between November 8 and 30, 2021.

81. Moreover, the operational performance of the MinerVa MV7 miners that Stronghold did eventually receive was extremely poor. As Stronghold later admitted, "the performance of MinerVa's miners has been below expectations, with hash rates ranging from 50% to 70% of the expected capacity." Moreover, according to CW-1, CW-2, and CW-3, approximately one-third of the miners Stronghold did eventually receive from MinerVa were inoperable or "dead on arrival." As these three CWs elaborated, the MinerVa miners suffered various defects and issues ranging from failures with their power distribution units ("PDUs") which caused them to not turn on or short circuit, to issues with the miners' cooling fans which caused them to overheat, to issues with the control boards and the MinerVa firmware itself which both rendered the miners non-operable. As a result, the CWs and the rest of the Data Center Technicians had to "Frankenstein" or "cannibalize" broken and defective MinerVa miners for parts, in order to swap those parts into other MinerVa miners and thereby make them operational.

### B. Stronghold Misrepresented Both the Hash Rate Capacity of the MinerVa MV7 Miners it Purchased and the Company's Ability to Reach 2,100 PH/s By December 2021

82. In the Offering Materials, Stronghold stated that it had purchased from MinerVa "15,000 of their MV7 ASIC SHA256 model cryptocurrency miner equipment (miners) with a total terahash to be delivered equal to 1.5 million terahash (total terahash)", which is equivalent to 1,500 PH/s. (Oct. 19, 2021 Form S-1/A at 104; Oct. 21, 2021 Form 424B4 at 105.) This amounts to a hash rate of 100 TH/s for each of the MinerVA model MV7 miners. Stronghold also forecasted that "[w]ith part of the proceeds of [the initial public] offering, we intend to procure approximately 55,800 additional miners, which we anticipate **will bring our total hash rate capacity to over 2,100 PH/s by December 2021** and to over 8,000 PH/s by December 2022." (Oct. 19, 2021 Form S-1/A at 1; Oct. 21, 2021 Form 434B4 at 1 (emphasis added).)

83. Unbeknownst to investors, however, Stronghold misrepresented the hash rate capacity of the individual MinerVA MV7 miners, and Stronghold additionally misrepresented its ability to reach a total hash rate of 2,100 PH/s by December 2021.

84. Stronghold stated to investors in its Offering Materials that each of the MinerVa MV7 miners would deliver an individual hash rate of 100 TH/s. However, the 100 TH/s figure touted was, in fact, the *maximum* possible output rate for the model MV7, which could not be achieved in real-world conditions. Rather, the hash rate Stronghold had expected internally was only 90% of the 100 TH/s figure the Company had announced in its Offering Materials, or 90 TH/s of the announced 100 TH/s. As Defendants later admitted, Stronghold was aware that the MinerVa miners could not consistently achieve 100 TH/s in real-world conditions. As Stronghold confirmed in March 2022, "the performance of MinerVa's miners has been below expectations, with hash rates ranging from 50% to 70% of the expected capacity, **compared to 90%+ for a standard performing machine**". (Mar. 29, 2022 Press Release at 3 (emphasis added).)

85. Bitcoin mining machines are advertised by their manufacturers with a standard set of key specifications, such as power consumption needs, weight, and dimensions. Amongst these specifications is the advertised maximum hash rate, which is the peak hash rate, or computing power, of a given mining machine operating under perfect conditions. The hash rate of a given mining machine is critical to prospective buyers of that machine because it allows the buyer to estimate the profitability of operating the machine for mining operations. From there, operators can combine the hash rate of their individual mining machines to determine the total hash rate (and profitability) of their fleet of miners. Similarly, investors in Bitcoin mining companies can use the advertised hash rate to evaluate a company's mining profitability.

86. Given that the hash rate advertised by miner manufacturers is the maximum

possible performance for the machines, rather than an average hash rate to be expected by operators, mining operators need to take into account that miners will not consistently nor reliably run at the maximum speeds. Thus, even if Stronghold *had* received all the MinerVa miners it had contracted to purchase and all had been free of defects, the miners were incapable of consistently operating at the 100 TH/s figure hash rate represented by Defendants in the Offering Materials.

87. Additionally, Stronghold's statements as to the energy efficiency and hash rate for the MinerVa MV7 miners it had purchased further demonstrate that Stronghold misrepresented the hash rate of the MV7 miners. In its Offering Materials, the Company stated that when its Scrubgrass Plant reached full capacity, it would do so using the "latest-generation miners." Defendants clarified that they "consider latest-generation miners to be miners with an efficiency of 37 joules per terahash" or J/TH. There are three sub-models of the MinerVa MV7 miner:[34] the MV7L miner, with a hash rate of 95–105 TH/s and an efficiency of 31 J/TH; the MV7M, with a hash rate of 85–95 TH/s and an efficiency of 35 J/TH; and the MV7S, with a hash rate of 75–85 TH/s and an efficiency of 39 J/TH.[35] When Stronghold stated that it planned to stock its mining fleet with miners that would consume 37 joules per terahash, it implied that the Company had purchased an equal split of MV7M miners, with efficiency of 35 J/TH, and MV7S miners, with

---

[34] At the time of the Stronghold IPO, MinerVa sold the MV7 exclusively to private commercial clients, a divergence from the business model of competitors like Bitmain and MicroBT, which sold and continue to sell their mining machines to individuals and businesses alike. Therefore, publicly-available product documentation, advertising, and industry analysis for the MinerVa MV7 was unavailable to investors at the time of Stronghold's IPO. MinerVa has however updated its website since the time of the Stronghold IPO to provide product specifications for multiple sub-models of the MV7. Amongst these specs, MinerVa states that the hash rate of its various MV7 miner sub-models are, in fact, ranges of hash rate, rather than single guaranteed hash rates: "95-105 TH/s" for the MV7L, "85-95 TH/s" for the MV7M, and "75-85 TH/s" for the MV7S. (MinerVa, (archived version dated Jan. 29, 2022), https://web.archive.org/web/20220129052658/https://miner-va.com/ (cached version of MinerVa homepage via Archive.org)).

35 A higher quantity of joules per terahash, or J/TH, indicates a lower-efficiency mining machine. The MV7S sub-model, for example, has the highest electricity needs of the three sub-models, requiring 39 J/TH. The MV7M sub-model is more energy efficient, requiring only 35 J/TH, followed by the MV7L sub-model, which is the most efficient of the three sub-models requiring only 31 J/TH.

efficiency of 39 J/TH, for an average of 37 J/TH. However, this combination of miners necessary to deliver the efficiency level Stronghold stated in its Offering Materials would only yield an average hash rate of 85 TH/s. Therefore, based on the Offering Materials' own figures for miner efficiency, Minerva did not purchase miners with a hash rate of 100 TH/s.

88. CW-3 and CW-1 confirmed that, when the each of them had been tasked with unpacking MinerVa miners from their shipping packaging, it was immediately evident that MinerVa had supplied multiple models of the MV7 miners to Stronghold because the miners, themselves, were labeled with different hash rates. CW-3, in particular, recalled that at least some of the MinerVa miners Stronghold received were labeled with hash rates below 90 TH/s, corroborating that Stronghold had in fact purchased at least some lower-efficiency MinerVa model MV7Ss or MV7Ms.

89. As a result of the foregoing, Stronghold could not achieve the "total hash rate capacity" of "over 2,100 PH/s by December 2021" as it had misrepresented in the Offering Materials. With such a large portion (roughly 71%) of the year-end hash rate goal dependent on MinerVa miners, any disparity in hash rate below 100 PH/s for each of the MV7 miners would make the total combined hash rate goal of 2,100 PH/s unachievable.

90. Accordingly, Stronghold's statement that the 15,000 MV7 miners would produce a total of 1.5 million TH/s, equivalent to 1,500 PH/s, was false.

91. CW-1, CW-2, and CW-3 each stated that, at all times relevant hereto, Stronghold used software to track hash rate at the individual mining machine level, at the data center level, and at the overall fleet level. CW-1 and CW-3 recounted that, throughout these witnesses' tenures, each MinerVa MV7 miner arrived at Stronghold preloaded with MinerVa firmware and software, which CW-1 recalled was named "MinerVa Tools." Once a miner was hooked up to internet and

power and put into operation, a technician could use a standard web browser to look up the IP address of the individual machine to view the Minerva Tools dashboard for that particular machine, *i.e.*, a dashboard detailing the hash rate and power consumption of the individual miner.

92. In addition to tracking miner hash rates at an individual machine level, CW-1, CW-2, and CW-3 confirmed that, at all times relevant hereto, Stronghold tracked the hash rate and Bitcoin profit of the Company's entire fleet of miners using a dashboard web application called Foundry. The Foundry dashboard allowed Stronghold to track their miners' hash rate for both the Scrubgrass and Panther Creek Data Centers, as well as provide total combined hash rate for the two data centers (*i.e.*, Stronghold's entire fleet). CW-2 confirmed that Buchinski, Visintainer, and Frantz each had access to the Foundry dashboard and the hash rate data contained therein. CW-1 corroborated that Stronghold leadership, including Talcott and Defendant Beard, also had access to the Foundry dashboard.

93. CW-1 recalled that Beard used the Foundry dashboard to exhibit the hash rate to visitors when he brought them on tours of Panther Creek. As CW-1 recounted, monitoring the Foundry dashboard was critical not only to track the total hash rate Stronghold was putting out in its mining operations, but also to track the Bitcoin mined, *i.e.*, the Company's mining revenue.

94. CW-2 confirmed that during this witness' tenure as a Data Center Technician primarily assigned to work at the Panther Creek Data Center, Stronghold's fleet of miners were not operating at 100%. Indeed, CW-2 recalled that CW-2 and the rest of the Panther Creek team of technicians were deployed to the Scrubgrass Data Center during the last week of December 2021 where they scrambled to help the Scrubgrass facility reach "100% efficiency" and to get all of the miners stored at Scrubgrass up-and-running in pods in order to meet the expected hash rates that Stronghold had communicated to the investing public.

95. CW-1 and CW-2 each corroborated that the purpose of the Technician team's trip to the Scrubgrass facility in December 2021 was to "boost numbers" *i.e.*, to increase the number of miners in operation, and thereby increase the total hash rate output by those miners, because many miners at Scrubgrass at the onset of the trip were not operating at full capacity or were not installed at all. As both CW-1 and CW-2 stated, Stronghold management had informed them that more miners needed to be put into operation, and the total hash rate at Scrubgrass needed to be increased.

96. Stronghold's workers on the ground, who personally dealt with getting miners operational, confirmed that the hash rate statements in the Offering Materials were unachievable. CW-2 corroborated that the hash rate figures stated at the time of the IPO were "wrong", and that Stronghold had imposed "unrealistic expectations" that both the Panther Creek and Scrubgrass facilities would be operating at "100% efficiency" by the end of calendar year 2021. As CW-2 stated, Stronghold management repeatedly pared back total expected hash rates for both the Scrubgrass and Panther Creek facilities because there would "inevitably be setbacks", relating to but not limited to issues with the MinerVa miner delays.

## VI. STRONGHOLD GOES PUBLIC BY MEANS OF THE MATERIALLY FALSE AND MISLEADING OFFERING MATERIALS[36]

97. On July 27, 2021, the Company filed a Registration Statement on Form S-1, which would subsequently be assigned Registration No. 333-258188 by the SEC. On October 19, 2021, the Company filed its final amendment to the Registration Statement under Registration No. 333-258188 with the SEC on Form S-1/A. The Registration Statement was signed by each of the Individual Defendants, either directly or through the grant of a power of attorney, and was declared

[36] The statements Plaintiffs allege are false and misleading are underlined and bolded. The rest of the statements quoted in this section are provided for context.

effective by the SEC on the same day, October 19, 2021. On October 21, 2021, the Company filed its corresponding Prospectus for Registration No. 333-258188 on Form 424B4 with the SEC.

98. The Prospectus advised investors that "[n]either we nor the underwriters have authorized anyone to provide you with information different from that contained in this prospectus and any free writing prospectus we have prepared. We take no responsibility for, and can provide no assurance as to the reliability of, any other information that others may give you."

99. Shares of the Company's Class A common stock began trading on the NASDAQ Global Market on October 20, 2021, under the ticker symbol "SDIG". In the IPO, the Company sold 7,690,400 shares of Class A common stock at a price of $19.00 per share, netting proceeds of approximately $132.5 million from the Offering.

100. The Defendants were negligent in their due diligence and drafting of the Offering Materials and, as a result, they contained false statements of material facts and/or omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing their preparation.

101. Further, under applicable SEC rules and regulations, the Offering Materials were required to disclose known trends, events or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations, but did not.

### A. Disclosure Obligations Under the Securities Act

102. "The Securities Act of 1933 . . . was designed to provide investors with full disclosure of material information concerning public offerings of securities in commerce, to protect investors against fraud, and, through the imposition of specified civil liabilities, to promote ethical standards of honesty and fair dealing." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976); *see also Randall v. Loftsgaarden*, 478 U.S. 647, 659 (1986) (The Securities Act aims "to

place adequate and true information before the investor"); *Pinter v. Dahl*, 486 U.S. 622, 638 (1988) ("The primary purpose of the Securities Act is to protect investors by requiring publication of material information thought necessary to allow them to make informed investment decisions concerning public offerings of securities in interstate commerce.").

103. Section 11 prohibits materially misleading statements or omissions in registration statements filed with the SEC. *See* 15 U.S.C. § 77k. Accordingly, Section 11 gives rise to liability if "any part of [a company's] registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Section 11 provides for a cause of action by the purchaser of a registered security against certain statutorily enumerated parties, including: "(1) every person who signed the registration statement; (2) every person who was a director . . . at the time of the filing of . . . the registration statement with respect to which his liability is asserted; (3) every person who, with his consent, is named in the registration statement as being or about to become a director [;]" (4) "any person . . . who has with his consent been named as having prepared or certified any part of the registration statement[;]" and (5) "every underwriter with respect to such security." 15 U.S.C. § 77k(a)(1)-(5).

104. In addition to the disclosure obligations imposed on issuers by Section 11, Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii), required Defendants to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations." Under these requirements, even a one-time event, if "reasonably expect[ed]" to have a material impact of results, must be disclosed. Examples of such required disclosures include: "[a] reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance

coverage; or the likely non-renewal of a material contract." *S.E.C. Release No. 6835*, 1989 WL 1092885, at *4 (May 18, 1989).

105. The SEC has clarified that there are:

> "two assessments management must make where a trend, demand, [commitment], event or uncertainty is known: 1. Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required. 2. If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur".

*In Re Comm'n Guidance Regarding Md&a of Fin. Condition & Results of Operation*, SEC Release No. 8350 n.37 (Dec. 19, 2003).

106. The failure of the Offering Materials to disclose the ongoing trend and uncertainty that Stronghold's largest supplier of miners could not deliver them on anywhere near the timeframe stated in the Offering Materials, if at all, violated 17 C.F.R. § 229.303(b)(2)(ii), because these undisclosed facts would (and did) have an unfavorable impact on the Company's sales, revenues, and income for continuing operations, as described further below. Defendants were negligent for not disclosing these trends uncertainties and their impact on Stronghold's business.

107. Further, Item 105 of Regulation S-K, as promulgated by the SEC, 17 C.F.R. § 229.105, imposes an affirmative duty on issuers to provide "a discussion of the material factors that make an investment in the registrant or offering speculative or risky." "This discussion must ... adequately describe[] the risk." (17 C.F.R. § 229.105(a)). Item 105, which contains language formerly housed under Item 503, is intended "to provide investors with a clear and concise summary of the material risks to an investment in the issuer's securities." *Sec. Offering Reform,*

S.E.C. Release No. 8501, 2004 WL 2610458, at *86 (Nov. 3, 2004). The SEC instructs that "[t]he presentation of risks that could apply generically to any registrant or any offering is discouraged", instead providing that registrants should "explain how each risk affects the registrant or the securities being offered... in plain English". (17 C.F.R. § 229.105(a) and (b)). Generic or boilerplate discussions of risk factors do not adequately inform investors how the risks might affect their investment. *See Statement of the Comm'n Regarding Disclosure of Year 2000 Issues and Consequences by Pub. Cos., Inv. Advisers, Inv. Cos., & Mun. Sec. Issuers,* 1998 WL 425894, at *14 (July 29, 1998).

108. Defendants' risk disclosures were wholly insufficient, as they did not disclose that, by the time of the IPO, Stronghold's largest supplier of miners, MinerVa, was so crippled by problems in its assembly facilities and its inability to source components for the miners, that it could not assemble or deliver the miners touted in the Offering Materials.

109. As detailed herein, Defendants wholly failed to meet its disclosure obligations with respect to the IPO.

**B. <u>Stronghold Falsely Stated that MinerVa Was Delivering Bitcoin Miners According to the Timeline and Quantities Stated in the Offering Materials</u>**

110. With investors focused on Stronghold's ability to generate revenues from its Bitcoin mining activities as soon as possible, Stronghold highlighted in its Offering Materials that the Company had entered into a purchase agreement with MinerVa for 15,000 "latest-generation" model MV7 Bitcoin miners slated for monthly deliveries to be completed by the end of 2021, so as to generate mining revenues quickly for Stronghold. (Oct. 21, 2021 Form 424B4 at 5.) The delivery schedule was set forth in the Offering Materials, with the first delivery represented to include "no less than 2,500 miners by October 31, 2021" just ten days after the IPO. The MinerVa miners accounted for more than half of the total miners Stronghold then had on order (and five

times the total miners Stronghold then had in operation).

111. Specifically, Offering Materials detailed the "agreement . . . to purchase 15,000 miners" with MinerVa, as follows:

> On April 2, 2021, the Company entered into a purchase agreement (the "Minerva Purchase Agreement") with Minerva Semiconductor Corp ("Minerva") for the acquisition of 15,000 of their MV7 ASIC SHA256 model cryptocurrency miner equipment (miners) **with a total terahash to be delivered equal to 1.5 million terahash (total terahash)**. The price per miner is $4,892.50 for an aggregate purchase price of $73,387,500 to be paid in installments. The first installment equal to 60% of the purchase price, or $44,032,500, was paid on April 2, 2021, and an additional payment of 20% of the purchase price, or $14,677,500, was paid June 2, 2021. The remaining 20% is still owed and is scheduled to be made one month before the shipping date. The seller anticipates shipping no less than 15,000 miners by January 2022. **Anticipated delivery quantities and timeframe will be no less than 2,500 miners by October 31, 2021, no less than 5,000 miners by November 30, 2021, no less than 5,000 by December 31, 2021, and the remaining 2,500 by January 2022.** The aggregate purchase price does not include shipping costs, which are the responsibility of the Company and shall be determined at which time the miners are ready for shipment.

(Oct. 19, 2021 Form S-1/A at F-18; Oct. 21, 2021 Form 424B4 at F-18.)

112. The Company reiterated the "Delivery Timeframe" of "Oct. '21 – Jan. '22" for the MinerVa miners in a chart on page F-19 of the Registration Statement. (Oct. 19, 2021 Form S-1/A at F-19; Oct. 21, 2021 Form 424B4 at F-15.)

113. The Offering Materials also touted Stronghold's ability to expand mining capacity: "While many of our competitors have struggled to obtain mining equipment due to historically strong demand and pre-sold supply, **we believe that these recent confirmed purchase orders demonstrate our ability to leverage the breadth of our relationships to quickly expand our mining capacity**." (Oct. 19, 2021 Form S-1/A at 3; Oct. 21, 2021 Form 424B4 at 3.) This statement indicated to investors that Stronghold was not "struggl[ing] to obtain mining equipment," and that the "recently confirmed" MinerVa purchase orders, accounting for the majority of Stronghold's miners, were on schedule as they "demonstrate our ***ability to … quickly expand*** our mining

capacity." (Oct. 19, 2021 Form S-1/A at 3; Oct. 21, 2021 Form 424B4 at 3.)

114. The foregoing statements in the Offering Materials were materially false and misleading when made because they failed to disclose that: (1) MinerVa, was unable to achieve the miner delivery quantities and by the deadlines stated in the Offering Materials because MinerVa's miner assembly facility in China was effectively inoperative prior to the IPO due to power curtailments and because MinerVa was unable to source adequate component parts for the miners (*supra*, Section V.A.); (2) as a result of the foregoing, Stronghold would not be able "expand" its "mining capacity" and certainly not "quickly" as false represented in the Offering Materials; (3) as a result of MinerVa being unable to deliver the miners the parties contracted for, the total hash rates set forth in the Offering Materials were inaccurate; (4) as a result of the foregoing, Stronghold would experience significant losses, rendering the misstatements and omissions highly material; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

115. The Registration Statement purported to warn that "if" suppliers do not provide the agreed miners as expected, the Company's operations "could" be materially affected:

> ***We are dependent on third-party brokers and direct suppliers to source some of our miners, and failure to properly manage these relationships, <u>or the failure of these brokers or suppliers to perform as expected, could have a material adverse effect on our business, prospects or operations</u>.***
>
> We currently rely on third-party brokers and direct suppliers to source some of our miners. We have no assurance that business interruptions will not occur as a result of the failure by these brokers or suppliers to perform as expected, including the failure to locate acceptable or sufficient miners for our purchase. Many of the competitors in our industry have also been purchasing mining equipment at scale, which has caused a world-wide shortage of mining equipment and extended the corresponding delivery schedules for new miner purchases. **<u>We cannot ensure that our brokers or suppliers will continue to perform services to our satisfaction or on commercially reasonable terms. The recent increased</u>**

> **<u>demand for miners has also limited the supply of miners that brokers may source for us.</u>** Our brokers or suppliers may also decline our orders to fulfill those of our competitors, putting us at competitive harm. There are no assurances that any miner manufacturers will be able to keep pace with the surge in demand for mining equipment. Further, resource constraints or regulatory actions could also impact our ability to obtain and receive miners. For example, China has been experiencing power shortages, and certain of our miner suppliers have been impacted by related intermittent power outages. Additionally, certain companies, including Bitmain, may move their production of miners out of China and into other countries following the September 2021 blanket ban on crypto mining and transactions by Chinese regulators. Such power outages and production relocations could result in cancellations or delays and may negatively impact our ability to receive mining equipment on a timely basis or at all. **<u>If our brokers or suppliers are not able to provide the agreed services at the level of quality and quantity we require or become unable to handle the volume of miners we seek, we may not be able to replace such brokers or suppliers in a timely manner.</u>** Any delays, interruption or increased costs could have a material adverse effect on our business, prospects or operations.

(Oct. 19, 2021 Form S-1/A at 30 (First emphasis in original)).

116. The foregoing risk disclosures were materially false and misleading when made because they falsely represented as purported risks that Stronghold's suppliers may not be able to provide the agreed to quantity of miners or "continue to perform services to our satisfaction or on commercially reasonable terms" (and thus could have a material impact on Stronghold's business or prospects) when, in fact, that risk had already materialized and, thus, was not a risk but an already existing adverse event that Stronghold was required to disclose in the Offering Materials. The above statements were also false and misleading when made because Defendants did not disclose that, by the time of the IPO, Stronghold's largest supplier of miners, MinerVa, was so crippled by problems in its assembly facilities that it could not assemble or deliver to Stronghold, the miners specifically touted in the Offering Materials and certainly not by the stated schedule, if ever. Indeed, it was knowable to Defendants from their "daily" communications with MinerVa, that delivery of the represented number of miners was impossible by the October 31 deadline (just ten days away) as well as the November 30 deadline (as well as by the end of the year), due to the

severity of the assembly problems, which Stronghold later acknowledged had simply prevented assembly of the miners, and MinerVa's inability to source components for the miners, as it was just entering agreements to supply chips for such miners at the time of the IPO.

### C. <u>**Stronghold's Offering Materials Misleadingly Touted Expected Hash Rates for Both Stronghold's Entire Mining Operations and for the Individual MinerVa MV7 Mining Machines**</u>

117. As a cryptocurrency mining company, Stronghold reported and closely tracked the hash rate of its individual miners and of its entire mining fleet to assess the profitability of its Bitcoin mining operations. Stronghold was clear to state in its Offering Materials how much processing power it would generate with its fleet of miners by the end of 2021, or total combined hash rate, as well as the hash rates for the individual miners in its fleet that would add up to reach that total.

118. In its Offering Materials, Stronghold stated that the IPO would be used to help fund the ramp-up of its mining operations:

> [w]ith part of the proceeds of this offering, we intend to procure approximately 55,800 additional miners, which <u>**we anticipate will bring our total hash rate capacity to over 2,100 PH/s by December 2021**</u> and to over 8,000 PH/s by December 2022.

(Oct. 19, 2021 Form S-1/A at 1; Oct. 21, 2021 Form 424B4 at 2.) As noted *supra*, at Section IV.D., a majority of the 2,100 PH/s, or "1.5 million terahash (total terahash)"—equivalent to 1,500 PH/s—was to come from the 15,000 MinerVa MV7 miners that Stronghold had purchased.

119. The foregoing statements in the Offering Materials were materially false and misleading when made because they failed to disclose that: (1) MinerVa, was unable to achieve the miner delivery quantities and deadlines stated in the Offering Materials because MinerVa's miner assembly facility in China was effectively inoperative prior to the IPO due to power curtailments and because MinerVa was unable to source adequate component parts for the miners

(*supra*, Section V.A.); (2) as a result of MinerVa being unable to deliver the miners the parties contracted for, Stronghold could also not meet its total hash rate forecasts in the Offering Materials; (3) as a result of the foregoing, Stronghold would experience significant losses; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

120. In its Offering Materials, Stronghold reported the hash rates of the individual mining machines in its existing and contracted-for fleet, to indicate to investors how the Company planned to scale up its mining operations and to reach its purportedly expected 2,100 PH/s 2021 year-end hash rate.

121. Concerning the specified hash rates, the Company particularly emphasized the performance of the MinerVa MV7 miners it had purchased, stating in its Registration Statement that it had "entered into an agreement with a leading manufacturer of Bitcoin miners to purchase 15,000 miners **with aggregate hash rate of approximately 1,500 PH/s** for delivery between October 2021 and January 2022." (Oct. 19, 2021 Form S-1/A at 3; Oct. 21, 2021 Form 424B4 at 3.) Stronghold also detailed the MinerVa purchase in describing its "various equipment contracts to purchase miners":

> [o]n April 2, 2021, the Company entered into a purchase agreement (the "Minerva Purchase Agreement") with Minerva Semiconductor Corp ("Minerva") for the acquisition of 15,000 of their MV7 ASIC SHA256 model cryptocurrency miner equipment (miners) **with a total terahash to be delivered equal to 1.5 million terahash (total terahash).**

(Oct. 19, 2021 Form S-1/A at F-18; Oct. 21, 2021 Form 424B4 at F-18.). Dividing 1.5 million terahash by 15,000 miners meant that each of the model MV7 miners would deliver a hash rate of 100 terahash, shorthand for 100 terahash per second (100 TH/s).

122. The foregoing statements in the Offering Materials were materially false and

misleading when made because they failed to disclose that: (1) the MinerVa MV7 miners could only operate in real world conditions at 90%, or 90 TH/s, not the 100 TH/s disclosed to investors in the Offering Materials and, thus, Stronghold's management had only expected them to operate at or around 90 TH/s; (2) as a result of the foregoing shortcomings with the MinerVa MV7's hash rate, Stronghold's mining fleet containing the MV7s would not be able to reach a total hash rate of 2,100 PH/s by year-end 2021; (3) as a result of the foregoing, Stronghold's Bitcoin operations would not be mining Bitcoin and thereby generating revenue as stated, rendering these misstatements highly material to investors; and, thus (4) as a result of the foregoing, Defendant's positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## VII. POST-IPO EVENTS

### D. Stronghold Downplays Delays in Deliveries from MinerVa, While Reassuring Investors that Deliveries are Incoming

123. On November 8, 2021, Stronghold filed a report on Form 8-K with the SEC stating that the Company had closed the acquisition of its Panther Creek Energy Facility, and describing a registration rights agreement allowing the registration of shares that may be received upon the redemption of Panther Creek shares in connection with that acquisition.

124. In the November 8, 2021 Form 8-K, Defendants disclosed that Stronghold had yet to receive any miners from MinerVa and that only 240 miners were on the way—a far cry from the 7,500 miners that Defendants told the market it would receive by the end of November in the Offering Materials:

> [p]ursuant to the MinerVa Purchase Agreement previously disclosed in the Initial Registration Statement, 240 MinerVA MV7 miners have been received by the Company's designated carrier and are in transit to Pennsylvania. The Company expects the 240 miners to arrive and be operational before the end of November 2021.

125. Thus, in the November 8, 2021 Form 8-K (just twelve business days after the October 21, 2021 IPO Prospectus was filed), Stronghold began to suggest, albeit opaquely and combined with reassurances, that Minerva would not meet the schedule touted in the Offering Materials.

126. In a Company press release issued that same day and published on its website, Stronghold announced that it had closed on the acquisition of the Panther Creek facility, and the related services agreement, but did not mention the receipt of miners from MinerVa or their quantity at all.

127. On November 30, 2021, Stronghold filed a Form 8-K with the SEC attaching a press release issued that same day announcing the Company's third quarter 2021 financial results. In the press release, which was issued after stock market trading hours, the Company cited the following highlights:

**Third Quarter and Recent Operational and Financial Highlights**

- Removed approximately 106,000 tons of coal refuse and returned approximately 64,500 tons of beneficial use ash to waste coal piles during the quarter, facilitating the remediation of these sites
- Closed upsized initial public offering ("IPO") on October 22, 2021, generating net proceeds of approximately $132.5 million
- Closed acquisition of Panther Creek Plant on November 2, 2021, increasing owned power generation capacity to approximately 165 megawatts ("MW")
- As of November 29, 2021, has received nearly 6,000 miners with total hash rate capacity of approximately 470 petahash per second ("PH/s") and remains on track to achieve its hash rate capacity goal of 8,000+ PH/s by the end of 2022
- Pro forma cash and cash equivalents as of September 30, 2021 was approximately $104.2 million, as adjusted for net proceeds from the IPO, closing of the Panther Creek Plant acquisition, and deposits paid in relation to announced miner purchases.

128. The Company also stated in the press release that:

As of September 30, 2021, the Company had approximately 3,000 miners deployed

> with total hash rate capacity of approximately 185 PH/s. As of November 29, 2021, the Company has purchased or installed approximately 45,000 miners with total hash rate capacity of approximately 4,390 PH/s…. Since the end of the third quarter, Stronghold has received nearly 3,000 miners, ***including the first 240 MV7 miners from MinerVa***, and the Company expects to have over 500 MinerVa miners installed by the end of the week, with shipments ramping up for the 15,000-miner order. ***Performance for these machines has been in line with expectations***.

129. The same day, Stronghold held an earnings call after trading on the stock market closed. During the earnings call, Defendant Beard stated that:

> we are actively receiving commercial quantities of miners under our agreements with MinerVa …. ***With respect to MinerVa, we have 240 MV7 miners plugged in currently and expect to have over 500 plugged in by the end of this week. We had expected all 15,000 MinerVa miners to be received late this year or early next year, and this is still the case***.

130. During the November 30, 2021 earnings call, Defendant Larroudé echoed Defendant Beard's comments and assured investors that Stronghold was in "consistent contact with MinerVa":

> At the end of the third quarter, we had about 3,000 miners employed with total hash rate capacity of roughly 185 petahash. From the end of the quarter through November 29, we received nearly 3,000 additional miners with total hash rate capacity of approximately 285 petahash, more than doubling our hash rate capacity in less than 2 months.
>
> ***These miners include 240 MinerVa MV7 miners, and we expect to have by over 500 by the end of the week***. ... ***We're in consistent contact with MinerVa*** … and expect to receive the balance of the miners under these agreements over the next few months.

131. During the same November 30 earnings call, an analyst from B. Riley Securities, Inc. followed up by asking, "On the miner delivery, you mentioned MinerVa. And in the release, you say your shipments are ramping up towards the 15,000. Would it be possible to provide some color as to what you're hearing from your supplier in terms of how quickly that cadence is expected to pick up? And … has the supplier provided guidance as to what bottlenecks it is currently facing and how they're going to be overcome?" In response, Defendant Beard confirmed the delays in

MinerVa miner shipments and attributed them to delays in the assembly and power outage and curtailments:

> **Gregory A. Beard**
> *President, CEO & Co-Chairman of the Board*
> … So I don't want to, beyond my quarterly conference call, sort of make representations on behalf of MinerVa. ***I'll tell you what they have told us, and we believe them, is that their constraint comes largely from having an assembly center that has been part of an industrial park that has experienced power curtailments, which – that's concerning.***
>
> In spite of that, they're still shipping miners to us and hopefully others, and they're now starting to show up. And they're working as expected on the spec that we paid for. And in fact, today, I posted on -- I'm aware that there are rumors out there saying, "***Hey, is Minerva -- are they going to be able to deliver all of this?*** Does this company really even exist?" So for that reason, I posted on LinkedIn pictures of one of our StrongBoxes full of MinerVa miners that have been delivered and/or running. And hey, we'll be doubling that quantity by the end of the week -- this week actually. And so they're coming.
>
> So ***the curtailment of power impacted one facility. We talk to MinerVa every day***. We are aware of the other facilities that they are trying to move their assembly operations to and believe that they will be successful in ramping up assembly outside of Mainland China to be able to produce, I would say, industrial quantities of these machines.
>
> I can tell you that -- I don't think they've done it yet. So I think right now, we're still – it's still dribs and drabs out of that one facility. But because we have -- we are not passive in this effort. We're actively trying to both understand and push and help MinerVa with that assembly issue.
>
> ***
>
> So it's a – it's a pretty bad fraud if they're actually shipping miners. So that's the -- and I'm aware -- I've been made aware of what some folks are saying about MinerVa. Again, not representing them, but – and it's certainly not issue free. But we do believe that we're going to get all 15,000 miners in the first quarter of next year. For that to happen, they still need to figure out their assembly issues. But having helped them and worked with them, I think they're going to do it. [Sic.]

132. Defendant Beard further acknowledged that, contrary to Stronghold's prior statement that it was taking delivery of 15,000 miners 2021, the Company would receive only 1,500 miners from MinerVa in 2021:

> I think also, just from your modeling standpoint and ours, like ***we're presuming that we get only 1,500 of these miners by the end of this year***. So it is not like we're assuming that we're going to get 15,000 and our growth is going to be limited by MinerVa. They are a small part of the picture this year. And overall, I think they're going to be a relatively small part of our story. They're a part of it because I think we got what we feel like a good deal on those machines. ***But obviously, them being late, that hurts us.***
>
> So it's not a position that we want to be in, but we are reliant on a single producer of these things. I'm not sure what your question was, but that was -- I want to make sure I said those things.

133. That same day, November 30, 2021, Stronghold filed its Form 10-Q for the Third Quarter ended September 30, 2021 (the "Third Quarter 2021 10-Q"). The Third Quarter 2021 10-Q, stated (at 33, "Note 25 – Subsequent Events") that the Company paid the final MinerVa deposit of $14,667,500 on October 26, 2021, even though it had received no MinerVA miners to date, but again stated regarding MinerVa that "Delivery of miners are per the timeframes discussed in Note 8" (which repeated the timeframes set forth in the Offering Materials).

### E. Stronghold Amends its Financing Agreement Due to the MinerVa Miner Delivery Delays But Continues to Assure Investors that Deliveries are Incoming

134. On January 6, 2022, Stronghold filed a Form 8-K with the SEC ("January 6, 2022 Form 8-K") indicating that, due to lack of MinerVa MV7 miners, it had been forced into an amendment of the WhiteHawk Financing Agreement in exchange for payment of an Amendment Fee of $250,000. The January 6, 2022 Form 8-K noted that the WhiteHawk Financing Agreement originally contained terms requiring that all of "the 15,000 miners being purchased pursuant to a purchase agreement (the "MinerVa Purchase Agreement") with MinerVa Semiconductor Corp. ("MinerVa") be delivered on or before December 31, 2021" and that failure to do so "would result in an Event of Default" which would "give WhiteHawk the right to accelerate all amounts then outstanding under the WhiteHawk Financing Agreement" and "could only be cured by a waiver from WhiteHawk."

135. The January 6, 2022 Form 8-K acknowledged that "MinerVa did not deliver all of the miners under the MinerVa Purchase Agreement by the December 31, 2021 deadline," and that instead of 15,000, Stronghold had only "received over 1,000 of the miners to date," although Stronghold reassured investors the miners could still "arrive by the end of March 2022" and that the Company had extended the deadline in the WhiteHawk Financing Agreement to April 30, 2022.

### F. Defendants' March 29, 2022 Acknowledgments Regarding Shipments of Miners From MinerVa

136. On March 29, 2022, after the market closed, Stronghold announced its fourth quarter and full year 2021 financial results in a press release filed with the SEC on Form 8-K. The Company reported a net loss of $0.52 for the quarter, below analyst estimates of $0.04 earnings per share, on total revenues of $17.0 million.

137. The March 29, 2022 Press Release filed concurrently with the Form 8-K quoted Defendant Beard as stating that:

> "Over the past few months, we have faced significant headwinds in our operations which have materially impacted recent financial performance and have led us to re-assess our near-term growth plans. We no longer believe targeting 8.0 EH/s by the end of 2022 is achievable, given the current circumstances, and we will focus on installing and optimizing the performance of the miners that we have already ordered while maximizing our financial flexibility."
>
> "Specific to our contract with MinerVa, deliveries have been well short of the timelines in the contract and subsequently communicated to us by MinerVa. We are continuously evaluating all means of extracting value because of this shortfall."
>
> ***
>
> As of December 31, 2021, Stronghold had received approximately 14,700 miners with total hash rate capacity of 1.3 EH/s, of which more than 8,000 miners were hashing over 0.8 EH/s. ***For the fourth quarter of 2021, Stronghold averaged a hash rate of approximately 0.3 EH/s,*** and, for the first quarter of 2022, the Company estimates it will average a hash rate of approximately 0.9 EH/s. As of March 24, 2022, the Company had received approximately 25,200 miners with total hash rate capacity of approximately 2.3 EH/s, of which approximately 20,500

miners were hashing approximately 1.9 EH/s.

***

> To date, Stronghold has only received approximately 3,300 of the total 15,000 miners ordered from MinerVa... . Stronghold continues to have active dialogue with MinerVa regarding its delivery schedule and operational capabilities, but the Company does not have sufficient information from MinerVa to provide an update or a timeline on future deliveries, or if the Company can expect any future deliveries. Additionally, the performance of MinerVa's miners has been below expectations, with hash rates ranging from 50% to 70% of the expected capacity, compared to 90%+ for a standard performing machine. The Company is actively working to improve MinerVa miner performance and evaluating all appropriate avenues to extract value from the MinerVa miners and contract. The most recent batch of MinerVa machines are showing improved performance; however, the Company is evaluating all available remedies at its disposal.

138. Stronghold also stated in the March 29, 2022 Press Release that it had "amended the WhiteHawk Agreement to remove all MinerVa miners from the collateral package" of the WhiteHawk Financing Agreement. Moreover, in its Form 10-K filed with the SEC that same day, Stronghold stated that MinerVa actually "has only delivered approximately 3,200" of miners to date, not 3,300, that Stronghold did "not know when the remaining MinerVa miners will be delivered, if at all," and further indicated that, "[a]s a result, we may write off some or all of the approximately 12,000 undelivered MinerVa miners."

139. In its Investor Presentation materials filed with the March 29, 2022 Form 8-K, the Company acknowledged that the negative impact of the concealed MinerVa minor delivery delays was ***a loss of approximately "$30-35mm in estimated revenue*** missed through March 2022."

140. The same day, Stronghold held a conference call in connection with these financial results. During the call, Defendant Beard cited "two key factors that have negatively impacted [Stronghold's] operations and near-term growth trajectory":

> [T]here are two key factors that have negatively impacted our operations and near-term growth trajectory. We estimate these factors collectively created a $40 million to $45 million reductions in cash flow to date, relative to our base case plan. As many of you know, we placed an order for miners with a miner manufacturer called

> MinerVa in 2021. Additionally, MinerVa presented a compelling value proposition for the price of roughly $50 per terahash, a significant discount to prevailing market rates.
>
> However, ***to-date we have only received approximately 3300***[37] ***out of the 15,000 miners originally ordered from MinerVa that were scheduled for delivery by December, as they have continually fallen short of contractual and communicated delivery timelines.*** Based on what we know today in our recent communications with MinerVa, ***we cannot provide any definitive guidance after the timing of future deliveries***. We are evaluating all appropriate avenues to extract value from MinerVa and also proactively removed all MinerVa and  miners from the collateral-based supporting our equipment financing agreements.

141. Defendant Beard also acknowledged in his opening statement on the earnings call that Stronghold continued to be "in near constant contact" with MinerVa regarding the miner deliveries." Indeed, Beard stated that "we probably talk[ed] to [MinerVa co-founder] Mar[c] Ma on an either daily basis by phone or by text," and that in fact "[h]e's been with us on site in Pennsylvania, for probably ten days in the past of the past 30 [sic]." Notwithstanding, Beard acknowledged that "MinerVa has been unreliable in hitting their projected dates thus far, and we are not confident in their ability to deliver the remaining miners on any time frame…"

142. Additionally, Defendant Beard acknowledged on the March 29, 2022 earnings call that, even with respect to the miners Stronghold had received to date, "they haven't proven reliable."

143. According to the Company's first quarter (ended March 31, 2022) Form 10-Q filed with the SEC on May 16, 2022, "[a]s a result" of MinerVa's delivery failures, "an impairment charge totaling $12,228,742, was recognized on March 31, 2022," indicating that Stronghold expected no further MinerVa miner deliveries.

---

[37] As indicated above, in its Form 10-K filed with the SEC that same day (and subsequent SEC filings), Stronghold stated that MinerVa actually "has only delivered approximately 3,200" miners until the end of March 2022 (and thereafter).

### G. Defendants' March 29, 2022 Acknowledgment That Stronghold Had Not Met Total Hash Rate Goals

144. In its March 29, 2022 press release, Stronghold conceded that because of MinverVa's failure to deliver miners, its total hash rate was significantly less than it had touted in the Offering Materials. While in the Offering Materials, the Company had stated the miners would generate a total output of 2,100 PH/s by the end of 2021, Stronghold revealed on March 29 that it had only 8,000 miners "hashing over 0.8 EH/s", equivalent to 800 PH/s, as of December 31, 2021. (Mar. 29, 2022 Press Release, at 2.) The Company added that "[f]or the fourth quarter of 2021, Stronghold averaged a hash rate of approximately 0.3 EH/s", equivalent to just 300 PH/s. (*Id.*)

145. While Defendants pointed to delays in Minerva MV7 miners as a reason why Stronghold's total hash rate underperformed, they acknowledged for the first time on March 29, 2022 another contributing factor: that the initial figure of 100 TH/s per MinerVa MV7 miner, as reported in the Offering Materials, was unachievable.

146. In describing how "the performance of MinerVa's miners has been below expectations", the Company elaborated that the MV7 miners were exhibiting hash rates "ranging from 50% to 70% of the expected capacity, ***compared to 90%+ for a standard performing machine***". (*Id.* at 3.) This statement was the first time Stronghold had admitted that Stronghold had all along only expected the MinerVa MV7 mining machines to operate at 90% of the 100 TH/s hash rate that the Company had touted in its Offering Materials. Moreover, Stronghold had only revealed its internal expectation of 90%, or 90 TH/s per MV7 miner, to mitigate from the fact that many of the MinerVa miners were defective and were only operating at 50 to 70% of the 100 TH/s capacity Stronghold had touted in the IPO, or 50 PH/s to 70 PH/s. Had Defendants applied their expectation of 90% hash to their hash rate projections for the 15,000 MV7 miners stated in the Offering Materials, the actual expected total hash rate for the 15,000 miners would have been

around 1,350 PH/s, short of the 1,500 PH/s figure stated in the Offering Materials.

147. On March 30, the Company's stock price fell as much as $3.28 per share, or 35%, to close at $6.97 per share that day, on trading volume of 6,192,200 shares, almost ten times the trading volume of 632,200 shares on March 28, 2022.

148. By the commencement of this action, Stronghold stock was trading as low as $4.78 per share, a 75% decline from the $19 per share IPO price.

149. On April 14, 2022, Stronghold announced via press release, and a corresponding Form 8-K filed with the SEC, that its CFO, Defendant Larroudé, who had served as Stronghold's top finance executive since the Company's IPO, would be "leaving the Company to pursue other business interests" by May 15, 2022.

## VIII. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

150. Defendants are liable for any false and misleading forward-looking statements issued in connection with the IPO. The safe harbor provision of § 27A of the Securities Act, 17 U.S.C. § 77z-2(b)(2)(D), specifically excludes those statements "made in connection with an initial public offering," which includes all of the false and misleading statements made in connection with the IPO and alleged herein.

151. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

152. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could

cause actual results to differ materially from those in the purportedly forward-looking statements.

153. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Stronghold who knew that the statement was false when made.

## IX. CLASS ACTION ALLEGATIONS

154. Co-Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Stronghold Class A common stock pursuant and/or traceable to the Company's false and/or misleading Offering Materials issued in connection with the Company's October 2021 IPO, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

155. The members of the Class are so numerous that joinder of all members is impracticable. During the relevant time period, Stronghold's securities were actively traded on the NASDAQ Global Market under the symbol "SDIG." While the exact number of Class members is unknown to Co-Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Co-Lead Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. The Company sold 7,690,400 shares of Class A common stock in the IPO pursuant to the Offering Materials. Moreover, record owners and other members of the Class may

be identified from records maintained by Stronghold or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

156. Co-Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

157. Co-Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

158. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the Defendants violated the Securities Act;

(b) whether statements made by Defendants to the investing public in the Offering Materials were false and/or misrepresented material facts;

(c) whether certain defendants have a viable "due diligence" defense to the strict liability imposed by Section 11 of the Securities Act;

(d) whether the Individual Defendants are control persons of Stronghold for purposes of Section 15 of Exchange Act; and

(e) to what extent members of the Class have sustained damages, and if so, the proper measure of damages.

159. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, since the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X. COUNT I

### Violation of Section 11 of the Securities Act
### (Against All Defendants)

160. Co-Lead Plaintiffs incorporate each preceding paragraph by reference.

161. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77K, on behalf of Co-Lead Plaintiffs and the Class, against Stronghold, the Individual Defendants, and the Underwriter Defendants.

162. The Offering Materials for the IPO were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

163. Stronghold is the registrant for the IPO and the issuer of the securities purchased by Co-Lead Plaintiffs and the Class. The Defendants named herein were responsible for the contents and dissemination of the Offering Materials.

164. As issuer of the shares, Stronghold is strictly liable to Co-Lead Plaintiffs and the Class for the misstatements and omissions.

165. The Individual Defendants each signed the Offering Materials or authorized the signing of the Offering Materials on their behalf. As such, each is strictly liable for the materially inaccurate statements contained therein and the failure of the Offering Materials to be complete and accurate, unless they are able to carry their burden of establishing an affirmative "due diligence" defense. The Individual Defendants each had duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering

Materials, and to ensure that they were true and accurate, that there were no omissions of material facts that would make the Offering Materials misleading, and that the documents contained all facts required to be stated therein. In the exercise of reasonable care, the Individual Defendants should have known of the material misstatements and omissions contained in the Offering Materials and also should have known of the omissions of material fact necessary to make the statements made therein not misleading. Accordingly, the Individual Defendants are liable to Co-Lead Plaintiffs and the Class.

166. The Underwriter Defendants each served as underwriters in connection with the IPO. As such, each is strictly liable for the materially inaccurate statements contained in the Offering Materials and the failure of the Offering Materials to be complete and accurate, unless they are able to carry their burden of establishing an affirmative "due diligence" defense. These defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Materials. They had a duty to ensure that they were true and accurate, that there were no omissions of material facts that would make the Offering Materials misleading, and that the documents contained all facts required to be stated therein. In the exercise of reasonable care, the Underwriter Defendants should have known of the material misstatements and omissions contained in the Offering Materials and also should have known of the omissions of material facts necessary to make the statements made therein not misleading. Accordingly, each of the Underwriter Defendants is liable to Co-Lead Plaintiffs and the Class.

167. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

168. By reasons of the conduct herein alleged, each Defendant violated, and/or

controlled a person who violated Section 11 of the Securities Act.

169. Co-Lead Plaintiffs acquired Stronghold shares pursuant and/or traceable to the Offering Materials for the IPO without knowledge of the material omissions or misrepresentations alleged herein.

170. Co-Lead Plaintiffs and the Class have sustained damages. The value of Stronghold Class A common stock has declined substantially subsequent to and due to the Defendants' violations.

171. This claim was brought within one year after the discovery of the untrue statements and omissions and within three years of the date of the Offering.

172. By virtue of the foregoing, Co-Lead Plaintiffs and the other members of the Class are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from Defendants and each of them, jointly and severally.

## XI. COUNT II

### Violations of §12(a)(2) of the Securities Act Against the Underwriter Defendants and Stronghold

173. Co-Lead Plaintiffs repeat and re-allege the foregoing allegations above.

174. The Underwriter Defendants and Stronghold were sellers, offerors, and/or solicitors of buyers of Stronghold shares offered pursuant to the October 21, 2021 Prospectus for their own financial gain.

175. The Underwriter Defendants are statutory sellers as they are in privity with Co-Lead Plaintiff ACERS and with other members of the class who purchased Stronghold shares directly from the various Underwriter Defendants in the IPO pursuant to the October 21, 2021 Prospectus. ACERS purchased shares directly from the Underwriter Defendants in the IPO.

176. As the issuer of the shares in the IPO, Stronghold was a statutory seller pursuant to

SEC Rule 159A which provides that "in a primary offering of securities," an issuer is a statutory seller for the purposes of Section 12(a)(2) "regardless of the underwriting method used to sell the issuer's securities." (17 C.F.R. §230.159A).

177. Stronghold and the Underwriter Defendants used the means and instrumentalities of transportation and communication in interstate commerce and of the mails, in offering, soliciting, and selling Stronghold shares to Co-Lead Plaintiffs and other members of the class.

178. The October 21, 2021 Prospectus misrepresented and failed to disclose material facts required to be stated therein.

179. Neither Co-Lead Plaintiffs, nor any member of the class knew, or in the exercise of reasonable care could have known, of the omitted facts or of the untrue statements of material fact in the October 21, 2021 Prospectus.

180. This action was brought within one year after the discovery of the misrepresentations and omissions in the October 21, 2021 Prospectus, and within three years after the sale of Stronghold shares pursuant to the prospectus.

181. Co-Lead Plaintiffs and the other members of the class hereby tender their Stronghold shares and seek recission and return of the consideration they paid with interest, or seek rescissory damages or such other damages to the extent permitted by law.

## XII. COUNT III

**Violation of Section 15 of the Securities Act**
**(Against the Individual Defendants)**

182. Co-Lead Plaintiffs incorporate each preceding paragraph by reference.

183. This Count is asserted against the Individual Defendants and is based upon Section 15 of the Securities Act.

184. The Individual Defendants, by virtue of their offices, directorship, and specific acts,

were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Stronghold within the meaning of Section 15 of the Securities Act. Each of the Individual Defendants had a series of direct or indirect business or personal relationships with other directors or officers or major shareholders of Stronghold. Each of the Individual Defendants had a financial interest in taking the Company's stock public in order to increase the holding value and marketability of their holdings, as alleged herein. The Individual Defendants had the power and influence and exercised the same to cause Stronghold to engage in the acts described herein.

185. The Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Co-Lead Plaintiffs and the Class.

186. By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Co-Lead Plaintiffs and the Class for damages suffered.

## XII. PRAYER FOR RELIEF

WHEREFORE, Co-Lead Plaintiffs pray for relief and judgment, as follows:

(a) Declaring this action to be a proper class action and certifying Co-Lead Plaintiffs as representatives of the class under Rule 23 of the Federal Rules of Civil Procedure and counsel as Class counsel;

(b) Awarding Co-Lead Plaintiffs and the members of the Class damages, including interest;

(c) Awarding Co-Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including and attorneys' fees; and

(d) Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## XIII. JURY TRIAL DEMANDED

Co-Lead Plaintiffs hereby demand a trial by jury.

Dated: October 18, 2022

**LEVI & KORSINSKY, LLP**

*/s/ Shannon L. Hopkins*
Shannon L. Hopkins (SH-1887)
Andrew Lencyk (AL-4329)
55 Broadway, 10th Floor
New York, NY 10006
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: shopkins@zlk.com
Email: alencyk@zlk.com

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen
Jonathan Stern
275 Madison Avenue, 40th Floor
New York, NY 10006
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: jstern@rosenlegal.com
Email: lrosen@rosenlegal.com

*Co-Lead Counsel for Lead Plaintiffs Gulzar Ahmed and the Allegheny County Employees' Retirement System*