**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARK WINTER,<br><br>     Plaintiff,<br><br>          v.<br><br>STRONGHOLD DIGITAL MINING, INC.,<br>GREGORY A. BEARD, RICARDO R. A<br>LARROUDÉ, WILLIAM B. SPENCE, B.<br>RILEY SECURITIES, INC., COWEN AND<br>COMPANY, LLC, TUDOR, PICKERING,<br>HOLT & CO. SECURITIES, LLC, D.A.<br>DAVIDSON & CO., COMPASS POINT<br>RESEARCH & TRADING, LLC, and<br>NORTHLAND SECURITIES, INC.,<br><br>     Defendants. | Case No. 1:22-cv-03088-RA |

**THE STRONGHOLD DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION TO DISMISS**

VINSON & ELKINS LLP

Clifford Thau
Marisa Antonelli
David Hoffman
1114 Avenue of Americas
New York, NY 10036
Telephone: (212) 237-0000
Facsimile: (212) 237-0100
Email: cthau@velaw.com
Email: mantonelli@velaw.com
Email: dhoffman@velaw.com

*Attorneys for Stronghold Digital Mining, Inc.,*
*Gregory A. Beard, and William B Spence.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................... iii

INTRODUCTION .................................................................................................................... 1

BACKGROUND ...................................................................................................................... 3

    I.     Stronghold's Business ................................................................................ 3

    II.    The MinerVa EPA. .................................................................................... 4

    III.   The Offering Materials. ............................................................................ 4

    IV.   MinerVa's Breach of the EPA. ................................................................. 5

    V.    The Cryptocurrency Market Crashes. ...................................................... 6

LEGAL STANDARDS ............................................................................................................ 7

    I.     Rule 12(b)(6). ........................................................................................... 7

    II.    Section 11 and 12(a)(2) Claims. .............................................................. 7

ARGUMENT ........................................................................................................................... 9

    I.     The Complaint Fails to State a Claim under Section 11 or 12(a)(2). ...... 9

          A.    The Complaint Does Not Plead Actionable Omissions Based on Stronghold's Failure to Disclose MinerVa's Possible Breach of the EPA. ........................................................................................... 9

               1.    Stronghold Had No Duty to Disclose MinerVa's *Potential* Breaches of the EPA to Make Its Other Disclosures Not Misleading. ...................................................................... 9

                    a.    The Risk of MinerVa Breaching the EPA Had Not "Ripened" Beyond a Speculative Contingency. ............... 10

                    b.    The Allegedly Misleading Statements Are Insufficiently Specific to Guarantee Any Outcome. .......... 14

               2.    Stronghold Had No Duty to Disclose MinerVa's Potential Delivery Delays and Shortfalls Under Regulation S-K. ............... 15

          B.    The Complaint Pleads No Material Misstatements or Omissions Related to the Projected Hash Rates of MinerVa Miners. ........................ 16

C.    The Offering Materials Warned Investors About the Risk of Suppliers Providing Inadequate Miners..................................................20

II.    Plaintiffs' Own Allegations Negate Loss Causation. ............................................22

III.    The Complaint Fails to State a Section 15 Claim. .................................................24

CONCLUSION..........................................................................................................................25

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Acito v. IMCERA Grp., Inc.*,
　　47 F.3d 47 (2d Cir. 1995)........................................................................... 10, 17

*Akerman v. Oryx Commc'ns Inc.*,
　　810 F.2d 336 (2d Cir. 1987)............................................................................... 22

*Amorosa v. AOL Time Warner Inc.*,
　　409 F. App'x 412 (2d Cir. 2011) ....................................................................... 24

*Ashcroft v. Iqbal*,
　　556 U.S. 662 (2009)............................................................................................... 7

*Boluka Garment Co., Ltd. v. Canaan Inc.*,
　　547 F. Supp. 3d 439 (S.D.N.Y. 2021).............................................................. 23

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
　　752 F.3d 173 (2d Cir. 2014)............................................................................... 14

*Garnett v. RLX Tech. Inc.*,
　　No. 21 Civ 5125, 2022 WL 4632323 (S.D.N.Y. Sept. 30, 2022) ................. 15, 20, 22, 25

*Holbrook v. Trivago N.V.*,
　　No. 17 Civ. 8348, 2019 WL 948809 (S.D.N.Y. Feb. 26, 2019) ....................... 10

*Hu v. City of New York*,
　　927 F.3d 81 (2d Cir. 2019)................................................................................... 3

*In re Aceto Corp. Sec. Litig.*,
　　No. 18 Civ. 2425, 2021 WL 4350501 (E.D.N.Y. Mar. 16, 2021) .................... 13

*In re AstraZeneca plc Sec. Litig.*,
　　No. 21 Civ. 722, 2022 WL 4133258 (S.D.N.Y. Sept. 12, 2022) ...................... 14

*In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*,
　　757 F. Supp. 2d 260 (S.D.N.Y. 2010).............................................................. 15

*In re Britannia Bulk Holdings Inc. Sec. Litig.*,
　　665 F. Supp. 2d 404 (S.D.N.Y. 2009).............................................................. 22

*In re Express Scripts Holding Co. Sec. Litig.*,
　　No. 16 Civ. 3338, 2017 WL 3278930 (S.D.N.Y. Aug. 1, 2017) ................ 14, 17

*In re Express Scripts Holdings Co. Sec. Litig.*,
　　773 F. App'x 9 (2d Cir. 2019) ..................................................................... 11, 13

*In re Ferrellgas Partners, L.P., Sec. Litig.*,
  No. 16 Civ. 7840, 2018 WL 2081859 (S.D.N.Y. Mar. 30, 2018) ................................... 11

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  308 F. Supp. 2d 249 (S.D.N.Y. 2004) ............................................................................... 12

*In re HEXO Corp. Sec. Litig.*,
  524 F. Supp. 3d 283 (S.D.N.Y. 2021) ......................................................................... 8, 22

*In re Hi-Crush Partners L.P. Sec. Litig.*,
  No. 12 Civ. 8557, 2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ..................................... 11

*In re Lehman Bros. Sec. & Erisa Litig.*,
  131 F. Supp. 3d 241 (S.D.N.Y. 2015) ............................................................................... 23

*In re Lehman Brothers Mortgage-Backed Securities Litigation*,
  650 F.3d 167 (2d Cir. 2011) .............................................................................................. 25

*In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*,
  272 F. Supp. 2d 243 (S.D.N.Y. 2003) ............................................................................... 24

*In re Morgan Stanley Info. Fund Sec. Litig.*,
  592 F.3d 347 (2d Cir. 2010) ....................................................................................... 7, 8, 9

*In re Nokia Corp. Sec. Litig.*,
  No. 19 Civ. 3509, 2021 WL 1199030 (S.D.N.Y. Mar. 29, 2021) ................................... 14

*In re Omnicom Grp., Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010) .............................................................................................. 23

*In re ProShares Trust Sec. Litig.*,
  728 F.3d 96 (2d Cir. 2013) ............................................................................................... 21

*In re State St. Bank & Tr. Co. Fixed Income Funds Inv. Litig.*,
  774 F. Supp. 2d 584 (S.D.N.Y. 2011) ............................................................................... 23

*In re Tempur Sealy Int'l, Inc. Sec. Litig.*,
  No. 17 Civ. 2169, 2019 WL 1368787 (S.D.N.Y. Mar. 26, 2019) .............................. 3, 13

*In re XP Inc. Sec. Litig.*,
  524 F. Supp. 3d 23 (E.D.N.Y. 2021) ................................................................................. 8

*Jiajia Luo v. Sogou, Inc.*,
  465 F. Supp. 3d 393 (S.D.N.Y. 2020)......................................................................... 10, 19

*Lau v. Opera Ltd.*,
  527 F. Supp. 3d 537 (S.D.N.Y. 2021).............................................................................. 23

*McKenna v. Smart Techs. Inc.*,
        No. 11 Civ. 7673, 2012 WL 1131935 (S.D.N.Y. Apr. 3, 2012)....................................... 10

*Oklahoma Firefighters Pension & Ret. Sys. v. Xerox Corp.*,
        300 F. Supp. 3d 551 (S.D.N.Y. 2018)................................................................................ 14

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
        681 F.3d 114 (2d Cir. 2012)................................................................................................ 11

*Pub. Employees' Ret. Sys. of Mississippi v. Merrill Lynch & Co. Inc.*,
        714 F. Supp. 2d 475 (S.D.N.Y. 2010)................................................................................ 24

*River Birch Cap., LLC v. Jack Cooper Holdings Corp.*,
        No. 17 Civ. 9193, 2019 WL 1099943 (S.D.N.Y. Mar. 8, 2019) ....................................... 10

*Rubinstein v. Credit Suisse Grp. AG*,
        457 F. Supp. 3d 289 (S.D.N.Y. 2020)................................................................................ 17

*Schuler v. NIVS Intellimedia Tech. Grp., Inc.*,
        No. 11 Civ. 2484, 2013 WL 944777 (S.D.N.Y. Mar. 12, 2013) ....................................... 24

*St. Clair-Hibbard v. Am. Fin. Tr., Inc.*,
        812 F. App'x 36 (2d Cir. 2020) ........................................................................................... 3

*Stratte-McClure v. Morgan Stanley*,
        598 F. App'x 25 (2d Cir. 2015) ........................................................................................... 6

*Stratte-McClure v. Morgan Stanley*,
        776 F.3d 94 (2d Cir. 2015).................................................................................................. 15

*Wandel v. Gao*,
        590 F. Supp. 3d 630 (S.D.N.Y. 2022)................................................................. 8, 10, 15, 16

*White v. UMG Recordings, Inc.*,
        No. 20 Civ. 9971, 2021 WL 6052106 (S.D.N.Y. Dec. 21, 2021)....................................... 7

*Wilbush v. Ambac Fin. Grp., Inc.*,
        271 F. Supp. 3d 473 (S.D.N.Y. 2017)................................................................................ 23

*Willard v. UP Fintech Holding Ltd.*,
        527 F. Supp. 3d 609 (S.D.N.Y. 2021)................................................................................ 25

*Yaroni v. Pintec Tech. Holdings Ltd.*,
        No. 20 Civ. 8062, 2022 WL 1215450 (S.D.N.Y. Apr. 25, 2022)....................................... 21

**Statutes and Regulations**

15 U.S.C. § 77k...................................................................................................................... passim

15 U.S.C. § 77k(a) .................................................................................................. 7

15 U.S.C. § 77k(e) ................................................................................................ 22

15 U.S.C. § 77l ....................................................................................................... 1

15 U.S.C. § 77l(2) ........................................................................................... passim

15 U.S.C. § 77l(b) ............................................................................................... 22

17 C.F.R. § 229.105 ............................................................................................. 15

17 C.F.R. § 229.303(a)(3)(ii) ............................................................................. 15

**Rules**

Fed. R. Civ. P. 12(b)(6) ......................................................................................... 7

Defendants Stronghold Digital Mining, Inc. ("***Stronghold***"), Gregory A. Beard, and William B. Spence (the "***Individual Defendants***," and collectively with Stronghold the "***Stronghold Defendants***") submit this memorandum of law in support of their motion to dismiss the amended complaint of co-lead plaintiffs Gulzar Ahmed and Allegheny County Employees' Retirement System ("***Plaintiffs***").  *See* Am. Compl., *Winter v. Stronghold Digital Mining, Inc., et al.*, No. 22 Civ. 3088 (S.D.N.Y. Oct. 18, 2022), ECF No. 51 (the "***Complaint***" or "***Compl.***").

## INTRODUCTION

Plaintiffs' Complaint centers around the baseless claim that Stronghold failed to disclose, at the time of its initial public offering ("***IPO***"), potential delivery and performance failures by a key supplier, and that this failure constitutes a violation of Sections 11 and 12 of the Securities Act of 1933 (the "***Securities Act***").  Plaintiffs' claims fail for the basic reason that they fail to allege a single fact showing that the Stronghold Defendants knew, at the time of the IPO, that these delivery and performance failures would occur.  Absent such knowledge, Plaintiffs have alleged nothing more than a failed contractual relationship, which does not give rise to a claim under the securities laws.  As demonstrated below, courts in this Circuit routinely hold that such allegations are properly dismissed for failure to state a claim.

Stronghold is a crypto asset mining company currently focused on mining Bitcoin.  In April 2021, Stronghold entered into an Equipment Purchase Agreement (the "***EPA***") with MinerVa Semiconductor Corp. ("***MinerVa***") to supply Stronghold with computers needed to mine Bitcoin ("***Miners***").  *See* Stronghold Digital Mining, Inc., Fin. Am. Reg. Stmt., 99 (Form S-1/A) (Oct. 19, 2021) (the "***Registration Statement***"), attached as Exhibit 4 to the Declaration of Clifford Thau in Support of Defendants' Motion to Dismiss ("***Thau Decl.***").   Under the EPA, MinerVa "***anticipated***" shipping "(i) no less than 5,000 miners by October 31, 2021, (ii) no less than 5,000 miners by November 30, 2021, and (iii) the remainder of the miners by December 31, 2021." *Id.*

1

at F-62 (emphasis added).  The EPA also required that MinerVa's Miners provide a "Total Terahash" (i.e., computing power) of 1.5 million terahash.  *Id.* at 99.  Stronghold disclosed the EPA's terms in its Securities and Exchange Commission ("**SEC**") filings in connection with its October 2021 IPO.  *See id.* at F-19; Stronghold Digital Mining, Inc., Prospectus, F-18 (Form 424B4) (Oct. 21, 2021) (the "***Prospectus***," and collectively with the Registration Statement, the "***Offering Materials***"), attached as Thau Decl. Exh. 5.  In these disclosures, Stronghold specifically warned investors that its business would be harmed, if its suppliers—like MinerVa— failed to provide adequate Miners.  *See* Thau Decl. Exh. 4 at 31; Thau Decl. Exh. 5 at 31. Stronghold also cautioned that Chinese regulations and power curtailments could impact its suppliers.  *See id.*  Following the IPO, MinerVa breached the EPA.  In short, the risks Stronghold identified in the Offering Materials materialized.  The Chinese government mandated power curtailments targeting the crypto industry, which forced MinerVa to shutter its Chinese production facilities.  Consequently, MinerVa experienced significant shipping delays and sent fewer Miners than required under the EPA.  In addition, the Miners MinerVa supplied did not operate at the "hash rate" (i.e., speed) MinerVa promised under the EPA.

The Complaint asserts that the Offering Materials were false and misleading because they: (1) "touted" the MinerVa contract "while omitting to disclose that the[] delivery quantities and deadlines were unachievable;" and (2) overstated the "hash rate" for MinerVa's Miners by disclosing MinerVa's contractually-guaranteed hash rate—rather than the slower hash rate that Stronghold "actually internally anticipated."  Compl. ¶¶ 10-11.  These assertions, however, are entirely unsupported in the Complaint, which is devoid of any facts supporting the contention that Stronghold knew MinerVa would breach its contractual obligations at the time of the IPO.  Rather, the Complaint seems to suggest that Stronghold knew—"via clairvoyance and a secret window

into the corporate thinking and workings" of MinerVa—that MinerVa would inevitably breach the EPA. *In re Tempur Sealy Int'l, Inc. Sec. Litig.*, No. 17 Civ. 2169, 2019 WL 1368787, at *8 (S.D.N.Y. Mar. 26, 2019). No securities claim is viable on this basis.

Furthermore, the face of the Complaint demonstrates that Stronghold's purported misstatements and omissions did not cause Plaintiffs' losses. The Complaint attempts to link the alleged "corrective disclosure" of MinerVa's EPA breach on March 29, 2022 to a drop in the price of Stronghold's stock. But Stronghold first disclosed MinerVa's shipment delays in November 2021, and its stock price actually increased in the days thereafter. Moreover, Stronghold's share price began to drop in January 2022, before the "corrective disclosure," and precisely when Bitcoin's price started to plunge and the broader cryptocurrency market crashed.

Ultimately, Plaintiff seeks to recoup losses from a sector-wide downturn by manufacturing a securities violation from the failure of a supplier relationship that (even according to the Complaint's allegations) entirely post-dated Stronghold's IPO. The Court should reject this effort and dismiss the Complaint with prejudice.

## BACKGROUND[1]

## I.    Stronghold's Business.

Stronghold's crypto asset mining business focuses on mining the decentralized digital currency Bitcoin. Thau Decl. Exh. 5 at 1, 9. Bitcoin utilizes "blockchain" technology, which requires each member of its network to verify independently and validate transactions by solving a complex cryptographic puzzle and providing a solution known as a "hash." *Id.* at 9-10. Once a

---

[1] The following background is drawn from the Complaint and assumed true only for this motion. *See Hu v. City of New York*, 927 F.3d 81, 88 (2d Cir. 2019). Background is also taken from "documents attached to or incorporated by reference in the complaint, legally required public disclosure documents filed with the SEC, and documents on which the plaintiff relied in bringing suit." *St. Clair-Hibbard v. Am. Fin. Tr., Inc.*, 812 F. App'x 36, 38 (2d Cir. 2020) (summary order) (citation omitted).

computer solves the puzzle, its owner receives a newly-minted Bitcoin. *Id.* at 10. Solving cryptographic puzzles "essentially requires random guesswork and computers generate millions of guesses to arrive at the correct answer." *Id.* at 9.[2] This process is known as "mining." *Id.* at 9. Stronghold operates Miners to generate hashes, and sources these Miners from multiple companies. Thau Decl. Exh. 5 at 1, 3. Stronghold's business is vertically integrated; it generates the power necessary to run Miners at two low-cost, environmentally-beneficial coal refuse power generation plants: Scrubgrass and Panther Creek. Compl. ¶ 24; Thau Decl. Exh. 5 at 1.

## II.   The MinerVa EPA.

On April 2, 2021, Stronghold entered into the EPA with MinerVa to acquire 15,000 Miners, with "a total terahash to be delivered equal to 1.5 million terahash." Thau Decl. Exh. 4 at 99. Pursuant to the EPA, Stronghold agreed to pay 60% of the purchase price as a deposit on April 2, 2021, another 20% on or before June 2, 2021, and the final 20% balance one month before the shipping date. *Id.* Under the EPA, MinerVa had "an anticipated shipping period of (i) no less than 5,000 miners by October 31, 2021, (ii) no less than 5,000 miners by November 30, 2021 and (iii) the remainder of the 15,000 miners by December 31, 2021." *Id.* at F-62.

## III.   The Offering Materials.

In advance of its October 2021 IPO, Stronghold filed the Offering Materials with the SEC, and flagged specific risks associated with the EPA for investors:

- "We currently rely on third-party brokers and direct suppliers to source some of our miners. We have no assurance that business interruptions will not occur as a result of the failure by these brokers or suppliers to perform as expected, including the failure to locate acceptable or sufficient miners for our purchase;"

---

[2] A Miner's guessing speed is its "hash rate." Compl. ¶ 56. Hash rate is expressed in "terahash" or terahash per second ("***TH/s***"), with one terahash equaling 1 trillion hashes. *Id.* ¶ 67 n.31. A fleet of Miners' speed is expressed in "petahash" or "petahash per second" ("***PH/s***"), with one petahash equaling 1,000 terahash or 1 quadrillion hashes. *Id.*

- "We cannot ensure that our brokers or suppliers will continue to perform services to our satisfaction or on commercially reasonable terms;"

- "Our brokers or suppliers may also decline our orders to fulfill those of our competitors, putting us at competitive harm.  There are no assurances that any miner manufacturers will be able to keep pace with the surge in demand for mining equipment;" and

- "[R]esource constraints or regulatory actions could also impact our ability to obtain and receive miners.  For example, China has been experiencing power shortages, and certain of our miner suppliers have been impacted by related intermittent power outages. . . .  Such power outages and production relocations could result in cancellations or delays and may negatively impact our ability to receive mining equipment on a timely basis or at all."

Thau Decl. Exh. 4 at 31; Thau Decl. Exh. 5 at 31.  Stronghold also noted, "[a]ny delays, interruption or increased costs could have a material adverse effect on our business, prospects or operations."  Thau Decl. Exh. 5 at 31.

## IV.   MinerVa's Breach of the EPA.

Some of the risks disclosed in the Offering Materials did, eventually, materialize. Stronghold made its final payment under the EPA on October 26, 2021, and MinerVa's first shipment of Miners arrived between November 8 and 30, 2021.  Compl. ¶ 77 n.33.  By the end of November, it became clear that additional shipments from MinerVa would be materially delayed, due largely to power cuts and outages across China, impacting MinerVa's assembly facilities.  *Id.* ¶¶ 68-69.  On November 30, 2022, Stronghold disclosed in a press release and earnings call that it had received only 240 Miners from MinerVa, and that MinerVa's "constraint comes largely from having an assembly center that has . . . experienced power curtailments, which—that's concerning."  *Id.* ¶ 131; *see* Stronghold Digital Mining, Inc., Q3 2021 Earnings Call (Nov. 30, 2021), attached as Thau Decl. Exh. 7.  Stronghold also disclosed that it was "aware of other facilities that they [MinerVa] are trying to move their assembly operations to" but that "overall, I think they're going to be a relatively small part of our story."  Compl. ¶ 131; Thau Decl. Exh. 7 at

10.  Stronghold further noted that it now presumed it would "get only 1,500" MinerVa Miners by year-end 2021.  Compl. ¶ 132.

Over the subsequent months, MinerVa shipments were subject to additional material delays, and Stronghold disclosed these additional delays to its shareholders in a March 29, 2022, press release and Form 8-K.  *Id.* ¶ 136.  Specifically, Stronghold disclosed that it had "only received approximately 3,300 of the total 15,000 miners ordered from MinerVa."  *Id.* ¶ 137.  While Stronghold "continue[d] to have active dialogue with MinerVa," it did not "have sufficient information from MinerVa to provide an update or a timeline on future deliveries," or if Stronghold "can expect any future deliveries" at all.  *Id.*  Stronghold also disclosed that "the performance of MinerVa's miners has been below expectations, with hash rates ranging from 50% to 70% of the expected capacity, compared to 90%+ for a standard performing machine."  *Id.*  Although the "most recent batch of MinerVa machines [was] showing improved performance," Stronghold was "evaluating all appropriate avenues to extract value from the MinerVa miners and contract."  *Id.*

## V.    The Cryptocurrency Market Crashes.

On November 30, 2021, when Stronghold first disclosed delays in MinerVa's shipments, Stronghold stock traded at $17.24/share.  *See* Thau Decl. Exh. 1.[3]  The next day, December 1, 2021, Stronghold stock traded at $17.74/share, and on December 2, 2021, it traded at $19.79/share.  *Id.*  At the time, one Bitcoin was valued at $56,546.40.  Thau Decl. Exh. 2.  As admitted in the Complaint, the price of Bitcoin fell dramatically in 2022.  *See* Compl. ¶¶ 54-55.  By January 22, 2022, the price of Bitcoin had declined by more than one third, to $35,245.40.  Thau Decl. Exh. 2.  Stronghold—whose business is highly dependent on Bitcoin's price—experienced a parallel drop:

---

[3] Courts may consider publicly-available stock price data upon a motion to dismiss.  *See Stratte-McClure v. Morgan Stanley*, 598 F. App'x 25, 27 (2d Cir. 2015) (summary order).

to $9.21/share by January 22, 2022.  Thau Decl. Exh. 1.  The price of Bitcoin, and Stronghold's share price in tandem, continued to decline throughout 2022.  *See* Thau Decl. Exh. 3.  As of this filing, one Bitcoin is worth $16,728.70, *see* Thau Decl. Exh. 2, and Stronghold shares are trading at less than $1, *see* Thau Decl. Exh. 1.

## LEGAL STANDARDS

### I.    Rule 12(b)(6).

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted).  To be plausible, a complaint must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* "Although courts must draw all reasonable inferences in the plaintiff's favor and assume all well-pleaded factual allegations to be true, they are not bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions."  *White v. UMG Recordings, Inc.*, No. 20 Civ. 9971, 2021 WL 6052106, at *2 (S.D.N.Y. Dec. 21, 2021) (quotations omitted).

### II.   Section 11 and 12(a)(2) Claims.

Section 11 of the Securities Act "prohibits materially misleading statements or omissions in registration statements filed with the SEC."  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010) (citing 15 U.S.C. § 77k).  To plead a Section 11 claim, a complaint must allege that the plaintiff "(1) [] purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  *Id.* at 358–59 (quotations omitted).

Section 12(a)(2) provides a "similar redress" to Section 11—except that it applies to material misstatements or omissions in a prospectus, rather than a registration statement. *Id.* at 359. Section 12(a)(2) claims have four elements:

> (1) [plaintiff] was offered or purchased a security by means of a prospectus or oral communication; (2) from a statutory seller; (3) when the prospectus or oral communication includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading; and (4) the plaintiff did not know of such untruth or omission at the time of sale.

*In re XP Inc. Sec. Litig.*, 524 F. Supp. 3d 23, 29 (E.D.N.Y. 2021) (quotations and alterations omitted). A "statutory seller" is someone "who (1) passes title to the plaintiff, or (2) solicits such security purchases for his financial gain." *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 304 (S.D.N.Y. 2021) (quotations omitted). Standing exists only if a plaintiff "directly purchase[d] securities from the defendant in a public offering, rather than on the secondary market. . ." *Id.*

"Collectively, the language of sections 11 and 12(a)(2) creates three potential bases for liability based on registration statements and prospectuses filed with the SEC: (1) a misrepresentation; (2) an omission in contravention of an affirmative legal disclosure obligation; and (3) an omission of information that is necessary to prevent existing disclosures from being misleading." *In re Morgan Stanley*, 592 F.3d at 360. The misstatement or omission must be "material." *Id.* Courts "holistically" analyze a company's offering documents—rather than "cherry-picking individual statements"—to determine if they would "mislead a reasonable investor." *Wandel v. Gao*, 590 F. Supp. 3d 630, 639 (S.D.N.Y. 2022). And the offering materials' accuracy must be judged by analyzing the facts that "existed, and were known or knowable, at the time of the offering." *In re HEXO*, 524 F. Supp. 3d at 300.

**ARGUMENT**

**I.     The Complaint Fails to State a Claim under Section 11 or 12(a)(2).**

The Complaint raises two theories as to why the Offering Materials are purportedly materially misleading:  (1) they "touted agreements for the purchase of miners and delivery schedules" with MinerVa "while omitting to disclose that these delivery quantities and deadlines were unachievable;" and (2) they overstated Stronghold's expected hash rate for "each of the MinerVa MV7 Miners it had purchased" and Stronghold's ability to "reach a total hash rate of 2,100 petahash per second (PH/s) across the Company's entire mining operations by December 31, 2021." Compl. ¶¶ 10-11.  Neither theory is viable.

**A.     The Complaint Does Not Plead Actionable Omissions Based on Stronghold's Failure to Disclose MinerVa's Possible Breach of the EPA.**

The Complaint's first theory of liability is one of omission.  The Complaint alleges that Stronghold failed to disclose that "by the time of the IPO, Stronghold's largest supplier of miners, MinerVa, was so crippled by problems in its assembly facilities and its inability to source components for the miners, that it could not assemble or deliver the miners touted in the Offering Materials." *Id.* ¶ 108.  An omission is actionable under Section 11 and 12(a)(2) only if the defendant had a duty to disclose. *See In re Morgan Stanley*, 592 F.3d at 360.  The Complaint claims that Stronghold had a duty to disclose that MinerVa would breach its delivery obligations because:  (1) disclosure was "necessary" to make Stronghold's other statements "not misleading;" and (2) a disclosure obligation existed under Items 105 and 303 of Regulation S-K. *See* Compl. ¶¶ 103-07, 162.  Under either formulation, the facts alleged do not support a duty to disclose.

**1.     Stronghold Had No Duty to Disclose MinerVa's *Potential* Breaches of the EPA to Make Its Other Disclosures Not Misleading.**

Sections 11 and 12(a)(2) require a defendant to disclose information when necessary to make other disclosures not misleading. *See* 15 U.S.C. § 77k(a), l(2).  This duty "arises only when

9

the issuer knew—or should have known—of the omitted fact at the time the statements were made." *Wandel*, 590 F. Supp. 3d at 640 (citations omitted).  But "[c]lairvoyance is not required" from the issuer, *id.* (citations omitted), and "*post hoc* description[s]" of what occurred cannot show the issuer's knowledge at the time of the IPO, *Holbrook v. Trivago N.V.*, No. 17 Civ. 8348, 2019 WL 948809, at *13 (S.D.N.Y. Feb. 26, 2019).   Stronghold's disclosures are not rendered misleading by failure to disclose MinerVa's potential breaches of the EPA's delivery obligations, because (1) Stronghold neither knew nor should have known that MinerVa was going to breach the EPA materially at the time of the disclosure, and (2) the disclosures identified by the Complaint are insufficiently definite to be rendered misleading by the omission.

### a.   The Risk of MinerVa Breaching the EPA Had Not "Ripened" Beyond a Speculative Contingency.

The allegations of the Complaint show (at most) that there was a speculative risk, as of the October 2021 IPO, that MinerVa would breach the EPA.  Stronghold had no obligation to disclose such a risk; any other rule would impose a substantial burden on issuers to predict the outcome of uncertain business negotiations.  *See McKenna v. Smart Techs. Inc.*, No. 11 Civ. 7673, 2012 WL 1131935, at *15 (S.D.N.Y. Apr. 3, 2012) (stating that "requiring companies to disclose the substance" of ongoing "negotiations would impose new and substantial burdens on businesses").

Issuers need not disclose matters that are merely speculative; they need only disclose a negative contingency when it becomes a "foregone conclusion."  *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 53 (2d Cir. 1995).  Put differently, before a risk is a "foregone conclusion," the duty to disclose has not "ripened."  *River Birch Cap., LLC v. Jack Cooper Holdings Corp.*, No. 17 Civ. 9193, 2019 WL 1099943, at *6, *8 (S.D.N.Y. Mar. 8, 2019) (citation omitted); *see, e.g.*, *Jiajia Luo v. Sogou, Inc.*, 465 F. Supp. 3d 393, 412 (S.D.N.Y. 2020) (no duty to disclose risk that had not "transpired" or was not "a near certainty").  Accordingly, issuers need not disclose the fraught

nature of important business relationships just because those relationships ***might*** collapse.  *See In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x 9, 14 (2d Cir. 2019) (summary order) (issuer "did not have a duty to disclose more about the uncertain state of the negotiations" with its biggest customer); *In re Ferrellgas Partners, L.P., Sec. Litig.*, No. 16 Civ. 7840, 2018 WL 2081859, at *14-15 (S.D.N.Y. Mar. 30, 2018) (issuer had "no obligation to publicly speculate" whether a "contractual counterparty [] would be able to meet its obligations," because it need not have "somehow guessed the outcome of the ongoing negotiations") (quotations omitted); *In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12 Civ. 8557, 2013 WL 6233561, at *13 (S.D.N.Y. Dec. 2, 2013) (disclosure duty "ripened" only after issuer's largest customer terminated their contract).[4]

The Complaint's conclusory allegations do not plead any facts showing that Stronghold knew (or should have known) that the risk of MinerVa breaching the EPA had "ripened" into a "foregone conclusion" prior to the October 2021 IPO.  The Complaint raises three primary allegations in this regard; none is sufficient.

***First***, the Complaint alleges that Stronghold must have known that MinerVa would not provide the (1) required quantity of Miners (2) under the promised schedule, because Stronghold executives had significant communication with MinerVa executives.  *See* Compl. ¶ 116 ("daily" communication); *id.* ¶ 141 ("near constant contact").  However, the Complaint never describes the ***substance*** of those alleged communications—i.e., that MinerVa disclosed an imminent breach of the EPA.  The Complaint's own allegations suggest that MinerVa was not forthcoming.  For example, Stronghold made its final 20% payment to MinerVa on October 26, 2021 (five days after the IPO).  *See id.* ¶ 78 n.33.  If Stronghold knew that MinerVa would breach the EPA on October

---

[4] *See also Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 122 (2d Cir. 2012) (circumstances moved from "potentially problematic" to "very bad," and required disclosure, only when the issuer learned that its computer chips had a defect rate of "100% for all chips sold to clients representing 72% of revenues").

21, 2021, then it would not have paid MinerVa $14,677,500 immediately thereafter.  Moreover, on calls "around the end of 2021," Stronghold executives were "cussing" and "shouting" at MinerVa executives upon learning of shipping delays—suggesting those delays were unexpected. Compl. ¶ 73; *see also id.* ¶ 131 (November 30, 2021 statement that MinerVa is commiting "pretty bad fraud," if it does not ship the Miners).  The Complaint's allegations contradict, rather than support, an inference that Stronghold knew of MinerVa's imminent breach as of the IPO.

   ***<u>Second</u>***, regarding timing, the Complaint alleges that Stronghold must have known that MinerVa would deliver late, because:  (1) Stronghold did not pay the final 20% to MinerVa under the EPA until October 26, 2021, and that payment was due "one month before the shipping date;" and (2) Stronghold was responsible for paying for shipping costs under the EPA, which were determined at the time of shipment.  *See* Compl. ¶¶ 78-80.  At most, these allegations show that Stronghold knew of a potential ***<u>immaterial</u>*** delay in MinerVa's first shipment, which does not trigger a disclosure obligation.  *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 270 (S.D.N.Y. 2004) (no material omission based on failure to disclose that project was delayed by at least three months).  According to the Complaint's own allegations, the first shipment of Miners "arrived between November 8 and 30, 2021"—i.e., between nine and thirty-one days late.  Compl. ¶ 78 n.33.  This slight delay does not suggest that a material breakdown in the Stronghold-MinerVa relationship was a "foregone conclusion" requiring disclosure.

   And ***<u>third</u>***, the Complaint cites an October 21, 2021 press release filed by AGM Group Holdings Inc. (one of MinerVa's parts suppliers), stating that AGM "agreed to supply MinerVa . . . with 25,000 units of its 100 TH/S MinerVa MV7 ASIC to build the MinerVa family of crypto Miners."  Compl. ¶ 77.  Allegedly, this constitutes evidence that "MinerVa did not have the necessary parts to even construct the miners Stronghold had ordered."  *Id.*  This allegation is

inapposite.  Nothing in the Complaint suggests that Stronghold knew about MinerVa's dealings with AGM or what parts MinerVa had on hand.  Nor could Stronghold have even read AGM's press release prior to filing the Offering Materials, because Stronghold filed the Offering Materials first.  *See* AGM Group Holdings Inc., Rep. of Foreign Private Issuer, Exh. 99.1 (Form 6-K) (Oct. 21, 2021) (the "***AGM Press Release***"), attached as Thau Decl. Exh. 6 (filed at 5:00 PM on October 21, 2021); *see also* Thau Decl. Exh. 4 (filed at 8:13 AM on October 19, 2021); Thau Decl. Exh. 5 (filed at 4:31 PM on October 21, 2021).  Moreover, the AGM Press Release does not even state that MinerVa will use AGM's parts to build Miners for Stronghold; rather, it states that MinerVa provides services to two other crypto companies.  Thau Decl. Exh. 6.[5]

Thus, at its core, the Complaint is premised on Plaintiffs' belief that Stronghold should have divined earlier that MinerVa would breach the EPA.  This thesis cannot sustain a claim.  *See In re Express Scripts*, 773 F. App'x at 15 (allegations "that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice. . .") (quotations omitted).  Indeed, courts hold that issuers lack a duty to disclose the potential breakdown of contractual relationships—even where plaintiffs allege far more to suggest an impending rupture than does the Complaint.  *See, e.g.*, *In re Aceto Corp. Sec. Litig.*, No. 18 Civ. 2425, 2021 WL 4350501, at *9 (E.D.N.Y. Mar. 16, 2021) (no duty to disclose potential breach of contract where issuer's "internal forecasts" suggested impending violation of debt covenants, because the breach was a "far cry from the foregone conclusion. . . .") (quotations omitted); *In re Tempur Sealy*, 2019 WL 1368787, at *6, *14 (no duty to disclose "deteriorated" relationship, and "increased risk of contract termination," with the issuer's biggest customer where the issuer gave

---

[5] The Complaint quotes a November 4, 2021, "industry press" report that the MinerVa had ordered the ASIC units from AGM to produce the Miners it "is then bound to ship" to Stronghold.  Compl. ¶ 78.  No basis for this allegation is provided, and the "industry press" report post-dates the Offering Materials.

the customer an "ultimatum" and threatened contract cancellation); *Oklahoma Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 576-77 (S.D.N.Y. 2018) (no duty to disclose "strained relationship" or "implementation challenges," before customers "repudiat[ed]" contracts); *In re Express Scripts Holding Co. Sec. Litig.*, No. 16 Civ. 3338, 2017 WL 3278930, at *11-13 (S.D.N.Y. Aug. 1, 2017) (no duty to disclose that issuer's largest customer had served multiple notices of breach and threatened contract termination).

### b. The Allegedly Misleading Statements Are Insufficiently Specific to Guarantee Any Outcome.

The alleged omission does not render the Complaint's two cited statements materially misleading for the additional reason that they are insufficiently specific to "guarantee" any "concrete fact or outcome." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014).

***First***, the Complaint alleges that the Offering Materials' statement that "we believe that [] recent confirmed purchase orders demonstrate our ability to leverage the breadth of our relationships to quickly expand our mining capacity" was materially false, because of MinerVa's inability to supply Miners. Compl. ¶¶ 113-14 (emphasis omitted). But this is a classic example of non-actionable "puffery"—i.e., a non-specific statement of corporate optimism that cannot "guarantee" any "concrete fact or outcome." *City of Pontiac*, 752 F.3d at 185; *see In re AstraZeneca plc Sec. Litig.*, No. 21 Civ. 722, 2022 WL 4133258, at *8 (S.D.N.Y. Sept. 12, 2022) (statement about "moving quickly" to develop a drug was puffery); *In re Nokia Corp. Sec. Litig.*, No. 19 Civ. 3509, 2021 WL 1199030, at *17 n.16 (S.D.N.Y. Mar. 29, 2021) (statement about "coming back very fast" from some "product integration challenges" was puffery).

***Second***, the Complaint alleges that the statement that the "***anticipated*** delivery quantities and timeframe will be no less than 2,500 miners by October 31, 2021, no less than 5,000 miners

by November 30, 2021, no less than 5,000 by December 31, 2021, and the remaining 2,500 by January 2022" was false and misleading because of the failure to disclose MinerVa's manufacturing and shipping problems.  *See* Compl. ¶ 111, 114 (emphasis added).  However, as previously noted, the Complaint does not plead that Stronghold knew (or should have known) about those issues at MinerVa.  *See supra* Section I.A.1.a.  Moreover, the Offering Materials warn that inclusion of the qualifier "anticipated" is designed to reflect "risks and uncertainties," which could cause "results and plans" to "differ materially from those expressed."  Thau Decl. Exh. 4 at 70-71; *see infra* Section I.A.2; *see also In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 314 (S.D.N.Y. 2010) (statement about "the extent" of the issuer's "needs" was not misleading because the "statement was qualified" by describing the needs as "anticipated").  This qualified statement does not guarantee any outcome.

### 2.     Stronghold Had No Duty to Disclose MinerVa's Potential Delivery Delays and Shortfalls Under Regulation S-K.

Because the Complaint fails to plead that Stronghold had actual knowledge that MinerVa would materially breach the EPA, the Complaint also fails to plead a disclosure duty under Regulation S-K.  *See supra* Section I.A.1.  Item 105 of Regulation S-K requires disclosure of the "most significant risk factors" associated with the security.  17 C.F.R. § 229.105.  Item 105 requires disclosure only if an issuer has ***actual knowledge*** of the risk that might hurt its business.  *See Wandel*, 590 F. Supp. 3d at 646; *accord Garnett v. RLX Tech. Inc.*, No. 21 Civ. 5125, 2022 WL 4632323, at *15 (S.D.N.Y. Sept. 30, 2022).  Item 303 of Regulation S-K requires disclosure of "known trends or uncertainties" that the company "reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii); *see also Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 102 (2d Cir. 2015) (describing Item 303's "probability/magnitude test").  Under Item 303, a complaint also

must adequately allege the defendant's ***actual knowledge*** of the risk they failed to disclose; it is insufficient that the defendant should have known of the risk. *See Wandel*, 590 F. Supp. 3d at 646. Stronghold fully disclosed the risks and uncertainties of which it was aware at the time of the IPO, including the risks of supplier failures, and Chinese government-mandated power curtailments. *See infra* Section I.C.  Absent allegations of actual knowledge by Stronghold that MinerVa would materially breach the EPA (which are found nowhere in the Complaint), the Complaint fails to establish a duty to disclose under Regulation S-K.  *See supra* Section I.A.1.

### B.   The Complaint Pleads No Material Misstatements or Omissions Related to the Projected Hash Rates of MinerVa Miners.

The Complaint alleges that the Offering Materials misled investors by stating that "each of the model MV7 miners" Stronghold purchased from MinerVa "would deliver a hash rate of 100 terahash"—when Stronghold predicted internally that each Miner would deliver only 90 terahash. Compl. ¶¶ 121-22.  Because Stronghold purportedly overstated the expected performance of each Miner by 10 TH/s, the Complaint alleges that the Offering Materials also misrepresented Stronghold's ability to reach a "total hash rate capacity" across its operations of "over 2,100 PH/s by December 2021."  *Id.* ¶ 82.  These allegations fail.

As an initial matter, the Complaint mischaracterizes the disclosures.  The Offering Materials do not state that each MinerVa Miner would operate at 100 TH/s.  Compl. ¶ 121.  They state that Stronghold contracted with MinerVa for 15,000 Miners "with a total terahash to be delivered equal to 1.5 million terahash (total terahash)."  Thau Decl. Ex. 5 at F-18.  Thus, Stronghold did not only contract with MinerVa for a certain number of Miners, but also for a certain computing power—i.e., the "total terahash."  The Complaint's assumption that the 1.5 million total terash commitment "meant that each of the model MV7 Miners would deliver a hash rate of 100 terahash" is unsupported.  Compl. ¶ 121.  The "total terahash" is calculated across the

15,000 MinerVa Miner fleet (and MinerVa produces three types of Miners with hash rates ranging between 105 TH/s and 95 TH/s). *See id.* ¶ 87. Therefore, each MinerVa Miner need not necessarily provide 100 TH/s; MinerVa guaranteed that its 15,000 Miners would—on average—operate at 100 TH/s and, if they did not, MinerVa would make up the shortfall with additional Miners to arrive at the EPA's total terahash of 1.5 million. *See* Thau Decl. Exh. 5 at F-18.

However the performance failures are characterized, the Complaint fails to plead a material misstatement or omission because it does not allege facts showing that Stronghold knew (or should have known)—at the time of the IPO—that the MinerVa miners would not perform as expected. After all, according to the Complaint, Stronghold had not received any MinerVa miners as of the date of the Offering Materials. *See* Compl. ¶ 133. Consequently, Stronghold could not have tested the Miners' hash rates before the IPO to determine compliance with the EPA; no duty to disclose MinerVa's potential breach existed. *See Acito*, 47 F.3d at 53 (no duty to disclose a negative contingency until it is a "foregone conclusion"); *In re Express Scripts*, 2017 WL 3278930, at *11 ("Where an outcome is merely speculative, the duty to disclose does not attach.") (citations omitted). Nor is it dispositive that MinerVa's Miners ultimately performed at between 50 and 70 TH/s, *see* Compl. ¶ 146, because the Offering Materials' accuracy cannot be judged after-the-fact, *see, e.g.*, *Rubinstein v. Credit Suisse Grp. AG*, 457 F. Supp. 3d 289, 295 (S.D.N.Y. 2020) (dismissing Section 11 claim rooted in "20/20 hindsight" and "a backward-looking assessment" of offering materials) (quotations omitted). Any possible misstatement was also immaterial because, if the delivered Miners operated below the 1.5 million "total terahash," then the EPA obligated MinerVa to send more Miners to cure the shortfall. Thau Decl. Exh. 5 at F-18.

Nevertheless, the Complaint attempts to supply three reasons why Stronghold must have known that the MinerVa Miners would underperform as of the IPO. None is persuasive.

***First***, per the Complaint, Miner manufacturers such as MinerVa provide customers with only "the advertised maximum hash rate" for Miners.  Compl. ¶ 85.  Allegedly, this advertised hash rate cannot be trusted.  *See id.* ¶ 86.  The Complaint provides no support for this conclusory assertion.  Moreover, 100 TH/s was not merely MinerVa's "***advertised***" maximum speed for its Miners.  *Id.* ¶ 85 (emphasis added).[6]  Rather, 100 TH/s was the average hash rate per Miner that MinerVa ***guaranteed*** via the "total terahash" under the EPA.  Thau Decl. Exh. 4 at F-19.  If the 15,000 Miners did not produce 1.5 million terahash, MinerVa was obligated to supply additional Miners.  *See id.*  Once again, the Complaint's main point is that Stronghold should have known and disclosed that MinerVa would breach the EPA.  The Complaint cannot state a claim on this basis.  *See supra* Section I.A.1.

***Second***, the Complaint cites Stronghold's March 29, 2022, statement that "the performance of MinerVa's Miners has been below expectations" with hash rates "ranging from 50% to 70% of the expected capacity, compared to ***90%+ for a standard performing machine***."  Compl. ¶ 146 (emphasis in Complaint).  This purportedly constitutes an admission that Stronghold anticipated MinerVa's Miners to operate at 90 TH/s prior to the IPO.  *See id.*  For three reasons, it does not.

- The disclosure actually states that Stronghold had anticipated MinerVa would supply Miners operating at the contracted-for, average 100 TH/s—i.e., the "***expected capacity***"—but had received many Miners operating at 50 to 70 TH/s (i.e., "50% to 70% of the expected capacity"), and discovered that most Miners actually operate between 90 and 100 TH/s ("90%+ for a standard performing machine.").  The "expected capacity"—as of the IPO—remains 100 TH/s.

- The statement does not even imply that "standard performing machines" operate at only 90 TH/s—given that "standard performing machines" operate at "90%±."  100 TH/s clearly falls

---

[6] Nor is 100 TH/s the ***maximum*** speed for MinerVa's Miners.  *See* Compl. ¶ 87 n.34 (MV7L runs at "95-105 TH/s").

within the 90%± range for standard performing machines.  The Complaint cannot ignore the plus

sign in the disclosure.  Moreover, some of MinerVa's Miners have hash rates of up to 105 TH/s.

*See id.* ¶ 87 n.34.  Thus, a Miner with a maximum hash rate of 105 TH/s that is only operating at

95% would nevertheless have a hash rate of (about) 100 TH/s.

- Even if this statement could be read to suggest that Stronghold expected MinerVa's miners
to run at 90 TH/s, nothing about the statement suggests that such an expectation existed ***before*** the
IPO.  *See Jiajia Luo.*, 465 F. Supp. 3d at 406 ("It is not sufficient that, at some point after the
registration statement became effective, some subsequent event made it no longer accurate.").  The
disclosure simply does not discuss the timing of any knowledge.[7]

And ***third***, the Complaint points to Stronghold's disclosures regarding the anticipated

energy use of its Miners as evidence that it overstated the hash rates in the Offering Materials.

Compl. ¶ 87.  The Offering Materials state, "[W]e expect to be able to generate power for

approximately $18 per MWh at our Scrubgrass Plant at full capacity, which corresponds to less

than $3,000 per Bitcoin equivalent with latest-generation miners and assuming a network hash rate

of 150 EH/s.  We consider latest-generation miners to be miners with efficiency of 37 joules per

terahash."  Thau Decl. Exh. 4 at 6.  The Complaint states, "When Stronghold stated that it planned

to stock its mining fleet with miners that would consume 37 joules per terahash, it implied that the

Company had purchased an equal split of MV7M miners, with efficiency of 35 J/TH, and MV7S

miners, with efficiency of 39 J/TH, for an average of 37 J/TH."  Compl. ¶ 87.  According to the

---

[7] The Complaint's allegations from CWs are inapposite, because those allegations postdate the October 21, 2021 IPO. *See* Compl. ¶¶ 71-96.  Most of the CWs's allegations relate to setting up the MinerVa Miners, which cannot have occurred until the first MinerVa Miners arrived (i.e., after the IPO).  *See* Compl. ¶ 133; *see, e.g., id.* ¶ 81 (CWs had to "Frankenstein" parts to make defective Miners operational); *id.* ¶¶ 88-99 (Stronghold management "imposed unrealistic expectations" by trying to reach "100 efficiency").  Indeed, all three CWs worked at Stronghold for mere days before October 21, 2021.  *See id.* ¶ 47 (CW-1 worked at Stronghold from "early-to-mid-October 2021" until May 2022); *id.* ¶ 48 (CW-2 worked at Stronghold from "early-to-mid-October 2021" until July 2022); *id.* ¶ 49 (CW-3 worked at Stronghold "from October 11, 2021," to May 2022).  They cannot illuminate what Stronghold management knew about MinerVa's likely contractual compliance at the time of the IPO.

Complaint, because an even split of the two types of MinerVa Miners with those energy consumptions produces an average hash rate of 85 TH/s, Stronghold must have known that the Miners would not have hash rates of 100 TH/s.  *See id.*  This argument fails for two reasons.

- The Complaint mischaracterizes the disclosure.  Nowhere do the Offering Materials describe an ***average*** energy consumption of 37 joules per terahash for latest-generation Miners. They state that latest-generation Miners are those that consume 37 joules per terahash.  Thau Decl. Exh. 4 at 6.  Since none of MinerVa's Miners consume exactly 37 joules per terahash, this suggests that the disclosure is referring to Miners from another supplier—not MinerVa Miners.

- The Complaint ignores confounding variables.  Even if the disclosure describes an average energy efficiency for latest-generation Miners—including MinerVa Miners—that average would include the non-MinerVa Miners at Scrubgrass.  Moreover, the average would exclude the MinerVa Miners at Panther Creek, because the disclosure applies only to Scrubgrass.  Given these significant unknown variables, this disclosure does not suggest that Stronghold knew that the MinerVa Miners would operate below the contracted-for 100 TH/s.

### C.    The Offering Materials Warned Investors About the Risk of Suppliers Providing Inadequate Miners.

Courts protect forward-looking statements made in connection with IPOs under the bespeaks-caution doctrine.  *See Garnett*, 2022 WL 4632323, at \*14-15.  Under this doctrine, "[a] forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading."  *Id*. at \*15 (quotation omitted).  The cautionary language must be "meaningful"—i.e., "must pertain to the specific risk that was realized."   *Id.* (quotation omitted).   Thus, cautionary language must "expressly warn of" and "directly relate to" the "risk that brought about the plaintiff's loss."  *Id.* (quotation omitted).  The "relevant inquiry" is whether the issuer knew or should have known that

the warned-of risk had already materialized "at the time" of the IPO.  *Yaroni v. Pintec Tech. Holdings Ltd.*, No. 20 Civ. 8062, 2022 WL 1215450, at *7 (S.D.N.Y. Apr. 25, 2022).

The bespeaks-caution doctrine bars the Complaint.  The alleged misstatements are forward-looking, because they describe expectations for MinerVa's to-be-delivered Miners.  *See* Compl. ¶ 111 (describing "[a]nticipated delivery quantities" and timing); *id.* ¶ 118 (describing an "anticipate[d] . . . total hash rate capacity" for year-end 2021 and 2022) (emphasis omitted). Furthermore, the Offering Materials warn investors of the exact risks that the Complaint alleges materialized.  *See In re ProShares Trust Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013) ("When a registration statement warns of the exact risk that later materialized, a Section 11 claim will not lie as a matter of law."); *see also supra* Section I.A, B (Complaint alleges no facts demonstrating that Stronghold knew that MinerVa would breach the EPA as of the October 2021 IPO).

***Supplier Failures.***  The Offering Materials cautioned investors that suppliers might not provide a sufficient quantity of Miners, and that those Miners might underperform.  The Offering Materials state, "We are dependent on third-party brokers and direct suppliers to source some of our Miners . . . [T]he failure of these brokers or suppliers to perform as expected, could have a material adverse effect on our business, prospects or operations."  Thau Decl. Exh. 5 at 31.  They reiterate, "We have no assurance that business interruptions will not occur as a result of the failure by these brokers or suppliers to perform as expected. . ."  *Id*.  The Offering Materials also describe "a world-wide shortage of mining equipment," which has "extended the corresponding delivery schedules for new Miner purchases."  *Id*.  Per the Offering Materials, "If our brokers or suppliers are not able to provide the agreed services at the level of ***quality and quantity*** we require . . ., we may not be able to replace such brokers or suppliers in a timely manner."  *Id.* (emphasis added). Consequently, investors knew that MinerVa could fail to deliver enough high-hash-rate Miners on

21

time and that this failure "could have a material adverse effect on [Stronghold's] business. . ." *Id.*; *see also In re HEXO*, 524 F. Supp. 3d at 303 (applying bespeaks caution doctrine where the prospectus stated "that revenues were dependent on the purchasing decisions" of third parties).

> ***Chinese Regulations and Power Failures***.  Similarly, the Offering Materials warn that "resource constraints or regulatory actions could also impact our ability to obtain and receive miners." Thau Decl. Exh. 4 at 6.  They state, "China has been experiencing power shortages, and certain of our miner suppliers have been impacted by related intermittent power outages. . .  Such power outages and production relocations could result in cancellations or delays and may negatively impact our ability to receive mining equipment on a timely basis or at all." *Id.* at 31.  They also note, "In September 2021, Chinese regulators instituted a blanket ban on all crypto mining and transactions, including overseas crypto exchange services taking place in China, effectively making all crypto-related activities illegal in China." *Id.* at 45-46.  Consequently, investors knew that power curtailments and cryptocurrency regulation by the Chinese government "could have a material adverse effect on [Stronghold's] business. . ." *Id.* at 31; *see Garnett*, 2022 WL 4632323, at *18 (applying bespeaks-caution doctrine where defendant disclosed that "China may impose more stringent laws, regulations and policies" to regulate the issuer's industry).

## II.     Plaintiffs' Own Allegations Negate Loss Causation.

Although loss causation is not an element of Section 11 and 12(a)(2) claims, these statutes provide defendants with an "affirmative defense of disproving causation." *Akerman v. Oryx Commc'ns Inc.*, 810 F.2d 336, 341 (2d Cir. 1987) (citing 15 U.S.C. § 77k(e), l(b)); *see In re Britannia Bulk Holdings Inc. Sec. Litig.*, 665 F. Supp. 2d 404, 418 (S.D.N.Y. 2009).  Courts dismiss claims based on "negative causation" when "it is apparent from the face of the complaint

that the plaintiff cannot recover her alleged losses. . ."  *Boluka Garment Co., Ltd. v. Canaan Inc.*, 547 F. Supp. 3d 439, 447 (S.D.N.Y. 2021) (quotation omitted).[8]

The Complaint's loss theory is that the market reacted negatively to a "corrective disclosure" on March 29, 2022, regarding MinerVa's breach of the EPA.  *See* Compl. ¶¶ 14-17. According to the Complaint, this "corrective disclosure" caused Stronghold's stock price to decline from $19/share on October 21, 2021, to $4.78/share on April 14, 2022.  Compl. ¶ 148.  For three primary reasons, Plaintiffs' own Complaint refutes their theory of loss causation.

***First***, as the Complaint alleges, Stronghold publicized MinerVa's shipment delays on November 30, 2021, before the alleged corrective disclosure on March 29, 2022.  *See* Compl. ¶¶ 127-33; Thau Decl. Exh. 7 at 10 (Stronghold disclosed in November 2021 that it "would receive only 1,500 miners from MinerVa in 2021. . . ." and that "their constraint comes largely from having an assembly center that has been part of an industrial park that has experienced power curtailments, which—that's concerning").  Accordingly, the alleged corrective disclosure in March 2022 did not "reveal some then-undisclosed fact" and cannot have caused Plaintiffs' loss.  *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010); *see, e.g.*, *Lau v. Opera Ltd.*, 527 F. Supp. 3d 537, 561–62 (S.D.N.Y. 2021) (negative causation barred complaint because "corrective information was already publicly known").

***Second***, in the two days following the initial November 30, 2021, disclosure, Stronghold's stock rose from $17.24/share to $19.79/share.  *See* Thau Decl. Exh. 1.  Successfully pleading corrective disclosures ordinarily necessitates showing that the "stock fell ***immediately*** following the disclosure. . . ."  *Wilbush v. Ambac Fin. Grp., Inc.*, 271 F. Supp. 3d 473, 484 (S.D.N.Y. 2017)

---

[8] Although defendants must demonstrate negative causation, the "negative causation defense in Section 11 and the loss causation element in Section 10(b) are otherwise mirror images."  *In re Lehman Bros. Sec. & Erisa Litig.*, 131 F. Supp. 3d 241, 265 (S.D.N.Y. 2015) (quotations and alterations omitted); *see In re State St. Bank & Tr. Co. Fixed Income Funds Inv. Litig.*, 774 F. Supp. 2d 584, 589 (S.D.N.Y. 2011).

(emphasis added); *see Amorosa v. AOL Time Warner Inc.*, 409 F. App'x 412, 416 (2d Cir. 2011) (summary order) (affirming dismissal based on negative causation where the issuer's "share price went up" after the alleged corrective disclosure).

And ***third***, Stronghold's stock price decline began (1) before the alleged corrective disclosure in March 2022, *see* Thau Decl. Exh. 3, and (2) because of Bitcoin's diminishing value during the widespread cryptocurrency crash, *see* Compl. ¶ 54.  By January 22, 2022, the price of Bitcoin had dropped about one third from the month prior.  *See* Thau Decl. Exh. 2.  By this time, Stronghold's stock had almost halved its IPO price, dropping to $9.21/share.  *See* Thau Decl. Exh. 1.  The March 2022 alleged corrective disclosure cannot have caused losses predating it by almost two months.  *See In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*, 272 F. Supp. 2d 243, 254 (S.D.N.Y. 2003) (dismissing based on "negative causation" because "Plaintiff's alleged 'losses' occurred before th[e] disclosure" and the issuer's fund declined by "an amount proportional to the decline in the entire technology sector"); *see also Schuler v. NIVS Intellimedia Tech. Grp., Inc.*, No. 11 Civ. 2484, 2013 WL 944777, at *10 (S.D.N.Y. Mar. 12, 2013) (dismissing based on "negative causation" because plaintiff sought losses for a period "well prior to the corrective disclosures"); *In re State St.*, 774 F. Supp. 2d at 595 (dismissing based on "negative causation" because plaintiff's losses were "caused by a falling subprime mortgage market"—not "corrective disclosures").[9]

## III.   The Complaint Fails to State a Section 15 Claim.

A Section 15 claim requires:  (1) a "primary violation" of Section 11 or 12(a)(2); and (2) "control of the primary violator by defendants."  *In re Lehman Bros. Mortg.-Backed Sec. Litig.*,

---

[9] Plaintiff Ahmed also lacks standing under Section 12(a)(2), because he purchased shares "pursuant and/or traceable to" the IPO—not in the IPO.  Compl. ¶ 22; *see Pub. Employees' Ret. Sys. of Mississippi v. Merrill Lynch & Co. Inc.*, 714 F. Supp. 2d 475, 484 (S.D.N.Y. 2010).

650 F.3d 167, 185 (2d Cir. 2011) (numbering added); *see Garnett*, 2022 WL 4632323, at *13. Because the Complaint fails to state Section 11 and 12(a)(2) claims against Stronghold, the Section 15 claim against the Individual Defendants also fails.  *See Willard v. UP Fintech Holding Ltd.*, 527 F. Supp. 3d 609, 624 (S.D.N.Y. 2021).

## CONCLUSION

For these reasons, the Court should dismiss the Complaint in its entirety, with prejudice.

Dated:  December 19, 2022

Respectfully submitted,

VINSON & ELKINS LLP

*/s/ Clifford Thau*
Clifford Thau
Marisa Antonelli
David Hoffman
1114 Avenue of Americas
New York, NY 10036
Telephone: (212) 237-0000
Facsimile: (212) 237-0100
Email: cthau@velaw.com
Email: mantonelli@velaw.com
Email: dhoffman@velaw.com

*Attorneys for Stronghold Digital Mining, Inc., Gregory A. Beard, and William B Spence.*