**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins
Andrew Lencyk
55 Broadway, 10th Floor
New York, NY 10006
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: shopkins@zlk.com
Email: alencyk@zlk.com

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen
Jonathan Stern
275 Madison Avenue, 40th Floor
New York, NY 10006
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: jstern@rosenlegal.com
Email: lrosen@rosenlegal.com

*Co-Lead Counsel for Lead Plaintiffs*
*Gulzar Ahmed and the Allegheny County*
*Employees' Retirement System*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARK WINTER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>STRONGHOLD DIGITAL MINING, INC., GREGORY A. BEARD, RICARDO R. A LARROUDÉ, WILLIAM B. SPENCE, B. RILEY SECURITIES, INC., COWEN AND COMPANY, LLC, TUDOR, PICKERING, HOLT & CO. SECURITIES, LLC, D.A. DAVIDSON & CO., COMPASS POINT RESEARCH & TRADING, LLC, and NORTHLAND SECURITIES, INC.,<br><br>Defendants. | Case No. 1:22-cv-03088-RA<br><br>**LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT** |

1

**TABLE OF CONTENTS**

I.    Introduction ............................................................................................................. 1

II.   Factual Background ................................................................................................. 3

      A.    Stronghold's Strategy to Mine Bitcoin at Lower Cost than Competitors .................... 3

      B.    Stronghold's Offering Materials Falsely Claimed A Total Hash Rate Capacity
            That Was, In Reality, Unachievable .................................................................. 4

      C.    Contrary to the Offering Materials, MinerVa, Stronghold's Largest Supplier, Is
            Unable To Ship the Contractually Required Miners to Stronghold ........................... 5

III.  Argument ................................................................................................................ 7

      A.    Legal Standards ............................................................................................. 7

      B.    The Complaint Alleges Materially Misleading Statements and Omissions ................. 9

            1.    The Offering Materials Contained Materially Misleading Statements and
                  Omissions About the Delivery Timeframe and Quantities of Miners ................. 9

            2.    Defendants Made False and/or Misleading Statements Regarding the Hash
                  Rates of MinerVa Miners and Stronghold's Year End 2021 Total
                  Combined Hash Rate ......................................................................... 16

      C.    The Complaint Alleges that Defendants Made Material Omissions In Violation
            of their Obligations Under Items 303 and 105 ..................................................... 20

      D.    The Bespeaks Caution Doctrine Does Not Apply ............................................... 21

      E.    Defendants' Negative Causation Defense Fails ................................................... 22

      F.    The Complaint Alleges Control Person Liability Under Section 15 .......................... 25

IV.   Conclusion ............................................................................................................ 25

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Acito v. IMCERA Grp., Inc.*,
  47 F.3d 47 (2d Cir. 1995) ............................................................................................... 13

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
  572 F.3d 221 (5th Cir. 2009) .......................................................................................... 22

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .......................................................................................................... 8

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ........................................................................................................ 14

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .......................................................................................................... 8

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014) ........................................................................................... 15

*Dodona I, LLC v. Goldman, Sachs & Co.*,
  847 F. Supp. 2d 624 (S.D.N.Y. 2012) ........................................................................... 15

*Garnett v. RLX Tech. Inc.*,
  2022 WL 4632323 (S.D.N.Y. Sept. 30, 2022) ............................................................... 22

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983) .................................................................................................... 8, 10

*In re Adams Golf, Inc. Sec. Litig.*,
  381 F.3d 267 (3d Cir. 2004) ........................................................................................... 23

*In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*,
  757 F. Supp. 2d 260 (S.D.N.Y. 2010) ........................................................................... 15

*In re BioScrip, Inc. Sec. Litig.*,
  95 F. Supp. 3d 711 (S.D.N.Y. 2015) .............................................................................. 14

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
  2018 WL 2382600 (S.D.N.Y. May 24, 2018) ................................................................ 15

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
  986 F. Supp. 2d 487 (S.D.N.Y. 2013) ...................................................................... 15, 16

2

*In re Ferrellgas Partners, L.P., Sec. Litig.*,
   2018 WL 2081859 (S.D.N.Y. Mar. 30, 2018) ........................................................ 14

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   308 F. Supp. 2d 249 (S.D.N.Y. 2004) ..................................................................... 13

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
   643 F. Supp. 2d 562 (S.D.N.Y. 2009) ..................................................................... 23

*In re HEXO Corp. Sec. Litig.*,
   524 F. Supp. 3d 283 (S.D.N.Y. 2021) .............................................................. 10, 22

*In re Initial Pub. Offering Sec. Litig.*,
   241 F. Supp. 2d 281 (S.D.N.Y. 2003) ....................................................................... 8

*In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*,
   272 F. Supp. 2d 243 (S.D.N.Y. 2003) ..................................................................... 25

*In re Omnicom Grp., Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010) ................................................................................... 25

*In re Prudential Secs. Inc. P'ships Litig.*,
   930 F.Supp. 68 (S.D.N.Y.1996) .............................................................................. 21

*In re State St. Bank & Tr. Co. Fixed Income Funds Inv. Litig.*,
   774 F. Supp. 2d 584 (S.D.N.Y. 2011) ..................................................................... 25

*In re Take-Two Interactive Sec. Litig.*,
   551 F. Supp. 2d 247 (S.D.N.Y. 2008) ..................................................................... 24

*Jiajia Luo v. Sogou, Inc.*,
   465 F. Supp. 3d 393 (S.D.N.Y. 2020) ..................................................................... 13

*Kronfeld v. Trans World Airlines, Inc.*,
   832 F.2d 726 (2d Cir. 1987) ................................................................................... 14

*Lau v. Opera Ltd.*,
   527 F. Supp. 3d 537 (S.D.N.Y. 2021) ..................................................................... 25

*Levine v. AtriCure, Inc.*,
   508 F. Supp. 2d 268 (S.D.N.Y. 2007) ..................................................................... 23

*Litwin v. Blackstone Grp., L.P.*,
   634 F.3d 706 (2d Cir. 2011) ................................................................................ 8, 10

*McKenna v. Smart Techs. Inc.*,
   2012 WL 1131935 (S.D.N.Y. Apr. 3, 2012) ........................................................... 13

3

*Milman v. Box Hill Sys. Corp.*,
  72 F. Supp. 2d 220 (S.D.N.Y. 1999) ........................................................................... 21

*FHFA v. Nomura Holding Am., Inc.*,
  104 F. Supp. 3d 441 (S.D.N.Y. 2015) ........................................................................ 23

*FHFA v. Nomura Holding Am., Inc.*,
  2015 WL 685159 (S.D.N.Y. Feb. 18, 2015) .............................................................. 23

*FHFA v. Nomura Holding Am,. Inc.*,
  873 F.3d 85 (2d Cir. 2017) ................................................................................... 14, 23

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015) ..................................................................................................... 19

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
  681 F.3d 114 (2d Cir. 2012) ........................................................................................ 20

*River Birch Cap., LLC v. Jack Cooper Holdings Corp.*,
  2019 WL 1099943 (S.D.N.Y. Mar. 8, 2019) .............................................................. 13

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) ........................................................................................ 21

*Ronzani v. Sanofi S.A.*,
  899 F.2d 195 (2d Cir. 1990) ........................................................................................ 25

*Roth v. Jennings*,
  489 F.3d 499 (2d Cir. 2007) .......................................................................................... 8

*Set Cap. LLC v. Credit Suisse Grp. AG*,
  996 F.3d 64 (2d Cir. 2021) ............................................................................................ 9

*Stratte-McClure v. Morgan Stanley*,
  776 F.3d 94 (2d Cir. 2015) .......................................................................................... 20

*Strougo v. Barclays PLC*,
  317 F. Supp. 3d 815 (S.D.N.Y. 2018) ........................................................................ 11

*Wandel v. Gao*,
  590 F. Supp. 3d 630 (S.D.N.Y. 2022) ........................................................................ 10

*Wilbush v. Ambac Fin. Grp., Inc.*,
  271 F. Supp. 3d 473 (S.D.N.Y. 2017) ........................................................................ 25

*Wilson v. LSB Indus., Inc.*,
  2017 WL 7052046 (S.D.N.Y. Mar. 2, 2017) .............................................................. 19

**Statutes**

15 U.S.C. §77k(a) ....................................................................................................................... 8

15 U.S.C. §77k(e) ..................................................................................................................... 22

**Rules**

Fed. R. Civ. P. 8(a) ............................................................................................................... 8, 10

Fed. R. Civ. P. 15(a)(2)............................................................................................................. 25

**Regulations**

17 C.F.R. §230.424(b)(3)........................................................................................................... 12

17 C.F.R. § 229.303(b)(2)(ii)..................................................................................................... 20

## I.      <u>Introduction</u>

On October 21, 2021, Stronghold Digital Mining ("Stronghold" or the "Company") went public via a Registration Statement and Prospectus (the "Offering Materials"), presenting itself to investors as a low-cost cryptocurrency mining company that planned to generate electricity using coal waste products, which it then would use to power Bitcoin mining computers ("miners"). Crucial to Stronghold's success was obtaining reliable and high-speed miners. Accordingly, Stronghold assured investors that it had secured purchase orders with several manufacturers of Bitcoin miners. The Company's largest contract by far was with China-based MinerVa Semiconductor Corp. ("MinerVa"), entered into on April 2, 2021. Under the contract delivery schedules that Stronghold disclosed in the Offering Materials, MinerVa was to deliver no less than 2,500 to 5,000 miners to Stronghold by October 31, 2021, just ten days after Stronghold's IPO, with all 15,000 miners deliverable by January 2022.

Yet, unbeknownst to investors and in direct contradiction of these representations, MinerVa had already failed to produce a sufficient number of miners ready for shipment as of the IPO. Given that the miners had to arrive from China to Stronghold in the eastern United States a mere 10 days from the IPO, they were already behind schedule. Because it was Stronghold's responsibility to arrange shipping, Defendants were well aware of that fact. Moreover, Stronghold was required to pay MinerVa the remaining 20% of the contract price "one month before the shipping date", yet at the time of the October 21, 2021 IPO, Stronghold had made no such payment. In addition, through their admittedly "constant" and "daily" contact with MinerVa at the time of the IPO, it was at least knowable to Defendants that miner production was then nonviable because MinerVa's production facility was inoperable, and it lacked the necessary component parts to manufacture miners in the contracted-for quantities, and that therefore MinerVa would be unable to meet its delivery obligations then and for the foreseeable future.  Indeed, MinerVa only placed

1

an order with their supplier, AGM, for the miners that were destined for Stronghold, on the approximate date of the IPO. Despite all of these facts, Defendants did not disclose any of this in their Offering Materials and, instead, touted miner deliveries they knew they might never receive under a schedule they knew was impossible to achieve.

After downplaying repeated delays throughout the fall of 2021, Stronghold ultimately disclosed in March of 2022 that it had received only one-third of the contracted miners to date, and had recognized a substantial impairment due to MinerVa's inability to deliver on schedule, or "on *any* time frame." Stronghold also disclosed a substantial impact on its Bitcoin mining revenue due to the miner delays. Defendants also disclosed that the handful of miners MinerVa did deliver "haven't proven reliable" and performed at significantly worse hash rates than promised in the Offering Materials. As a result of Stronghold's failure to obtain the miners and miner performance metrics described in its Offering Materials, Stronghold's Bitcoin mining operation was significantly hampered, and its stock dropped dramatically.

Defendants' arguments for dismissal are meritless. First, while Defendants concede that Stronghold had reason to know there would be delays in the first major miner shipment from MinerVa, due, *inter alia*, to their failure to arrange shipment by the IPO, they contend they could not have known that the delays in hardware critical to Stronghold's Bitcoin mining operations would be material to investors. Materiality determinations, however, are highly factual and thus, inappropriate on a motion to dismiss. Moreover, because MinerVa's miners comprised the majority of Stronghold's touted growth strategy, receiving MinerVa miners according to schedule was highly material to investors. Further, Sections 11 and 12(a)(2) of the Securities Act impose strict liability on securities issuers, and plaintiffs need not allege that Defendants knew their statements were false, let alone that they knew the statements were materially false. But, given the

2

"constant" contact between MinerVa and Defendants, the Complaint plausibly alleges Defendants knew or should have known of the delays, and that they would be severe.

Next, Defendants claim that they either disclosed or had no obligation to disclose the risk of a material breach of the MinerVa contract because it was not a "foregone conclusion." But both SEC regulations and U.S. Supreme Court precedent hold that material uncertain risks must be meaningfully disclosed, which Defendants did not do. Defendants also improperly assert a negative causation argument, an affirmative defense rarely granted at the pleading stage, claiming a market decline in the price of Bitcoin, and not the revelation of the truth about Stronghold's misstatements, caused the drop in Stronghold's stock. But Defendants do not (and cannot at this stage) provide any evidence proving that something other than the alleged misstatements caused the entire decline in stock price. They also fail to explain how the decline in Stronghold's stock price could be caused solely by the change in Bitcoin when it fell disproportionately to the price of Bitcoin. Defendants' motion should be denied.

## II.    Factual Background

### A.    Stronghold's Strategy to Mine Bitcoin at Lower Cost than Competitors

Stronghold describes itself as a "vertically integrated crypto asset mining company currently focused on mining Bitcoin. ¶59.[1] Stronghold owns its own sources of fuel to power its fleet of Bitcoin miners. ¶60. At the time of the IPO, Stronghold stated that it owned one facility in Scrubgrass Township, Pennsylvania (the Scrubgrass Plant), and planned to acquire a second power generation facility, the Panther Creek Plant. *Id.*

Stronghold houses its miners on the same premises as its power generation facilities "to maximize efficiency and to minimize cost". *Id.* Stronghold claimed that because it owned its own

---

[1] References to paragraphs of Plaintiffs' Amended Class Action Complaint ("Complaint") are in the form "¶_". References to pages of the Stronghold Defendants' motion to dismiss brief are in the form "DB_".

power generating facilities, its "net cost of power … of approximately $18 per megawatt-hour ("MWh"), after accounting for [Renewable Energy Credits] and waste coal tax credits, is amongst the lowest compared to … publicly traded peer companies." ¶61. Stronghold added that "[t]his $18 per MWh corresponds to less than $3,000 per Bitcoin equivalent," when Bitcoin was valued at $60,692 per Bitcoin. *Id.*

### B. Stronghold's Offering Materials Falsely Claimed A Total Hash Rate Capacity That Was, In Reality, Unachievable

In the Bitcoin mining industry, total "hash rate" capacity, which represents the combined computing power of a fleet of miners, is the most important performance metric because it allows companies to project the profitability of Bitcoin mining operations. ¶65. As hash rate capacity rises, so does a mining fleet's ability to mine Bitcoin and thus generate profit from mining. *Id.*

Defendants claimed in the Offering Materials that as of the October 2021 IPO, Stronghold operated "approximately 3,000 crypto asset mining computers (known as 'miners') with hash rate capacity of approximately 185 petahash per second ('PH/s')".[2] ¶66. Stronghold's 26,150 additional miners would bring its "total hash rate capacity to over 2,100 PH/s by December 2021 and to over 8,000 PH/s by December 2022," a 1,000% growth rate in just two months following the IPO and a growth rate of over 4,000% in just one year, respectively. *Id.*

Approximately 71%, or 1,500 PH/s, of the 2,100 PH/s hash rate capacity goal Stronghold set for December 2021 was to come exclusively from miners Stronghold purchased from MinerVa. *Id.* Specifically, the Offering Materials stated Stronghold had "entered into a purchase agreement with a seller [MinerVa] for the acquisition of 15,000 of their MV7 ASIC SHA256 model

---

[2] Given that modern Bitcoin mining machines can each generate trillions of hashes per second, the hash rate of an individual miner is often represented in TeraHashes per second ("TH/s", with one TeraHash equivalent to 1 trillion hashes). The combined hash rate of a fleet of miners is often represented in PetaHashes per second ("PH/s", equivalent to 1,000 TH or 1 quadrillion hashes) or ExaHashes per second ("EH/s", equivalent to 1,000 PH or 1 quintillion hashes).

4

cryptocurrency miner equipment (miners) with a total terahash to be delivered equal to 1.5 million terahash", ¶67, thus indicating that each of the 15,000 MinerVA miners had an output of 100 TH/s. *Id.* With MinerVa miners constituting 71% of Stronghold's new miner purchases, Stronghold needed the combined hash rate of the MinerVa model MV7 miners to reach the 2,100 PH/s total combined hash rate set forth in the Offering Materials. *Id.*

**C.      Contrary to the Offering Materials, MinerVa, Stronghold's Largest Supplier, Is Unable To Ship the Contractually Required Miners to Stronghold**

As the Complaint alleges, from September 2021 through at least October 2021, power cuts and outages resulted in numerous slowed or closed factories across China. ¶68. These outages and cuts also led to increases in the price of coal used to generate electricity. *Id.* However, because Chinese regulators did not let Chinese utilities raise rates enough to cover the rising cost of coal, utilities either shut down or were slow to operate their power plants for sufficient hours to meet demand. *Id.* What investors did not know is that the facility where MinerVa assembled miners was subject to the power curtailments in the period leading up to Stronghold's IPO. ¶69. As Stronghold later acknowledged, prior to and at the time of the IPO, power outages prevented MinerVa from assembling and shipping the model MV7 machines to Stronghold, making it impossible to meet the schedule represented in the Offering Materials. *Id.*

Thus, at the time of the IPO, MinerVa was far behind the schedule set forth in the Offering Materials. ¶70. Contrary to Defendants' representation that MinerVa was to deliver "***no less than 5,000*** miners by October 31, 2021," at the time of the IPO (DB1),[3] MinerVa had not yet shipped ***any*** miners, making it impossible for it to deliver the miners by the published deadline. ¶70.

By November 30, 2021 (when another 5,000 miners were due), MinerVa had only delivered 240 miners, and according to confidential witnesses, about one-third of those miners

---

[3] Defendants are correct that the stated amount of MinerVa miners deliverable by October 31 was 5,000. DB1.

were defective. *Id.* CW-2, a Senior Data Center Technician at Stronghold's Panther Creek Data Center and mining facility, recalled that miner deliveries and deployments were far behind schedule at the Panther Creek Data Center, and Stronghold did not have the miners it planned to as of the IPO. ¶71.

Stronghold knew of MinerVa's manufacturing problems through, *inter alia*, "constant" and "daily" communications it had with MinerVa, with whom it "talk[ed] every day" —which is unsurprising, given how critical MinerVa's miners were critical to Stronghold's plans (¶¶14, 72-73, 76, 116, 131, 141), as well as physical inspections of Stronghold's own facilities which confirmed the miners' non-receipt (and defects in the miners received). ¶¶74-75.

Moreover, MinerVa could not build enough miners to meet the schedule because at the time of the IPO, MinerVa had not sourced adequate component parts for any significant number of miners in order to be able to achieve the delivery schedule Stronghold touted in the Offering Materials. ¶77. MinerVa's supplier China-based AGM Group Holdings Inc. ("AGM"), which had been in the chip-making business since only September 2021, announced on October 21, 2021 (the date the IPO) that it "agreed to supply [MinerVa] with 25,000 units - of its 100 TH/S MinerVa MV7 ASIC to build the MinerVa family of crypto miners[.]" *Id*. Thus, MinerVa did not have the parts it needed (application-specific integrated circuits, or "ASICs") from AGM to even construct the MinerVa model MV7 miners Stronghold had ordered. *Id.* Subsequently, on November 4, 2021, industry press reported that the ASIC units were ordered from AGM by MinerVa, "which is then bound to ship" the units as part of "its latest generation of miner equipment to … Stronghold Digital." *Id.* Thus, while the Offering Materials touted the delivery schedule indicating substantial amounts of miners delivered by the end of October 2021, in fact it was impossible for MinerVa to deliver its miners on time, if at all, as represented. *Id.*

6

Further, Stronghold had agreed to pay the remaining 20% of the purchase price one month before shipping. Yet that payment had not been made by October 21, 2021, the IPO date, showing that Defendants did not subjectively believe that the miners could arrive by October 31. ¶78.

Additionally, the operational performance of the MinerVa MV7 miners Stronghold did receive was extremely poor. As Stronghold later admitted, these miners were "below expectations, with hash rates ranging from 50% to 70% of the expected capacity", which translates to hash rates of 50 to 70 TH/s for each miner. ¶81. According to CW-1, CW-2, and CW-3, who had been responsible for putting the miners into operation, approximately one-third of the miners Stronghold received from MinerVa were completely inoperable or "dead on arrival." *Id.* As these three CWs elaborated, the MinerVa miners suffered from various defects and issues including failures with power distribution units ("PDUs"), which caused them to not turn on or short circuit; issues with the miners' cooling fans which caused them to overheat; and issues with the control boards and the MinerVa firmware itself, which rendered the miners inoperable. *Id.* As a result, the CWs and other Data Center Technicians had to "Frankenstein" or "cannibalize" the defective MinerVa miners for parts, to swap them into other MinerVa miners. *Id.* Given that the MinerVa MV7 miners each operated at a mere 50 to 70 TH/s versus the 100 TH/s Stronghold touted in the Offering Materials, Stronghold's Bitcoin mining operations only reached a total combined hash rate of 800 PH/s by year-end 2021, less than 40% of the 2,100 PH/s rate Stronghold claimed in its Offering Materials, cutting into its profits. ¶144.

III.   **Argument**

   A.    **Legal Standards**

To withstand a motion to dismiss, a plaintiff need only allege a "short and plain statement of the claim showing that the pleader is entitled to relief," to "give the defendant fair notice of what     the     ...     claim     is     and     the     grounds     upon     which     it

7

rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The court "must accept as true all of the factual allegations[,] draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." *Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007).

Securities Act claims are subject only to the "short and plain statement" requirements of Fed. R. Civ. P. 8(a). *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715 (2d Cir. 2011). Liability arises under Section 11 if "any part of the registration statement, when such part became effective … omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. §77k(a). Section 11 "was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381–82 (1983). Section 11 "places a relatively minimal burden on a plaintiff" to "only show a material misstatement or omission to establish his *prima facie* case. Liability against the issuer of a security is virtually absolute…. [while] other defendants bear the burden of demonstrating due diligence." 459 U.S. at 382.  As a result, under Section 11, a plaintiff need not allege that defendants knew, or should have known, of the falsity of their statements.  15 U.S.C. §77k(a); *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 344 (S.D.N.Y. 2003) ("Plaintiffs need not plead … that Defendants had the requisite knowledge" even if some defendants may raise an affirmative defense of due diligence).

Liability arises under the Securities Act if: "(1) the statement 'contained an untrue statement of a material fact,' (2) the statement 'omitted to state a material fact required to be stated

8

therein,' or (3) the omitted information was 'necessary to make the statements therein not misleading.'" *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 84 (2d Cir. 2021). "A statement or omission is material if a reasonable investor would view it as significantly altering the total mix of information made available." *Id.* (citation omitted).

### B. The Complaint Alleges Materially Misleading Statements and Omissions

#### 1. The Offering Materials Contained Materially Misleading Statements and Omissions About the Delivery Timeframe and Quantities of Miners

Defendants falsely represented in Stronghold's Offering Materials that MinerVa would deliver 15,000 Bitcoin miners, including "no less than 2,500 miners by October 31 2021, no less than 5,000 miners by November 30, 2021, no less than 5,000 by December 31, 2021." ¶ 111. This schedule was designed to reassure investors that Stronghold would have a large fleet of miners in short order. Yet this statement was false when made because, at the time of the October 21, 2021 IPO, a mere ten days before the first shipment was required to arrive, not a single miner had been shipped from China, making it impossible for MinerVA to meet its contractual obligation under the delivery schedule. Meanwhile, crippling supply and production problems at MinerVa made it impossible for MinerVa to ship miners on anywhere near the schedule, if at all. Thus, Defendants' stated schedule was inaccurate as of the IPO. Indeed, by November 30, 2021 Stronghold had only received 240 miners, and by January 6, 2022 it had received only 1,000. ¶¶130, 135. Similarly, Defendants' statement "[w]hile many of our competitors have struggled to obtain mining equipment due to historically strong demand and pre-sold supply, we believe that [] recent confirmed purchase orders demonstrate our ability to leverage the breadth of our relationships to quickly expand our mining capacity" was misleading because it assured investors that Stronghold was, unlike its competitors, *not* struggling to obtain mining equipment, as confirmed by its MinerVa order (by far the largest). In fact, the MinerVa order proved the opposite: it was severely

9

delayed and in serious jeopardy. ¶¶113-14.

Defendants make several unavailing arguments. First, they claim their statements are not actionable because Plaintiff failed to allege Defendants "knew" or "should have known" at the time of the IPO that MinerVa would "breach" its contract. But Plaintiffs need not allege Defendants' knowledge that their statements were false. Rather, as the U.S. Supreme Court held in *Huddleston*, "a plaintiff … need only show a material misstatement or omission to establish his prima facie case. ***Liability against the issuer of a security is virtually absolute***, even for innocent misstatements." 459 U.S. at 382 (emphasis added); *see also* cases cited in Section III.A above.[4]

Even if Plaintiffs were required to allege facts showing it was knowable to Defendants at the time of the IPO that their statements concerning the delivery schedule for MinerVa miners were false, the Complaint alleges ample facts showing just that. For example, Defendants concededly communicated with MinerVa "daily", according to CW-1 and CW-2 through videoconferencing and audio phone calls, through which Defendants knew MinerVa's factories were inoperable, and MinerVa could not source parts to make the miners. ¶¶14, 72-77, 116, 131,141. Defendants argue the Complaint fails to allege the substance of those admitted communications—a detail neither Rule 8(a) nor Section 11 requires. *See Litwin*, 634 F.3d at 715–16. Nonetheless, Plaintiffs have alleged the substance of those conversations, which CWs (and Defendants themselves) stated concerned mainly (and unsurprisingly) the problems and delays producing the miners. ¶¶14, 73, 76, 130-31, 137, 141. These well-pled facts support a plausible inference it was at least knowable to Defendants, at the time of the IPO, that MinerVa was severely

---

[4] Defendants cite two cases for the proposition that Sections 11 and 12(a)(2) require allegations that defendants knew or should have known of the concealed facts, but those cases are contrary to the language of Section 11 and the Supreme Court precedent in *Huddleston*, 459 U.S. at 382, and both were decided when the events that caused the defendants' statements not to come true had yet to occur. *See Wandel v. Gao*, 590 F. Supp. 3d 630, 640 (S.D.N.Y. 2022) (allegations of inadequate risk disclosures predicting impact of COVID-19 pandemic in IPO before it happened); *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 301 (S.D.N.Y. 2021) (allegation that company would not undertake a transaction, or its customer would not meet a purchase commitment, nine months post-IPO).

behind schedule, miners simply could not be produced, at least not anywhere near the numbers or timeframe Stronghold represented to investors. MinerVa's delays were only unknowable to Defendants if the Court assumes that MinerVa was lying to Defendants, yet that there is no fact in the record indicating that MinerVa lied to Defendants; to the contrary, on November 30, 2021, Defendant Beard actually reassured investors that Defendants did not believe MinerVa was lying. ¶131. Beard reassured investors that MinerVa would fix their assembly issues and ship miners. *Id.*

Other CWs confirm the material delays were at least knowable to Defendants at the time of the IPO. CW-1 stated that Defendant Talcott visited Stronghold's Panther Creek facility in mid-to-late October 2021, at which time Talcott acknowledged MinerVa did not have many miners and could not provide them on the timeframe Strongly gave investors in the Offering Documents . ¶75. CW-2 recalled that "miner deliveries and deployments were behind schedule at the Panther Creek Data Center, and Stronghold did not have the miners it planned to have as of the IPO." ¶71.[5]

In addition, Defendants do not contest they knew MinerVa would fail to provide miners on time because, as of the IPO, MinerVa had not asked them to arrange and pay for shipping from China, which was their obligation under their contract with MinerVa.[6] Defendants contend that the lack of shipping arrangements only put them on notice of an "immaterial delay in MinerVa's first shipment." DB12. Materiality determinations, however, are highly factual and, thus, inappropriate for a decision on a motion to dismiss. *See Strougo v. Barclays PLC*, 317 F. Supp. 3d 815, 818

---

[5] Defendants attempt to discredit the multiple CWs by noting that the CWs joined Stronghold shortly before the Company's IPO. Not only does their length of tenure prior to the IPO not invalidate their knowledge of events at the time of the IPO, but Defendants also fail to provide context that as of October 7, 2021, Stronghold only had 50 employees. Oct. 21, 2021 Form 434B4 at 127. Accordingly, the four CWs represented up to 8% of Stronghold's entire workforce at the time of the IPO, not to mention that all four CWs were focused on the Company's Bitcoin operations specifically, rather than in Stronghold's administrative or other units. Therefore, there is a plausible inference that the four CWs constituted a significant portion of Stronghold's workforce engaged in the Bitcoin mining operations.

[6] That Stronghold had not yet paid the 20% installment payment due "one month before the shipping date" as of the October 21, 2021 Prospectus filing also indicates Defendants were aware MinerVa would not meet the represented delivery schedule, which called for deliveries to *arrive* by October 31, 2021. ¶78.

(S.D.N.Y. 2018). Moreover, it is indisputable that the receipt of critical hardware (*e.g.*, miners) from Stronghold's largest supplier was material.

Further supporting an inference that MinerVa's delays were knowable as of the IPO is that MinerVa only contracted to purchase chips, a necessary component, from AGM on October 21, 2021—just ten days before MinerVa was to make its first shipment of miners containing AGM's chips to Stronghold. Defendants argue that this fact was not known or knowable to them as of the IPO because AGM filed its press release with the SEC after Stronghold published the Offering Documents. DB at p. 13. However, while AGM filed the release *with the SEC* at 5 PM, AGM had also published the press release over PRNewswire at 9:18 AM, before Stronghold's Prospectus was filed. Stern Dec. Ex. 1.[7] The arrangement between AGM and MinerVa shows that it was knowable MinerVa had not secured the necessary computer chips until ten days before MinerVa was to deliver miners. Moreover, Defendants' argument that there was no way of knowing if the AGM contract was for the same miners to be provided to Stronghold falls flat; AGM's release clearly stated the chips would be supplied to MinerVa to build the exact same miner model MV7 that MinerVa was to ship to Stronghold, which at the very least puts them on notice of a duty to inquire as to whether these are in fact the same miners. Defendants also ignore the report on the cryptocurrency website "The Block" cited in the Complaint which states those miners would be shipped to Stronghold. ¶78 & n.32.

Defendants also claim the delayed shipment from MinerVa, which arrived between November 8 and 30, 2021, was an immaterial delay. But even so, MinerVa only shipped 240 miners—meaning MinerVa was 7,260 miners behind schedule and had delivered a paltry 3.2% of

---

[7] Even if Stronghold's press release were issued shortly after Stronghold's registration statement became effective, it would not aid Defendants because SEC regulations require registrants such as Stronghold to update their prospectuses with information on any major developments occurring within five days after their offering documents are declared effective. 17 C.F.R. §230.424(b)(3).

miners expected by November 30 according to the Offering Materials. ¶124. Far from a slight delay, this indicated critical supply chain problems with Stronghold's largest supplier of miners that detrimentally impeded Stronghold's mining operations.

Defendants cite *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 270 (S.D.N.Y. 2004). which held three-month project delay failed to allege a material omission, but that case only held that the complaint failed to allege specific facts showing that the three-month delay was material to the overall company, which it was required to do under the heightened pleading requirements of Rule 9(b). Plaintiffs here are not subject to those heightened requirements. In addition, here, the delay was material because MinerVa was to supply the majority (71%) of Stronghold's miners and, as of the IPO, did not have the parts to even construct the miners. Thus, the belated shipment of only 240 miners was indicative of a much larger problem--that MinerVa likely would not supply the agreed to quantity of miners.

Next, Defendants contend their statements are not actionable because they do not have a duty to disclose the status of ongoing business negotiations. DB10-11. Stronghold's contractually agreed-to delivery schedule hardly qualifies as an "ongoing business negotiation." MinerVa's negotiations with Stronghold were concluded in April 2021—months before the October IPO— and investors had every reason to be confident that the contract's terms were no longer uncertain.[8]

---

[8] Defendants' cases (DB10-11) are inapposite as they concern developments in the course of negotiating contracts before execution, which investors understand are by their nature uncertain, or events which defendants had no way of predicting, unlike here. *See McKenna v. Smart Techs. Inc.*, 2012 WL 1131935, at *15 (S.D.N.Y. Apr. 3, 2012)(disclosure obligations do not apply to "***beginning co***ntract discussions between companies if [the] outcome [is] known to be uncertain.") (emphasis added); *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 53 (2d Cir. 1995) (failure to disclose two inspections not actionable where a third inspection ultimately led to a plant being shut down, as there was nothing about the first two inspections to indicate the third inspection would lead to any adverse consequences; here, by contrast, by the time of the IPO it already was a "foregone conclusion" that MinerVa would fail to deliver its miners according to the contract); *River Birch Cap., LLC v. Jack Cooper Holdings Corp.*, 2019 WL 1099943, at *8 (S.D.N.Y. Mar. 8, 2019) (finding no duty to disclosure only because it was too early at the time of alleged material omission to determine whether there would be any breach of contract at all; here the signs of a future breach were known at the time of the IPO); *Jiajia Luo v. Sogou, Inc.*, 465 F. Supp. 3d 393, 412 (S.D.N.Y. 2020) (court found complaint did not allege anything had gone awry by the time of the IPO; here, as Defendants do not dispute, the failure

13

Defendants' use of the word "anticipated" preceding the contractual delivery schedule to purportedly reflect  "risks and uncertainties" cannot save them where, as here, their statements concealed the negative present facts that MinerVa was already materially behind on its deliveries. *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 737 (S.D.N.Y. 2015) (statement that defendants "anticipated 'relatively flat' revenues" misleading for failure to disclose loss of major client).

Defendants' argument that they had no duty to disclose the "speculative risk" that MinerVa would breach its contract rests on a faulty premise. Whether there was or would be technical breach is not the issue; rather, Defendants must disclose material adverse facts that would render statements misleading regardless.  *See, e.g., FHFA v. Nomura Holding Am,. Inc.*, 873 F.3d 85, 146-47 (2d Cir. 2017) (whether statement or omission is material is a "totality-of-the-circumstances inquiry").  In any event, MinerVa had already breached its contractually-agreed to delivery and quantity schedule at the time of the IPO.  Moreover, the U.S. Supreme Court has held that "contingent or speculative information or events" are material and thus must be disclosed, if they meet a balancing test "of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988). The Second Circuit has applied this standard to Section 11 claims. *See, e.g., Kronfeld v. Trans World Airlines, Inc.*, 832 F.2d 726, 731–32 (2d Cir. 1987). Here, the magnitude of consequences of MinerVa failing to deliver the miners was undeniably substantial: Stronghold indicated MinerVa would supply 15,000 of the total 26,150 it contracted to purchase by the end of 2021, and MinerVa's 15,000 miners were to provide 71% of the computing power Stronghold needed by year-end 2021. ¶¶63, 66. And MinerVa's failure to deliver

---

to arrange shipping alone made it impossible for MinerVa to comply with the contract terms by the time of the IPO); *In re Ferrellgas Partners, L.P., Sec. Litig.*, 2018 WL 2081859, at *14 (S.D.N.Y. Mar. 30, 2018) (court found that question of whether there would be a default at all was speculative; here, by the time of the IPO, it was inevitable MinerVa would default on terms).

those miners in 2021 was highly probable at the time of the IPO. Indeed, because the miners had not shipped from China by the time of the IPO, and MinerVa's factory was inoperable, significant delays were assured. ¶¶68-69.

Defendants' statement that "[w]hile many of our competitors have struggled to obtain mining equipment due to historically strong demand and pre-sold supply, we believe that [] recent confirmed purchase orders demonstrate our ability to leverage the breadth of our relationships to quickly expand our mining capacity", is not, as they contend, inactionable puffery. DB14-15 (relying on *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (holding statements with qualifiers such as "aims to," "wants to," and "should," inactionable puffery or mere corporate optimism)). Rather than being merely aspirational, Defendants' statement contained a specific claim that, unlike competitors, Stronghold was not subject to such problems, as supported by "recently confirmed purchase orders" such as from MinerVa. Such opinion-based statements that are anchored in 'misrepresentations of existing facts'" are actionable. *In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 310 (S.D.N.Y. 2010) (internal citation omitted); *see also In re Chicago Bridge & Iron Co. N.V. Sec. Litig.,* 2018 WL 2382600, at *8 (S.D.N.Y. May 24, 2018) (distinguishing *City of Pontiac* and holding that statement that the company "continue[s] to make progress and substantial progress" on nuclear projects despite the existence of delays in said projects was actionable).

Finally, Stronghold's purported risk disclosures are not only deficient, but misleading. *See In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) ("risk disclosures" misleading when they represented revenue cut as merely possible, when it had already materialized); *Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 646 (S.D.N.Y. 2012)

15

("[s]ince the Offering Circulars contained affirmative representations regarding the risks of investing, [] Defendants had a duty to ensure that those statements were accurate and complete."). Here, the Offering Materials contained risk disclosures framed in future terms, telling investors that "[w]e cannot ensure that our brokers or suppliers *will continue to* perform services to our satisfaction or on commercially reasonable terms" (emphasis added). These statements imply that Stronghold's suppliers including MinerVa were, at the time of the IPO, performing to Stronghold's satisfaction and on commercially-reasonable terms. Similarly, Stronghold's warning that "*[i]f* our brokers or suppliers are not able to provide the agreed services at the level of quality and quantity we require or *become unable* to handle the volume of miners we seek, we may not be able to replace such brokers or suppliers in a timely manner," conveyed to investors that, at the time of the IPO, Stronghold's suppliers including MinerVa were able to handle the volume of miners Stronghold sought. Such risk disclosures were materially misleading because the purported risks warned of had already occurred. *Facebook*, 986 F. Supp. 2d at 516. Defendants do not address the Complaint's allegations that these risk disclosures were misleading. *E.g.*, ¶¶108, 115-16.

### 2. Defendants Made False and/or Misleading Statements Regarding the Hash Rates of MinerVa Miners and Stronghold's Year End 2021 Total Combined Hash Rate

Stronghold's Offering Materials falsely represented not only the delivery schedule for miners purchased from MinerVa, but also the expected computer power or hash rate (and thereby the ability to mine Bitcoin). Stronghold claimed it had purchased "15,000 of [MinerVa's] MV7 ASIC SHA256 model cryptocurrency miner equipment (miners) *with a total terahash to be delivered equal to 1.5 million terahash* (total terahash)". ¶67 (emphasis added). The statement implies that each of the 15,000 MinerVa miners would output 100 TH/s, or at least an average of 100 TH/s per miner, to reach 1.5 million total terahash. As Stronghold later revealed, the performance (i.e. hash rate) of the MinerVa miners eventually received was "below expectations,

16

with ***hash rates ranging from 50% to 70% of the expected capacity [i.e. 50-70 TH/s], compared to 90%+ for a standard performing machine [i.e. 90 TH/s]***." ¶84 (emphasis added). Not only did Stronghold reveal that it actually internally expected only around 90% capacity, or 90 TH/s per machine, but Stronghold only revealed this internal expectation to investors to cushion the fact that the miners in actuality performed at just 50 to 70 TH/s, rather than the 100 TH/s touted in the Offering Materials. As a result, Stronghold did not reach a total combined hash rate of 2,100 PH/s across its mining fleet by year end 2021 as represented in the Offering Materials, instead only reaching 800 PH/s. ¶¶118, 144–146. CW-2 corroborated that the hash rate figures as of the IPO were "wrong" and imposed "unrealistic expectations". ¶96.

Though unnecessary, the Complaint also alleges specific facts showing that Defendants should have known that the miners would not actually operate at 100 TH/s.. The Complaint alleges Stronghold stated in its Offering Materials that it would outfit its facility using "latest-generation miners", which Defendants defined as "miners with an efficiency of 37 joules per terahash" (J/TH), yet not a single model of MinerVa miner matches both the 100 TH/s hash rate Stronghold and efficiency in the vicinity of 37 J/TH. ¶87. MinerVa manufactures three sub-models of the MV7 miner: the MV7L miner with a hash rate of 95–105 TH/s and an efficiency of 31 J/TH; the MV7M with a hash rate of 85–95 TH/s and an efficiency of 35 J/TH; and the MV7S with a hash rate of 75–85 TH/s and an efficiency of 39 J/TH. *Id.*

Defendants claim that the 37 J/TH miners described in the registration statement refer to different, non-MinerVa miners, brands which constituted a minority of the miners Stronghold had contracted to purchase as of the time of the IPO. However, if Stronghold actually anticipated receiving miners more efficient than 37 J/TH, such as MinerVa model MV7L miners with a 31 J/TH efficiency, there is no reason they would they have boasted having purchased *lower*

17

efficiency 37 J/TH miners in the Offering Documents. Moreover, by asking the Court to draw an uncertain inference in favor of Defendants that Defendants were really referring to a secret, undisclosed set of non-MinerVa miners, Defendants ignore Rule 12(b)(6)'s standard that inferences be drawn in favor of the plaintiff.

Further supporting the inference that Defendants never expected the MinerVa miners to operate at or around 100 TH/s is Stronghold's March 29, 2022 press release, which explained why the Company was revising down their growth projections first set forth in the Offering Materials. ¶137. The release stated that the MinerVa miners hashed at rates "ranging from 50% to 70% of the expected capacity, *compared to 90%+ for a standard performing machine*." *Id.* (emphasis added). Defendants claim that the statement that miners operate at 90%+ of the advertised hash rate capacity is consistent with their statement in the Offering Materials that the same miners would operate at 100 TH/s, *i.e.*, 100% of the nameplate capacity. If 90%+ capacity is a reasonable estimate for standard performing miners, then Stronghold's communication of such estimate to investors indicates Stronghold knew some MinerVa miners would not operate at 100 TH/s consistently, but rather in a range from 90 to 100% (90 to 100 TH/s). Thus, the performance figure provided in the Offering Materials of 100 TH/s per MinerVa miner was false.

Moreover, Defendants do not explain why Stronghold only told investors months after the IPO that it had an internal expectation for hash rates as low as 90 TH/s per machine, despite touting 100 TH/s in the Offering Materials.[9] If in the alternative Defendants truly did not know the hash rates for miners from their largest supplier at the time of the IPO, they do not explain why they

---

[9] Defendants contend the MinerVa miners were only were required to have an average hash rate of 100 TH/s, rather than a precise guarantee of 100 TH/s per miner. However, Defendants' argument wholly sidesteps the fact that regardless of whether the 100 TH/s figure stated in Stronghold's Offering Materials was an average or specific figure, the fact remains that the MinerVa miners Stronghold eventually received were underperforming, operating at a mere 50 to 70 TH/s. Even if Stronghold had received 15,000 MinerVa miners, and each had operated at the higher end of 70 TH/s, those 15,000 miners would have generated just 1,050 PH/s, far short of the 1,500 PH/s described in the Offering Materials.

failed to make the required reasonable inquiry to learn that 90+% efficiency was to be expected. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 188 (2015).

Defendants also claim that if MinerVa failed to provide miners with an average hash rate lower than 100 TH/s, MinerVa could make up the shortfall by providing additional miners. For this Defendants point to Page F-18 of the Registration Statement, but nowhere do the Offering Materials state that MinerVa could fulfill the 15,000-miner contract by providing a higher quantity of lower hash rate miners. Having MinerVa ship lower hash rate miners does not make business sense for Stronghold, either; as the Complaint notes, Stronghold sought the "latest-generation miners" which built with an emphasis on energy efficiency, given the key role energy costs play in Bitcoin mining profitability. Any lower-hash-rate miners MinerVa could plausibly backfill would be less energy efficient, making it more costly to Stronghold to operate a larger quantity of lower hash rate miners operating at lower efficiency. ¶87.

Defendants also assert that because Stronghold had not received any miners from MinerVa at the time of the IPO, they could not have known that the hash rates were lower than promised in the Offering Materials, and therefore, Stronghold's projected average hash rate of 100 TH/s for MinerVa miners could not be misleading. This contention ignores the fact that Defendants later admitted they never expected the miners to operate at 100% capacity, but rather at 90+% capacity or 90+ TH/s. Moreover, statements of opinion such as projections are materially misleading where, as here, "they do not result from a meaningful inquiry into their truth." *Omnicare*, 575 U.S. at 188. If Defendants truly did not and could not determine the actual hash rates of the MinerVa miners at the time of $70 million April 2021 contract, or at the time of the IPO, then their statement was misleading due to Stronghold's failure to make a "meaningful … inquiry". *Id.; see also Wilson v. LSB Indus., Inc.*, 2017 WL 7052046, at *1 (S.D.N.Y. Mar. 2, 2017) (holding plaintiff had

19

"plausibly alleged that defendants' cost and schedule estimates were misleading because the projections omitted the fact that [defendant] had not performed a meaningful inquiry into the engineering necessary to complete the … project.").

### C.     The Complaint Alleges that Defendants Made Material Omissions In Violation of their Obligations Under Items 303 and 105

Under Regulation S-K, Item 303, courts inquire whether "a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations." *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012). If a trend, event, or uncertainty becomes known to management, disclosure is mandated unless management determines it is "not reasonably likely to occur." If, however, "management cannot make that determination, it must evaluate objectively the consequences of the known trend [, event, or uncertainty] ... on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 103 (2d Cir. 2015).

Plaintiffs allege that the failure of the Offering Materials to disclose the ongoing trend and uncertainty that Stronghold's largest supplier of miners could not deliver them on anywhere near the timeframe stated in the Offering Materials, if at all, violated Item 303 (17 C.F.R. § 229.303(b)(2)(ii)), because these undisclosed facts would (and did) have an unfavorable impact on Stronghold's sales, revenues, and income for continuing operations, as did occur. ¶¶104-06.

Defendants argue that they are not liable under Item 303 because, while they do not contest they were aware of a breach at the time of the IPO, they did not know "that MinerVa would *materially* breach the EPA." But this misconstrues their obligation under Item 303. The knowledge requirement only applies to the first prong – the existence of the trend or uncertainty, which

20

Defendants clearly knew. Thus, even if Defendants did not know at the time of the IPO that MinerVa's breach would be material, once they realized that a breach was possible, or a foregone conclusion, they had an obligation to determine whether it was reasonably likely to occur. If they could not determine that it was not reasonably likely to occur – and since MinerVa had not even arranged shipping by the IPO, Defendants could not have reasonably so concluded – they were obligated to evaluate the consequences of MinerVa's breach assuming it would occur. And they were obligated to disclose unless they could affirmatively determine the breach would not have a material effect. Defendants identify no facts that could allow them to reach such a determination, thus their argument they have no liability under Item 303 is meritless.[10]

### D.      The Bespeaks Caution Doctrine Does Not Apply

Defendants invoke the "bespeaks caution" doctrine to insulate themselves from liability. However, as the Second Circuit found, "[c]autionary words about future risk ***cannot insulate from liability the failure to disclose that the risk has transpired***." *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004); *see also In re Prudential Secs. Inc. P'ships Litig.*, 930 F.Supp. 68, 72 (S.D.N.Y.1996) ("The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away."); *Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 232 (S.D.N.Y. 1999) (disclosure that "[t]he Company generally does not enter into long-term contracts with its customers, and customers generally have certain rights to extend or delay the shipment of their orders or to cancel orders without penalty" was misleading for failing to disclose that "the sales cycle problem was a present reality at the time of the Offering."). Here,

---

[10] For the reasons discussed herein, Defendants' risk disclosures were also insufficient under Regulation S-K, Item 105, as they did not disclose that, by the time of the IPO, Stronghold's largest supplier of miners, MinerVa, was so crippled by problems in its assembly facilities and its inability to source components for the miners, that it could not assemble or deliver the miners touted in the Offering Materials. ¶¶107-08.

and as discussed above (III.B.1), Defendants' risk disclosures were actively misleading because they portrayed then-existing, severe problems with suppliers being able to deliver as a future problem, rather than one that was then affecting MinerVa. Defendants' warning that suppliers may not provide enough miners or that they might underperform (DB21-22) did not warn investors that MinerVa had *already* failed to take actions necessary to deliver its initial shipment of miners on time, and that its factory was inoperable so it would not meet future deliveries either.[11] Likewise, "warnings" that power outages in China "could result in cancellations or delays and may negatively impact our ability to receive mining equipment on a timely basis or at all" (DB22) ignores that MinerVa **already** was experiencing severe delays, an inoperable factory, and parts shortages at the time of the IPO.[12]

### E.    Defendants' Negative Causation Defense Fails

"Once a plaintiff establishes a prima facie case under the Securities Act, loss causation is presumed"—*i.e.*, any decline in the stock price is presumed to have been caused by the misrepresentations or omissions in the registration statement. *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 234 (5th Cir. 2009). Defendants may try to rebut that presumption by "prov[ing]" that all or part of the stock loss did not result from any misrepresentation or omission—the "negative causation" defense. *Id.*; 15 U.S.C. §77k(e). But this is an affirmative

---

[11] For example, the language "[t]he failure of these brokers or suppliers to perform as expected, could have a material adverse effect on our business, prospects or operations" does not apply to MinerVa's shipment failure because, by the time of the IPO, Defendants could not have reasonably expected MinerVa's first shipment to be on time. Defendants also point to language (not specific to MinerVa) that a shortage of equipment has "extended the corresponding delivery schedules for new Miner purchases." But the issue here is not that MinerVa was imposing extended delivery schedules, but it did not and could not meet the schedules promised. Likewise, the "disclosure" that "[i]f our brokers or suppliers are not able to provide the agreed services at the level of quality and quantity we require . . ., we may not be able to replace such brokers or suppliers in a timely manner" s did nothing to warn investors of the adverse consequences of MinerVa's then-present failures, but only of potential consequences of future (unknown) supply failures. Defendants' citation to *In re HEXO* is inapposite because there, the issuer specifically disclosed in the registration statement that their customer was facing delays and making smaller than required orders under their contract. 524 F. Supp. 3d at 294.

[12] *Garnett v. RLX Tech. Inc.*, 2022 WL 4632323, at *18 (S.D.N.Y. Sept. 30, 2022) (DB20), is inapposite because the issuer there not only noted the possibility of China imposing more stringent regulations in the future, but also accurately described the then-current state of the Chinese regulation relevant to its product.

defense, "reflecting Congress's 'desire to allocate the risk of uncertainty to the defendants.'" *Levine v. AtriCure, Inc.*, 508 F. Supp. 2d 268, 272 (S.D.N.Y. 2007) (citation omitted).

The burden on defendants to prove negative causation is "heavy". *Nomura Holding*, 873 F.3d at 153, 155. While a defendant may ultimately be able to prove negative causation, "an affirmative defense may not be used to dismiss a plaintiff's complaint under Rule 12(b)(6)." *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 277 (3d Cir. 2004); *see also Levine*, 508 F. Supp. 2d at 272–73 ("Because an analysis of causation is often fact-intensive, negative causation is generally established by a defendant on a motion for summary judgment or at trial.").

"While courts have, on occasion, found dismissal of Section 11 and 12 claims based on a negative causation defense proper in light of the allegations pleaded in the complaint," they generally involve substantial stock price declines *before* any alleged corrective disclosure. *In re Giant Interactive Grp., Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 572 (S.D.N.Y. 2009). No such fact pattern is present here.

Defendants cannot meet their heavy burden. They offer no expert analysis or opinion, as typically required to show negative causation. *See FHFA v. Nomura Holding Am., Inc.*, 2015 WL 685159, at *4 (S.D.N.Y. Feb. 18, 2015) ("It will be difficult (if not impossible) for the defendants to sustain their burden of showing loss causation without persuasive expert testimony"). Rather, Defendants argue that the decline in Stronghold's stock price after the IPO was solely caused by a decline in the value of Bitcoin and not Defendants' corrective disclosures. DB23-24. This argument fails for several reasons. First, a negative causation defense will not succeed unless Defendants can prove that ***all*** of the decline in a security's price is tied to factors unconnected to their misstatements. *FHFA v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 587 (S.D.N.Y. 2015) ("where the burden of proving negative loss causation falls on defendants, the exact same

23

inability to disentangle works to defendants' disadvantage."). Here, while the price of Bitcoin declined from the date of the IPO to the filing of the initial complaint, it declined far less than the price of Stronghold stock. The price of Bitcoin declined by 38.2% from October 20, 2021 to April 14, 2022, but the price of Stronghold stock declined by 75% over the same period. Stern Dec. Ex. 2; ¶16. Moreover, on March 30, 2022, after Defendants announced an impairment related to MinerVa's failure to deliver miners, the price of Stronghold stock declined 32%, while conversely the price of Bitcoin increased from March 29 to March 30. Stern Dec. Ex 2, ¶15. Finally, it is also possible that information regarding MinerVa's breach leaked out prior to Defendants' March announcement, and Defendants have not proven that none of the decline in Stronghold's stock price was caused by the alleged misstatements.

Additionally, Defendants' argument that all relevant facts were revealed on November 30 is false. While Defendants disclosed that some MinerVa shipments were delayed, they couched that disclosure in the reassurance that "[p]erformance for [MinerVa] machines has been in line with expectations" and that "[w]e had expected all 15,000 MinerVa miners to be received late this year or early next year, and this is still the case". They also mollified investors that they "remain[ed] on track to achieve its hash rate capacity goal of 8,000+ PH/s by the end of 2022." By downplaying the severity of the situation, and countering it with false, positive statements, Defendants concealed the truth until March 29 when they revealed the full extent of MinerVa's failure. *See In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 289-90 (S.D.N.Y. 2008) (article's discussion of possible wrongdoing did not negate loss causation from later announcement of SEC investigation).

Defendants' cases (DB22-24) are distinguishable. In *Merrill Lynch*, unlike here, the decline in the price of the fund was directly "proportional to the decline in the entire technology sector".

*In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*, 272 F. Supp. 2d 243, 254 (S.D.N.Y. 2003). *Omnicom* concerns loss causation element, an affirmative element of a claim under Section 10(b) of the Securities Exchange Act, and occurred on a full record at summary judgment. *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010). *Lau* dismissed where "the allegedly corrective information was already publicly known and *referred to in the allegedly misleading statements*." *Lau v. Opera Ltd.*, 527 F. Supp. 3d 537, 561 (S.D.N.Y. 2021) (emphasis added). *Ambac Financial Group Wilbush v. Ambac Fin. Grp., Inc.*, 271 F. Supp. 3d 473, 484 (S.D.N.Y. 2017) involved Section 10(b) claims and did not suggest that the lack of an immediate stock drop is sufficient to establish a negative causation defense in a Section 11 case. *State Street* is inapposite because there, the court ruled the misstatements could not have caused investors' losses because the value of a mutual fund is determined by its Net Asset Value, ***not an open market***, and since misstatements cannot inflate Net Asset Value, they cannot cause investors' losses. *In re State St. Bank & Tr. Co. Fixed Income Funds Inv. Litig.*, 774 F. Supp. 2d 584, 595 (S.D.N.Y. 2011).

### F.      The Complaint Alleges Control Person Liability Under Section 15

Defendants do not contest that, if the Complaint successfully alleges a primary violation, it also alleges control liability. Because, as set forth above, the Complaint alleges primary violations of Section 11 and 12, it alleges a Section 15 control person claim.

## IV.      Conclusion

For the foregoing reasons, the motion to dismiss should be denied. If the Court dismisses any part or all of the Complaint, Plaintiffs respectfully request leave to amend, which should be "freely given" especially where, as here, no prior pleading has been adjudicated. *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990) (citing Fed. R. Civ. P. 15(a)(2)).

Dated: February 17, 2023

**THE ROSEN LAW FIRM, P.A.**

25

/s/ Jonathan Stern
Laurence M. Rosen
Jonathan Stern
275 Madison Avenue, 40th Floor
New York, NY 10006
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: jstern@rosenlegal.com
Email: lrosen@rosenlegal.com

**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins (SH-1887)
Andrew Lencyk (AL-4329)
55 Broadway, 10th Floor
New York, NY 10006
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: shopkins@zlk.com
Email: alencyk@zlk.com

*Co-Lead Counsel for Lead Plaintiffs*
*Gulzar Ahmed and the Allegheny County*
*Employees' Retirement System*