**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MARK WINTER,

                Plaintiff,

        v.

STRONGHOLD DIGITAL MINING, INC.,
GREGORY A. BEARD, RICARDO R. A
LARROUDÉ, WILLIAM B. SPENCE, B.
RILEY SECURITIES, INC., COWEN AND
COMPANY, LLC, TUDOR, PICKERING,
HOLT & CO. SECURITIES, LLC, D.A.
DAVIDSON & CO., COMPASS POINT
RESEARCH & TRADING, LLC, and
NORTHLAND SECURITIES, INC.,

                Defendants.

Case No. 1:22-cv-03088-RA

**Oral Argument Requested**

---

**THE STRONGHOLD DEFENDANTS' REPLY MEMORANDUM OF LAW IN**
**FURTHER SUPPORT OF THEIR MOTION TO DISMISS**

VINSON & ELKINS LLP

Clifford Thau
Marisa Antonelli
1114 Avenue of Americas
New York, NY 10036
Telephone: (212) 237-0000
Facsimile: (212) 237-0100
Email: cthau@velaw.com
Email: mantonelli@velaw.com

*Attorneys for Stronghold Digital Mining, Inc.,*
*Gregory A. Beard, and William B. Spence.*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT .........................................................................................................................2

    I.    The Complaint Fails to State a Claim under Section 11 or 12(a)(2) .......................2

        A.    Plaintiffs Misstate the Applicable Standard................................................2

        B.    Stronghold Had No Duty to Disclose the Chance of a Future
            Breach of Contract by MinerVa....................................................................3

        C.    Plaintiffs Complain About Non-Actionable Puffery ...................................7

        D.    The Complaint Does Not Allege Liability Under Regulation S-K..............7

        E.    The Complaint Lacks Allegations of a Material Misstatement or
            Omission Regarding Projected Hash Rates ..................................................7

        F.    Stronghold's Offering Materials Adequately Warned Investors .................9

    II.    The Complaint Negates Loss Causation.................................................................9

    III.    The Court Should Deny Leave to Amend the Complaint......................................10

CONCLUSION....................................................................................................................10

i

# TABLE OF AUTHORITIES

**Cases**

*Acito v. IMCERA Grp., Inc.*,
   47 F.3d 47 (2d Cir. 1995)........................................................................................ 4

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
   752 F.3d 173 (2d Cir. 2014)..................................................................................... 7

*Davidoff v. Farina*,
   No. 04-cv-7617, 2005 WL 2030501 (S.D.N.Y. Aug. 22, 2005)......................................... 5

*Herman & MacLean v. Huddleston*,
   459 U.S. 375 (1983)................................................................................................ 3

*Holbrook v. Trivago N.V.*,
   No. 17-cv-8348, 2019 WL 948809 (S.D.N.Y. Feb. 26, 2019),
   *aff'd sub nom. Shetty v. Trivago N.V.*, 796 F. App'x 31 (2d Cir. 2019) ............................. 3

*In re HEXO Corp. Sec. Litig.*,
   524 F. Supp. 3d 283 (S.D.N.Y. 2021)......................................................................... 2

*In re Initial Pub. Offering Sec. Litig.*,
   241 F. Supp. 2d 281 (S.D.N.Y. 2003).......................................................................... 3

*In re Sanofi Sec. Litig.*,
   87 F. Supp. 3d 510 (S.D.N.Y. 2015),
   *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016)......................................... 5

*Lin v. Interactive Brokers Grp., Inc.*,
   574 F.Supp.2d 408 (S.D.N.Y.2008).............................................................................. 3

*Schuler v. NIVS Intellimedia Tech. Grp., Inc.*,
   No. 11-cv-2484, 2013 Wl 944777 (S.D.N.Y. Mar. 12, 2013) ........................................... 9

*Scott v. Gen. Motors Co.*,
   46 F. Supp. 3d 387 (S.D.N.Y. 2014),
   *aff'd*, 605 F. App'x 52 (2d Cir. 2015)....................................................................... 2, 3

*Wandel v. Gao*,
   590 F. Supp. 3d 630 (S.D.N.Y. 2022)......................................................................... 2

*Wallace v. Kelly*,
   No. 12 Civ. 8210 RA, 2014 WL 713383 (S.D.N.Y. Feb. 24, 2014)................................ 10

*Zirkin v. Quanta Cap. Holdings Ltd.*,
   No. 07-cv-851, 2009 WL 185940 (S.D.N.Y. Jan. 23, 2009) ............................................. 3

**Statutes**

15 U.S.C. § 77k...................................................................................................... 2, 3, 6

15 U.S.C. § 77k(e) .......................................................................................................... 9

15 U.S.C. § 77*l*.................................................................................................... 2, 3, 6

iii

Defendants Stronghold, Gregory A. Beard, and William B. Spence submit this reply memorandum of law in further support of their motion to dismiss the Complaint.[1]

## PRELIMINARY STATEMENT

As the Stronghold Defendants demonstrated in their Motion, Plaintiffs' unsupported theory that Stronghold was required to disclose potential delivery and performance failures by a key supplier fails to state a claim under the federal securities laws. In their Complaint and Opposition to Defendants' Motion (the "*Opposition*"), Plaintiffs repeatedly play fast and loose with dates and Defendants' alleged "knowledge" in a failed attempt to cobble together a violation of the securities laws. However, when the facts known or knowable to Stronghold are considered as of the date of the IPO, it is clear that Plaintiffs' claims are hindsight driven and must be dismissed.

In their Opposition, Plaintiffs rely on inapposite case law in an attempt to relieve themselves of the burden to allege facts showing that Stronghold knew or should have known at the time of its IPO that MinerVa would—in the six months that followed—fail to deliver thousands of Miners, and that the Miners it would deliver would fall far short of performance expectations. Plaintiffs simply cannot sustain their burden under governing case law. Many of the purported facts they cite occurred weeks or months after the IPO, and none plausibly show that MinerVa's impending breach was known or knowable to Stronghold at the time of the IPO.

Plaintiffs do not disagree with this Court's ample authority that a potential negative contingency need be disclosed only when it becomes a "foregone conclusion." Accordingly, Stronghold had no duty to disclose the possibility that MinerVa could breach the EPA in the future. Furthermore, Stronghold specifically warned its investors that some of its suppliers had been impacted by power failures and increasing Chinese regulations and that its business could be

---

[1] Capitalized terms not otherwise defined herein have the meanings ascribed to them in Defendants' Memorandum of Law in Support of their Motion to Dismiss (the "Motion" or "Mot. at___").

materially harmed if this caused its suppliers—like MinerVa—to fall short of delivery expectations. Plaintiffs' contention that these risks had already "materialized" at the time of the IPO is unsupported by any facts and should be disregarded by the Court.

In sum, rather than admit that they cannot plead the requisite facts to support their claims and that the loss in value of their investment was due to the rapid decline in value of a highly volatile currency, Plaintiffs blame Stronghold for its contractual counterparty's eventual near-total disregard for its contractual obligations. These assertions, however, are entirely unsupported by the Complaint. The Court should reject Plaintiffs' attempts to fabricate a securities violation where none exists and dismiss the Complaint with prejudice.

## ARGUMENT

### I. The Complaint Fails to State a Claim under Section 11 or 12(a)(2).

#### A. Plaintiffs Misstate the Applicable Standard.

Under Sections 11 and 12(a)(2) of the Securities Act, a plaintiff must show that a registration statement or prospectus contained an untrue statement of material fact or omitted to state a material fact required to be stated or necessary to make statements therein not misleading. *Scott v. Gen. Motors Co.*, 46 F. Supp. 3d 387, 393 (S.D.N.Y. 2014), *aff'd*, 605 F. App'x 52 (2d Cir. 2015). In determining whether a fact is "untrue," the Court must analyze the facts that "existed, and were known or knowable, at the time of the offering." *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 300-01 (S.D.N.Y. 2021) (internal quotations omitted). Similarly, the duty to disclose "arises only when the issuer knew—or should have known—of the omitted fact at the time the statements were made." *Wandel v. Gao*, 590 F. Supp. 3d 630, 640 (S.D.N.Y. 2022).

Plaintiffs make the baseless claim that "a plaintiff need not allege that defendants knew, or should have known, of the falsity of their statements." Opp. at 8. Plaintiffs' position is wholly unsupported and contrary to the substantial body of case law interpreting Sections 11 and 12(a)(2).

2

*See, e.g.*, *Scott*, 46 F. Supp. 3d at 394 (plaintiff must allege that defendant "knew or had reason to know" of alleged false statement(citation omitted)); *Zirkin v. Quanta Cap. Holdings Ltd.*, No. 07-cv-851, 2009 WL 185940, at *10 (S.D.N.Y. Jan. 23, 2009) (same); *see also Holbrook v. Trivago N.V.*, No. 17-cv-8348, 2019 WL 948809, at *11 (S.D.N.Y. Feb. 26, 2019) (false statement must be "known or knowable"), *aff'd sub nom. Shetty v. Trivago N.V.*, 796 F. App'x 31 (2d Cir. 2019); *Lin v. Interactive Brokers Grp., Inc.*, 574 F. Supp. 2d 408, 421 (S.D.N.Y.2008) (same).

Though Plaintiffs cite two cases in support of their argument, neither addresses the requirement that a fact be at least "knowable" to defendants. *See* Opp. at 8, 10 (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375 (1983), and *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281 (S.D.N.Y. 2003)). Nowhere in *Huddleston* did the Court state that Section 11 liability attaches regardless of what was possible to know at the relevant time. Rather, *Huddleston* addressed Section 11's elements at a high level, to determine whether it was duplicative of Section 10(b). 459 U.S. at 386-87. Similarly, in *In Re Initial Public Offering Securities Litigation*, the Court rejected the argument that the Section 11 claims should be dismissed because plaintiffs failed to allege *actual knowledge* of the omitted facts. 241 F. Supp. 2d at 343. Stronghold does not argue Plaintiffs must plead actual knowledge, but they must—and failed to—allege facts showing the omitted information was at least knowable to Stronghold at the time of the IPO.

## B. Stronghold Had No Duty to Disclose the Chance of a Future Breach of Contract by MinerVa.

The core allegation of the Complaint is that Stronghold failed to disclose in October 2021 that MinerVa would breach the EPA. Because Plaintiffs plead no facts that MinerVa's future breach was known or knowable to Stronghold at the time of the IPO, this allegation fails to state a claim. Mot. at 10-13. Issuers need not disclose matters that are merely speculative; they need only disclose a negative contingency when it becomes a "foregone conclusion." *Acito v. IMCERA*

3

*Grp., Inc.*, 47 F.3d 47, 53 (2d Cir. 1995); Mot. at 10-11. The purported facts on which Plaintiffs rely in the Opposition did not give Stronghold any reason to know about MinerVa's future breach at the time of the IPO; most of them post-date the IPO entirely.[2] Nothing in the Opposition changes the fact that the Complaint's conclusory, hindsight allegations fail to allege facts showing that Stronghold could have known the speculative risk of MinerVa breaching the EPA had "ripened" into a "foregone conclusion" prior to the IPO. *See* Mot. at 11-13.

*"Daily" Communications with MinerVa*. As demonstrated in the Motion, the bare allegation that Stronghold executives had "daily" communications with MinerVa does not plausibly show that Stronghold knew or could have known prior to the IPO that MinerVa would fail to deliver thousands of the Miners promised under the EPA. Mot. at 11-12. Plaintiffs contend that they have alleged conversations with MinerVa concerning "the problems and delays producing the miners" (Opp. at 10), but the allegations they cite (and the only factual basis alleged for the "daily conversations") entirely post-date the IPO. *See* Compl. ¶¶ 14, 131 (November 2021 statement that "[w]e talk to MinerVa every day"); *id.* ¶ 73 (regular calls with MinerVa beginning in late 2021); *id.* ¶¶ 140-41 (March 2022 statement that Stronghold was "in near constant contact" with MinerVa and "talk[ed]" to MiverVa's co-founder daily). Conversations with MinerVa following the IPO, no matter how frequent, do not plausibly support an allegation that on October 21, 2021, Stronghold knew or could have known of MinerVa's future breach.

*October 31 Delivery Delay.* Plaintiffs' allegation that Stronghold knew of an imminent delay in MinerVa's October 31, 2021 shipment likewise does not show that Stronghold knew or could have known at the time of the IPO that MinerVa would ultimately breach the EPA. Even if

---

[2] For instance, Plaintiffs point to a statement by CW-1 that in "mid to late October 2021," Stronghold's then-Vice President of Operations, "acknowledged" that MinerVa "could not provide the miners on the timeframe represented or needed by Stronghold." Compl. ¶ 75. This vague allegation, which may well reference a visit *after* the IPO, does not show that MinerVa's ultimate breach of the EPA was known or knowable to Stronghold on October 21, 2021.

Plaintiffs had alleged that Stronghold knew the October 31 shipment would be late (they have not),[3] knowledge of one late shipment does not permit a plausible inference that Stronghold knew (or could have known) that MinerVa would breach the EPA by failing to deliver thousands of miners as promised over the coming six months. To the contrary, the allegations of the Complaint suggest that Stronghold firmly believed MinerVa would abide by its contractual obligations. Plaintiffs themselves allege that Stronghold made a final payment of $14.7 million on October 26, 2021—5 days after the IPO. Compl. ¶ 78 n.33. It is not plausible that Stronghold would have made this large payment to MinerVa had it known on October 21, 2021 that MinerVa would fail to deliver the Miners it promised. Mot. at 11-12. *See In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 531 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016) (inference that Defendant continued to fund clinical trials "while secretly believing that FDA approval was unlikely, impossible, or, if achievable, only on a delinquent time schedule—is implausible and conjectural."); *cf. Davidoff v. Farina*, No. 04-cv-7617, 2005 WL 2030501, at *11 n.19 (S.D.N.Y. Aug. 22, 2005) (concluding, in Section 10(b) action, that "it would have made no economic sense for defendants to invest literally billions of dollars in a venture that they knew would fail.").

Grasping at straws, Plaintiffs allege that delivery of MinerVa's first shipment by October 31 was a contractual obligation, and that Stronghold "represented" to investors that MinerVa would meet this obligation. Opp. at 9-11. Neither allegation is supported by the Offering Materials, which state only that "[t]he *seller anticipates* shipping no less than 5,000 miners by October 31, 2021." Thau Decl. Exh. 4. at F-62. (emphasis added). Plaintiffs even try to confuse

---

[3]Plaintiffs claim that because Stronghold had not made its final payment under the EPA at the time of the IPO (required 30 days before "shipment") and was required to "arrange and pay for shipping," it knew that MinerVa would not make a delivery of miners by October 31. Opp. at 11. But Plaintiffs admit that MinerVa actually began shipping Miners less than 30 days after Stronghold made the payment. Compl. ¶¶ 78 n.33, 80. In addition, nowhere do the Offering Materials state that Stronghold was required to "arrange" for shipping. Rather, they state only that Stronghold was responsible to pay for shipping costs. Thau Decl. Exh. 4, Excerpt B at 99.

the Court by suggesting that Stronghold's failure to disclose that MinerVa would not deliver

Miners by October 31 was itself a Section 11 and 12 violation.  Opp. at 9.  But here, Plaintiffs

ignore the allegations in the Complaint, which seeks damages for losses after Stronghold disclosed

on March 29, 2022 that it had "only received approximately 3300 out of the 15,000 miners

originally ordered from MinerVa," and could not provide an update on whether "the Company can

expect any future deliveries."  *See, e.g.*, Compl. ¶ 14.  Plaintiffs do not bring claims based on a

failure by Stronghold to disclose a single late shipment in October 2021, nor could they.

Stronghold disclosed this delay in November 2021 and Stronghold's stock price increased in the

days that followed.  *See* Thau Decl. Exh. 1, Figure B, Exh 7.

> ***The AGM Press Release***.  The Stronghold Defendants demonstrated in the Motion that

nothing in the Complaint (or in the AGM Press Release) suggests that Stronghold knew or had

reason to know that MinerVa was using AGM's parts to build Stronghold's Miners.  Therefore,

the AGM Press Release provided no information to Stronghold about MinerVa's ability to perform

under the EPA.  *See* Mot. at 12-13.  Rather than respond to these arguments, Plaintiffs focus on

the fact that the AGM Press Release was available on the morning of the IPO.  Opp. at 12.

However, even if Stronghold had known who AGM was and been able to find the release (which

did not mention Stronghold), it would have learned that AGM was providing MinerVa—which

AGM touted as "a premier . . . manufacturing company" that "provides top-tier" solutions—with

25,000 units to build miners. Thau Decl. Exh. 6, Excerpt B.  Thus, the release would only have

solidified Stronghold's belief that MinerVa could perform under the EPA.[4]

---

[4] Plaintiffs claim that the Stronghold Defendants "ignore" an article from cryptocurrency website "The Block."  It is addressed in the Motion on page 13 n. 5.

6

### C.      Plaintiffs Complain About Non-Actionable Puffery.

As demonstrated in the Motion, the Offering Materials' statement "we believe that [] recent confirmed purchase orders demonstrate our ability to leverage the breadth of our relationships to quickly expand our mining capacity" was non-actionable puffery—a statement of corporate optimism that cannot "guarantee" a "concrete fact or outcome." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014); Mot. at 4-5, 14.  Plaintiffs' only response is to argue that the statement is a "misrepresentation[] of existing facts." Opp. at 15.  But Plaintiffs fail to identify any "existing fact" that Stronghold misrepresented.  For example, nowhere in the Complaint do Plaintiffs allege (nor could they) that Stronghold did not have "recently confirmed purchase orders" with Miner suppliers.  *See* Mot. at 14-15.

### D.      The Complaint Does Not Allege Liability Under Regulation S-K.

Because the Complaint fails to plead that Stronghold had actual knowledge MinerVa would materially breach the EPA, the Complaint also fails to plead a disclosure duty under Regulation S-K.  *See* Mot. at 15-16.  Plaintiffs arguments to the contrary in the Opposition rest entirely on the unsupported allegation that Stronghold knew its "largest supplier of miners could not deliver them on anywhere near the timeframe stated in the Offering Materials, if at all." Opp. at 20.  As described in Section I.B, *supra*, Plaintiffs allege no facts supporting this contention.[5]

### E.      The Complaint Lacks Allegations of a Material Misstatement or Omission Regarding Projected Hash Rates.

It is undisputed that Stronghold did not receive its first shipment of miners from MinerVa until after the IPO, and therefore—as a matter of pure logic—had no way to know the Miners would not perform as expected.  This alone is fatal to Plaintiffs' claim that the Offering Materials

---

[5] Plaintiffs state that the Stronghold Defendants "do not contest they were aware of a breach at the time of the IPO." Opp. at 20.  This is untrue, and the lack of any support for such a statement speaks for itself.

contained false or misleading statements regarding projected hash rates. Mot. at 17. Indeed, Plaintiffs acknowledge that the Offering Materials described Stronghold's "*expected*" computer power: "As Stronghold *later* revealed [in March 2022], the performance (*i.e.* hash rate) of the MinerVa miners *eventually* received was 'below expectations...'" Opp. at 16 (emphasis added).

The Stronghold Defendants demonstrated in the Motion that the very premise of Plaintiffs' argument—that Stronghold represented each MinerVa Miner would operate at 100 TH/s (rather than the 90 TH/s purportedly "internally anticipated")—is based on a mischaracterization of the Offering Materials. Mot. at 2, 16. Plaintiffs offer no response to this argument. They are likewise silent on Stronghold's point that its March 29, 2022 statement—which Plaintiffs claim supports the "internally anticipated" 90 TH/s—actually shows that Stronghold *did* expect MinerVa Miners to operate at average rate of 100 TH/s. *Id.* at 18-20. Most importantly, Plaintiffs point to no facts showing that Stronghold expected anything other than an average rate of 100 TH/s before the IPO, the only relevant time period. *See id.* at 19. The only fact Plaintiff cites in support of the purported "internally expected" hash rate is Stronghold's statement on March 29, 2022—five months later.[6]

The Motion further demonstrated that Plaintiffs' convoluted chain of suppositions stemming from Stronghold's statement that it "consider[s] latest-generation miners to be miners with efficiency of 37 joules per terahash" does not show Stronghold "internally expected" hash rates below 100 TH/s at the time of its IPO. Mot. at 19-20. Plaintiffs mishcharacterize this argument as suggesting that the Offering Materials were describing "a secret, undisclosed set of non-MinerVa miners." Opp. at 18. But the Motion's central point—which Plaintiffs fail to address—is that this statement never mentions MinerVa, and may be referring to Miners from

---

[6] Plaintiffs have apparently abandoned their argument that 100 TH/s was MinerVa's "advertised maximum hash rate," and therefore could not be trusted. *See* Mot. at 18; Compl. ¶ 85.

another supplier or Miners from all suppliers.  Mot. at 20.  It does not create a plausible inference that Stronghold believed MinerVa's Miners would operate below 100 TH/s at the time of the IPO.

### F.    Stronghold's Offering Materials Adequately Warned Investors.

Plaintiffs do not meaningfully dispute that the complained-of statements in the Offering Materials were forward-looking.  Mot. at 21.  Nor do they dispute the Offering Materials warned investors of the exact risks the Complaint alleges subsequently materialized. Mot. at 21-22; Thau Decl. Ex. 5 at 31. Thus, investors were cautioned that Stronghold's suppliers—including MinerVa—could fail to deliver, or be delayed in delivering, acceptable or sufficient miners given the impacts of China's regulations and power outages.  Plaintiffs' only response is that the bespeaks caution doctrine does not apply because the risks warned of had already transpired.  Opp. at 21.  For the reasons discussed in Section I.B., *supra*, this argument fails.

### II.    The Complaint Negates Loss Causation.

As demonstrated in the Motion (at 22-24), the Complaint should be dismissed because it refutes Plaintiffs' own theory of loss causation.  Plaintiffs do not dispute that Stronghold disclosed major delays in MinerVa shipments in November 2021 as well as that MinerVa would be "a relatively small part of our story," and that Stronghold's stock price *rose* in the days following this disclosure.  Mot. at 5-6, 23.  Moreover, Plaintiffs admit that the price of Bitcoin declined precipitously at the same time Stronghold's stock price was falling.  Mot. at 24; Opp. at 24. Plaintiffs argue that dismissal is improper unless there is a "substantial stock price decline[] before any alleged corrective disclosure" (Opp. at 23)[7] but that is exactly what happened here.

---

[7] Plaintiffs argue defendants must offer "expert analysis or opinion" in support of their loss causation arguments and prove that "*all* of the decline in a security's price is tied to factors unconnected to their misstatements."  Opp. at 23. Neither argument is accurate.  *See Schuler v. NIVS Intellimedia Tech. Grp., Inc.*, No. 11-cv-2484, 2013 WL 944777, at *9 (S.D.N.Y. Mar. 12, 2013) (dismissing complaint where negative causation was "clear from the face of the complaint"); 15 U.S.C. § 77k(e) (affirmative defense of loss causation exists "if the defendant proves that *any portion or all* of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement" (emphasis added)).

Stronghold's stock price declined from $25.99 on October 21, 2021 to $9.65 on March 28, 2022 (the day before the supposed corrective disclosure).[8]  Thus, it is evident from the face of the Complaint that Stronghold's stock price fell because of Bitcoin's crash, not because of disclosures made after Stronghold's stock price had already declined by more than 50% from its IPO price.[9]

**III.    The Court Should Deny Leave to Amend the Complaint.**

Plaintiffs have failed for various reasons to plead a violation of the securities laws, and because Plaintiffs have already had the opportunity to amend, and failed to identify how they will remedy the Complaint's deficiencies, leave to amend should be denied.  *See, e.g.*, *Wallace v. Kelly*, No. 12 Civ. 8210 RA, 2014 WL 713383, at *5 (S.D.N.Y. Feb. 24, 2014) (Abrams, J.).

CONCLUSION

For the foregoing reasons and those set forth in the Motion, the Court should dismiss the Complaint in its entirety, with prejudice.

Dated:  March 20, 2023

Respectfully submitted,

VINSON & ELKINS LLP

*/s/ Clifford Thau*
Clifford Thau
Marisa Antonelli
1114 Avenue of Americas
New York, NY 10036
Telephone: (212) 237-0000
Facsimile: (212) 237-0100
Email: cthau@velaw.com
Email: mantonelli@velaw.com

*Attorneys for the Stronghold Defendants*

---

[8] The price of Bitcoin similarly declined during the same period from $65,979 to $47,105.  Plaintiffs incorrectly state that it increased from March 29 to March 30, 2022. Opp. at 24. The price actually decreased from $47,449 to $47,075 (and then dropped to $44,525 on March 31, 2022).  *See* Stern Decl. Ex. 2.

[9] Because the Complaint fails to state claims under Sections 11 and 12(a)(2) against Stronghold, the Section 15 claims against the Individual Defendants necessarily fail.  *See* Mot. at 25.