```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   MARK WINTER, et al.,

 4                    Plaintiffs,

 5           v.                              22 CV 3088 (RA)

 6   STRONGHOLD DIGITAL MINING,
     INC., et al.,
 7
                     Defendants.            Oral Argument
 8   ------------------------------x
                                            New York, N.Y.
 9                                          June 13, 2023
                                            4:15 p.m.
10
     Before:
11
                        HON. RONNIE ABRAMS,
12
                                            District Judge
13

14                            APPEARANCES

15   LEVI & KORSINSKY LLP
          Attorneys for Plaintiffs
16   BY:  SHANNON L. HOPKINS
          COLE VON RICHTHOFEN
17        -and-
     THE ROSEN LAW FIRM, P.A.
18   BY:  JONATHAN STERN

19   VINSON & ELKINS LLP
          Attorneys for Defendants Stronghold Digital Mining, Inc.,
20        Gregory A. Beard, and William B. Spence
     BY:  CLIFFORD THAU
21        MARISA ANTONELLI

22   FAEGRE DRINKER BIDDLE & REATH LLP
          Attorneys for Defendant Ricardo R. A Larroude
23   BY:  SANDRA DAWN GRANNUM
          LUCY N. ONYEFORO
24

25
```

```
1                (Case called)
2                MR. STERN:  Jonathan Stern from the Rosen Law Firm for
3    the plaintiffs and the class.
4                THE COURT:  Good afternoon.
5                MR. STERN:  Good afternoon.
6                MR. VON RICHTHOFEN:  Cole Von Richthofen, your Honor,
7    for additional plaintiffs in the class.
8                THE COURT:  Good afternoon.
9                MS. HOPKINS:  Good afternoon, your Honor, Shannon
10   Hopkins with Levi & Korsinsky for the plaintiffs.
11               THE COURT:  Good afternoon.
12               MR. THAU:  Good afternoon, your Honor, Cliff Thau from
13   Vinson & Elkins on behalf of Stronghold, Greg Beard, and
14   William Spence.
15               THE COURT:  Good afternoon.
16               MS. ANTONELLI:  Marisa Antonelli from Vinson & Elkins,
17   also on behalf of Stronghold, Mr. Beard, and Mr. Spence.  Good
18   afternoon.
19               MR. KORN:  Good afternoon, your Honor, this is Jeffrey
20   Korn of Willkie Farr & Gallagher for the underwriter
21   defendants.
22               THE COURT:  Good afternoon.
23               MS. GRANNUM:  Your Honor, Sandra Grannum from Faegre
24   Drinker Biddle & Reath for Mr. Larroude.
25               THE COURT:  Good afternoon.
```

1          MS. ONYEFORO:  Good afternoon, your Honor, Lucy

2    Onyeforo from Faegre Drinker Biddle & Reath as well.

3          THE COURT:  Good afternoon.

4          We are here for argument on defendants' motions to

5    dismiss the first amended complaint.  I intend, of course, to

6    hear from the Stronghold defendants, but do the underwriter

7    defendants and defendant Larroude wish to be heard separately

8    today, or no?

9          MR. KORN:  Your Honor, we will plan to join in the

10   arguments of Stronghold.

11         THE COURT:  Good.  Thanks.

12         Why don't we start with Stronghold.

13         MR. THAU:  Thank you, your Honor.

14         Good afternoon.

15         THE COURT:  Good afternoon.  I am going to ask

16   everyone to speak into the microphones.

17         MR. THAU:  Your Honor, I am prepared to address any

18   questions you may have, or I'll jump right into a presentation.

19         THE COURT:  You can jump right in, but I am going to

20   ask you about the pleading requirements on the section 11 and

21   12 claims and the -- about your argument in particular

22   regarding knowing or should have known and what needs to be

23   alleged.  But I'll let you start as you'd like.

24         MR. THAU:  Thank you, your Honor.

25         Plaintiffs plead no facts in their amended complaint

1    to support their baseless claim that Stronghold improperly

2    failed to disclose at the time of its October 21, 2021 IPO

3    potential future delivery and performance failures by a key

4    supplier.  Your Honor, I will get to the legal.

5              THE COURT:  Yeah, sure.

6              MR. THAU:  Plaintiffs claims fail for the fundamental

7    reason that the amended complaint does not plead a single fact

8    that existed at the time of the IPO to show that the Stronghold

9    defendants knew or could have known that these delivery and

10   performance failures would occur, and that MinerVa would breach

11   its contract in the future.

12             Absent a factual showing that defendants know or could

13   have known such future breaches at the time of the IPO, all

14   plaintiffs can allege is a contractual relationship that failed

15   months after the IPO.  As we show in our briefing, these types

16   of allegations do not give rise to a section 11 or section 12

17   claim under well-settled law.

18             Plaintiffs' claims are neither supported by any

19   alleged facts nor supportable under governing law in this

20   circuit.  Plaintiffs attempt to support their claims by arguing

21   in their opposition brief that there were daily communications

22   between Stronghold and MinerVA.  And based on these

23   communications, Stronghold somehow knew or could have known

24   that MinerVA would later fail to deliver thousands of miners

25   that MinerVA promised to deliver under the parties' agreement.

1          But when the actual allegations to the amended

2     complaint are examined, the communications that plaintiffs seek

3     to rely upon suffer from two fatal infirmities.

4          First, the amended complaint never describes the

5     actual factual substance of any of these communications between

6     Stronghold and MinerVA.

7          Second, the communications alleged in plaintiff's

8     pleading all postdate the IPO.  For example, the allegation

9     that Stronghold speaks with MinerVA, a large supplier, every

10    day refers to a November 2021 statement made by a Stronghold

11    executive, and the reference to near constant contact between

12    MinerVA and Stronghold is from a March 2022 statement.

13         I refer the Court to page 4 of our reply on this

14    point, our reply brief on this point.  Such communications,

15    regardless of their frequency, that took place after the IPO

16    cannot plausibly help plaintiffs meet their burden of showing

17    that, as of October 21, 2021, the date of the IPO, Stronghold

18    knew or could have known of MinerVA's future breaches.  Your

19    Honor, this is a classic case of pleading by hindsight.

20         Plaintiffs also argue that Stronghold knew of a delay

21    in MinerVA's first shipment of miners scheduled as an

22    anticipated shipping date of October 31.  On the first page of

23    their brief, plaintiffs say Stronghold's knew MinerVA was, and

24    I'm quoting, behind schedule.

25         A potential delayed single shipment does not give rise

1   to a plausible inference that Stronghold knew or could have

2   known MinerVA was going to breach the parties' agreement and

3   failed to deliver thousands of miners.

4          Your Honor, on this point the word anticipates is key.

5   In the prospectus the document states that seller anticipates

6   shipping miners by October 31 and anticipates making shipments

7   on subsequent dates into the future.

8          Your Honor, in the prospectus the term anticipates --

9   the prospectus makes clear that anticipated is intended to

10  identify a forward-looking statement which represents -- and

11  I'm quoting from this prospectus, your Honor -- which

12  represents Stronghold's current expectations about future

13  events.  I'll come back to that when I discuss the bespeaks

14  caution doctrine, your Honor.

15         But what's key here is, for the purpose of that

16  allegation, where plaintiffs say that the alleged delay in

17  making the first shipment of miners, it was an anticipated

18  shipping date, and we think that's important.

19         THE COURT:  Can I just ask.  Plaintiffs argue that

20  because Stronghold's final payment for the miners was due 30

21  days before shipment and because Stronghold only made the final

22  payment on October 26, 2021, it would have been impossible for

23  the miners to be delivered according to the schedule set forth

24  in the offering materials, right?  And that's in plaintiffs'

25  opposition.  I am going to read to you.  Can you respond to

1    that?

2          MR. THAU:  Yes, your Honor.  I think what plaintiff is

3    alleging is that, as of the date of the IPO, the final payment,

4    the $14.7 million payment had not been made.  Since shipping

5    follows that final payment by 30 days, I think it's plaintiffs'

6    assertion or allegation that at the time there was certainly

7    the possibility that the first anticipated shipment of miners

8    was not going to be on time.  I think that's their allegation.

9          With that said, your Honor, I think, first of all,

10   it's an anticipated shipping date.  It's not a hard-and-fast

11   shipping date.  I think that's relevant to the Court's

12   consideration of whether that's an actionable point or not,

13   because we do get into -- the risk factors discuss all types of

14   anticipated dates, A.

15         B, your Honor, if you roll the picture forward just a

16   little bit, five days after the IPO, on October 26, Stronghold

17   makes that final payment, the final 20 percent of the purchase

18   price due under the purchase agreement between Stronghold and

19   MinerVA.  It's a $14.7 million payment.

20         Our argument, your Honor, is that if Stronghold

21   believed that MinerVA, the supplier, was in breach, was

22   potentially going to be in breach, was going to breach into the

23   future, why would Stronghold make that payment five days after

24   the IPO and still five days before the anticipated shipping

25   date of October 31.  So that explains kind of Stronghold's

1    frame of mind with respect to what I think plaintiffs' point

2    is, that there was a potential for a delay in shipment at the

3    time of the IPO.

4              THE COURT:  You can proceed.  Thank you.

5              MR. THAU:  Thank you.

6              Plaintiffs also allege that Stronghold knew or could

7    have known that the miners it purchased from MinerVA could not

8    perform in the matter MinerVA had promised.  That is, the

9    miners would not generate the expected or anticipated computer

10   power.

11             It is undisputed, your Honor, that Stronghold did not

12   receive its first miners from MinerVA until November 8, 2021,

13   that is, eight days after the first anticipated shipping date,

14   and that's what gave plaintiff some pause here, potential delay

15   in shipping.  On November 8, MinerVA begins -- not fully

16   satisfied, but begins making shipment.

17             So as a matter of logic, your Honor, if Stronghold had

18   not received any of the miners at the time of the IPO, we would

19   argue there was simply no way for Stronghold to know that the

20   miners actually could perform or could not perform, and

21   plaintiffs' argument is, you must have known somehow that the

22   miners are not going to perform.  I would argue, as a matter of

23   common sense, there is no way for Stronghold to know that,

24   because the miners had not been received as of the time of the

25   IPO.

1          Second, your Honor, the amended complaint does not

2     allege any facts that Stronghold expected at the time of the

3     IPO, anything less than the hash rates, that's the computer

4     power, promised by MinerVA.

5          Your Honor, I will make the point again, because I

6     think it's somewhat important from a common sensical point of

7     view.  If Stronghold believed that MinerVA was not going to

8     deliver miners in the future that did not meet the performance

9     capabilities that MinerVA had promised, Stronghold believed

10    that.  And the stand, as your Honor knows, is knew or could

11    have known facts existed at the time of the IPO, and Stronghold

12    knew or could have known of a future breach.  If Stronghold

13    believed that MinerVA was going to breach, why would Stronghold

14    make that $14.7 million payment to MinerVA?

15         On this point, your Honor, I'd like to cite the Court

16    or refer the Court to this Court's decision, affirmed by the

17    Second Circuit, in *In Re Sanofi Securities Litigation*.  In that

18    case, your Honor, the Court was evaluating allegations of false

19    statements regarding timing of FDA approval of a Sanofi drug.

20         I think the language here is helpful to us, your

21    Honor.  The inference that Sanofi would continue to fund

22    clinical trials -- and here are the district court's words --

23    while secretly believing that FDA approval was unlikely and

24    possible or achievable only on a delinquent time schedule is

25    implausible and conjecture.

1          Your Honor, the same is true here.  Why would

2     Stronghold make its final contractual payment for miners of

3     $14.7 million to MinerVA on October 26 if only five days

4     earlier, on October 21, the date of the IPO, Stronghold knew

5     MinerVA was going to materially breach their agreement.  It's

6     implausible.  And plaintiffs' allegations, like those in the *In*

7     *Re Sanofi* case, are not supported by any facts; only legally

8     sufficient conjecture.

9          THE COURT:  I just want to go back.  I am just looking

10    at the transcript to the first statement about the number of

11    delivered miners.  Why wasn't it least knowable that the

12    electrical outages in China would cause shipping delays?  I am

13    not asking whether they should have known but whether it was

14    possible to know.

15         MR. THAU:  Your Honor, it's described as a risk

16    factor, the outages in China.  That obviously describes one of

17    the risk factors here.  Whether outages in China were causing

18    delays or lack of performance was not known at that time, your

19    Honor.

20         THE COURT:  Is it possible to know or was not known?

21    This goes back to the question I asked at the start, which

22    obviously you've briefed at length, about whether the standard

23    is knew or should have known or whether it's possible.

24         MR. THAU:  Your Honor, how would they know?

25         Plaintiffs argue there were frequent communications

1  between MinerVA and the supplier, the company with operations

2  in China, and with Stronghold here in the United States,

3  constant communications.

4         There is no allegation in the complaint, your Honor,

5  none, that prior to the IPO, at the relevant time period,

6  because this is at the time of the IPO, prior to the IPO, that

7  MinerVA had advised Stronghold of any repudiation or any

8  ability to perform.  How would Stronghold know?  Was it

9  knowable?  It would be knowable if MinerVA, the supplier, had

10  somehow shared information on that point with Stronghold, and

11  there is no allegation that had happened pre-IPO.

12         THE COURT:  You can proceed.  Thank you.

13         MR. THAU:  Your Honor, coming back to the law.

14         The law must consider offering documents holistically.

15  Plaintiffs cannot cherrypick words from the complaint and then

16  allege misrepresentations arising therefrom.

17         The law is also clear, your Honor, and I think this

18  addresses your point, in this circuit that issuers like

19  Stronghold are not required to disclose matters that are

20  speculative or conjecture.  They need only disclose a negative

21  contingency.  And here, your Honor, the negative contingency,

22  is that MinerVA might breach the parties' agreement in the

23  future.  That's what's at issue here.  That's what plaintiffs

24  allege Stronghold should have disclosed.

25         The Second Circuit in *Acito v. IMCERA* says you only

1    need to disclose that negative contingency, here that future

2    breach, when it becomes a foregone conclusion, a foregone

3    conclusion.  Said differently, before a risk is a foregone

4    conclusion, the duty for an issuer to disclose the negative

5    contingency has not ripened.  This point is particularly

6    pertinent where, as here, the negative contingency relates to

7    the ongoing relationship between contracting parties.

8         Your Honor, we discuss in our papers the Southern

9    District's decision in *Wandel v. Gao*.  In that case, Judge,

10   Judge Crotty ruled that the duty to disclose only arises when

11   the issuer knew or should have known of the allegedly omitted

12   fact at the time of the IPO.  Clairvoyant is not required.

13        Your Honor, we cite another case, *Tempur Sealy*, that

14   same concept.  Issuer is not charged with clairvoyance.  In

15   fact, in the *Tempur Sealy* case, the Court talked about

16   plaintiff does not have some secret window into the corporate

17   thinking and workings of its counterparty.

18        Here, Stronghold did not have some secret window into

19   thinking of MinerVA with respect to what was going on in China,

20   and there is no allegation that MinerVA had in fact told

21   Stronghold pre-IPO of any problems.

22        Judge Crotty went on to say in the *Wandel* case, the

23   fact that circumstances changed for the issuer, even rapidly

24   after the IPO, is irrelevant unless the change in circumstances

25   had already occurred on the date of the IPO or was a near

1    certainty.

2            Your Honor, here is the standards I think your Honor

3    may be interested in.  No facts are pleaded by plaintiff to

4    meet its burden that it was a foregone conclusion or a near

5    certainty on the day of the IPO that MinerVA would breach its

6    delivery and performance contractual obligations.  That's the

7    standard that plaintiff must meet, your Honor.

8            In the absence of pleading specific facts, your Honor,

9    in light of the stiff burden, in light of the fact that five

10   days after the IPO and five days before the anticipated first

11   scheduled date, delivery date, Stronghold made a 20 percent of

12   its total purchase price obligation to MinerVA.  They paid

13   $14.7 million.

14           If your Honor is considering what Stronghold knew or

15   could have known in the day of the IPO, Stronghold believed,

16   when it made that $14.7 million payment, Stronghold believed

17   that MinerVA was going to perform.

18           THE COURT:  Did you say should have known or could

19   have known?

20           MR. THAU:  Could have known, your Honor.

21           THE COURT:  Thanks.

22           MR. THAU:  Second point, your Honor.  As a second

23   separate basis for dismissing the amended complaint, the

24   bespeaks caution doctrine bars plaintiffs' claims.  Your Honor,

25   I know you know the law on this area, but I am going to go

1    through it very quickly.

2          Courts in this circuit have frequently protected

3    forward-looking statements and dismissed section 1112 claims

4    under the bespeaks caution doctrine.  Under this doctrine, a

5    forward-looking statement accompanied by sufficient cautionary

6    language is not actionable because no reasonable investor could

7    have found this statement to be materially misleading.  The

8    cautionary language, as is true here, must expressly warn and

9    directly relate to the specific risk that was realized.

10          THE COURT:  Just on the bespeaks caution doctrine,

11    given plaintiffs' allegations that the statements about the

12    shipments of MinerVA miners were false at the time they were

13    made, why does the doctrine apply?  I'm looking at the *Rombach*

14    *v. Chang* case, 355 F.3d at 179.  For example, where the Second

15    Circuit explained that cautionary words about future risk

16    cannot insulate from liability the failure to disclose that the

17    risk has transpired.

18          MR. THAU:  Yes, your Honor.  Actually, I was going to

19    quote from that case.  Your Honor, I think *Rombach* is a very

20    important point in this area.

21          First of all, your Honor, in *Rombach*, the Court

22    actually applied the bespeaks caution doctrine to bar section

23    11 claims.  So they may be arguing dicta, but in that case the

24    Second Circuit actually applied the doctrine.

25          I'm looking for the quote from Judge Jacobs, your

 1    Honor.  Just give me a second.

 2            It is worth noting, in *Rombach v. Chang*, the district

 3    court applied and the Second Circuit affirmed the dismissal of

 4    section 11 claims based on the bespeaks caution doctrine.

 5            Judge Jacobs, quoting from an earlier Second Circuit

 6    authority that bespeaks caution provides no protection to

 7    someone who warns his hiking companion to walk slowly because

 8    there might be a ditch ahead when he knows with near certainty

 9    that the Grand Canyon lies one foot away.

10            Your Honor, the standard here is that Stronghold would

11    have had to have known with near certainty or to a foregone

12    conclusion that MinerVA was going to breach at the time of the

13    IPO in the future and not meet its obligation to deliver 15,000

14    miners, and those miners would be substandard.

15            All Stronghold knew, potentially knew on the date of

16    the IPO is that MinerVA could possibly be late, could possibly

17    be delayed in delivering miners on the first anticipated

18    shipping date of October 31.  A possible delay, which

19    plaintiffs refer to in their brief as being behind schedule, is

20    not near certainty or not a foregone conclusion that the risk

21    at issue here, that MinerVA was not going to perform, was not

22    going to deliver 15,000 miners, was going to deliver

23    substandard miners, that risk had not been realized at the time

24    of the IPO.

25            The only thing that plaintiffs point to is the

1    possibility of a delay on the first single shipment, and that

2    single shipment had an anticipated delivery date of October 31.

3    In fact, your Honor, as I said, final payment was made on

4    October 26, and MinerVA did begin delivery of miners eight days

5    after the first anticipated shipping date.

6            I'd like to come back to my discussion of bespeaks

7    caution.

8            THE COURT:  Sure.

9            MR. THAU:  Thank you.

10           The misstatements alleged by the plaintiff here are

11   clearly forward looking.  These alleged misstatements describe

12   delivery and performance expectations of the MinerVA miners.

13   Paragraph 111 of the amended complaint quotes from the

14   prospectus regarding MinerVA's anticipated delivery quantities

15   and time frames.  And at paragraph 118 the amended complaint

16   quotes from the offering documents regarding the expected

17   performance of the miners to be obtained from MinerVA, and here

18   I am again quoting:  We anticipate the purchase miners will

19   bring a total hash rate, that is, performance capacity for

20   years end 2021 and 2022.

21           At the risk of repeating myself, your Honor, as the

22   prospectus makes clear, terms like anticipated are intended to

23   identify forward-looking statements which represents

24   Stronghold's current expectations of future events.  That's

25   what anticipated means.

1            When considering forward-looking statements, and now,

2     your Honor, I'm quoting from the prospectus, the reader of the

3     prospectus should keep in mind the risk factors and other

4     cautionary language in the prospectus.  Should one or more of

5     the risk described in the prospectus occur, our actual plans

6     and results could differ dramatically from those expressed in

7     any forward-looking statement.  And here, your Honor, the risk

8     factors were specific and on point.

9            I am reading from the prospectus, your Honor.  We are

10    dependent on direct suppliers to source some of our miners, and

11    the failure of these suppliers to perform as expected, that is,

12    as of the date of the IPO, could have a material adverse effect

13    on our business prospects or operations.  We have no assurance

14    that business interruptions will not occur as a result of the

15    failure of these suppliers to perform as expected.  The risk

16    factor goes on to state there is a worldwide shortage of mining

17    equipment which has extended the corresponding delivery

18    schedules for new miner purchases.  The prospectus is clear,

19    your Honor, that at the time of the IPO, Stronghold expected

20    its suppliers like MinerVA to perform, but warned in its risk

21    factors that suppliers might not perform in the future.  That

22    is the very nature of the bespeak caution doctrine.

23            There are no assurances, says the prospectus, that any

24    miner manufacturers will be able to keep pace with the surge

25    and demand for mining equipment, and critically the risk factor

1   provides if our suppliers are not able to provide the agreed

2   services at the quality and quantity we require, we may not be

3   able to replace supplies in a timely manner.

4           Consequently, your Honor, investors would clearly know

5   from the plain terms of the prospectus that MinerVA, a supplier

6   of miners, could fail to provide a sufficient number of

7   high-performance miners on time, and this failure could have a

8   material adverse effect on Stronghold's business prospects and

9   operations.

10          The risk factors in the prospectus made clear that

11  resource constraints and regulatory actions could impact

12  Stronghold's ability to obtain and receive miners.  For

13  example, China has been experiencing power shortages and

14  certain of our miner suppliers have been impacted by related

15  intermittent power outages.  Such power outages and production

16  relocations could result in cancellations or delays and may

17  negatively impact our ability to receive mining equipment on a

18  timely basis.  These are the very risks that ultimately

19  materialized, your Honor.

20          In their opposition, plaintiffs do not dispute that

21  the statements about anticipated delivery quantities and time

22  frames and anticipated total hash rate capacity are forward

23  looking.  Nor do plaintiffs dispute that the prospectus warned

24  investors of the specific risks that ultimately materialized.

25          Plaintiffs' only response to the application to

1    bespeak caution doctrine here is that the specific risks warned

2    of had already transpired by the time of the IPO, and they cite

3    *Rombach v. Chang*.

4         As we demonstrate in our briefs, Stronghold did not

5    know, and no facts are pleaded to show, that at the time of the

6    IPO Stronghold knew that MinerVA would fail to deliver

7    thousands of miners on time or that the miners would suffer

8    from performance issue, so the risk had not transpired by the

9    time of the IPO.

10        Your Honor, Judge Jacobs used the term near certainty

11   to describe how difficult it is, in essence, for plaintiffs to

12   show in these cases that the risk had already taken place.  It

13   had not taken place, your Honor.  The risk had not transpired

14   here.  Plaintiffs will talk about a potential late or a

15   potential delay in delivery that was subsequently cured.

16        As the Second Circuit ruled, statements of corporate

17   optimism -- this is from *Rombach*, your Honor -- do not give

18   rise to securities law violations.  Up to a point, companies

19   must be permitted to operate with a hopeful outlook.  People in

20   charge of an enterprise are not required to take a gloomy,

21   fearful, or defeatist view of the future.

22        Subject to what current data indicates, they can be

23   expected to be confident about their stewardship and the

24   prospects of the business they manage.  The Second Circuit

25   reviewed the risk factors at issue in *Rombach* and concluded --

1    they presented the Court's term, a sober picture of issuer's

2    financial condition.

3         Here too, Stronghold's offering statements presented a

4    sober picture of the specific risks of investing in the IPO,

5    and these very risks were subsequently realized.

6         Your Honor, we have a third argument and that is

7    negative causation.  I realize that I'm going a little longer

8    with my presentation.

9         THE COURT:  Why don't you make that final point.

10        MR. THAU:  We deal with negative causation.

11        Your Honor, it's not frequently dealt with on a motion

12    to dismiss.  We recognize that.  But the standard is, if it's

13    clear on the face of the pleading, then a motion to dismiss can

14    be considered and can be granted on negative causation.

15        Here, your Honor, it's not disputed that, on November

16    30, Stronghold disclosed shipment delays by MinerVA.

17        Following that disclosure, Stronghold's share price

18    increased, went from $17.24 to $19.79, two days after the

19    November 30 disclosure.

20        THE COURT:  Can you respond to plaintiffs' argument

21    that the disclosures on November 30 on that earnings call were

22    substantively different than the subsequent disclosure because,

23    in the November call, Stronghold officers stated that it

24    remained on track to achieve the hash rate and miners it had

25    projected.

1            MR. THAU:  Yes.  True, your Honor.  That is what was

2     said during the call.  But the disclosure also related to

3     delays in receipt of miners.

4            So our argument, your Honor, is plaintiffs allege

5     that, on March 30, the subsequent disclosure, the more fulsome

6     disclosure, that constituted a corrective disclosure, your

7     Honor.  that's their claim.

8            The breach occurred in the spring of 2022, not in

9     November of 2022, when the full problems were outlined.  It

10    became clear at that point that MinerVA was not going to

11    deliver the 15,000 miners that it promised and it was

12    delivering substandard.  In the spring, the full bad news came

13    out.

14            Our point is, in November, Judge, Stronghold disclosed

15    delivery problems, and, therefore, there is an argument that

16    the spring disclosure could not have been a corrective

17    disclosure if earlier in November disclosure had been made of

18    delay.

19            THE COURT:  Any final thoughts?

20            MR. THAU:  Last point, your Honor, and I'll stop.  I

21    am looking at the time.

22            We believe that the decline in Stronghold's share

23    price was not, as a matter of law, attributable to the

24    disclosure of Stronghold's receipt of miners from MinerVA.

25            There is no need for expert testimony, your Honor.  I

1    refer the Court to my declaration which has charts

2    demonstrating share price in comparison to Bitcoin.

3         Your Honor, we also make the point in the briefing

4    about corrective disclosure being made earlier than they

5    plaintiffs allege.

6         THE COURT:  One thing I did want to ask you about that

7    I started to ask at the start is just about the knew or should

8    have known the falsity of the statement.  Are you making a

9    different argument now about the pleadings standard?  Because I

10   have heard you say a number of times that defendants did not

11   know or could not have known.  Or are you just kind of covering

12   both bases to the extent that I disagree with you on that

13   argument?

14        MR. THAU:  I am covering both, your Honor.

15        But, again, if I may for one minute on that point.

16   The key here, your Honor, is to consider what was available,

17   what facts existed on the day of the IPO, what was known to

18   Stronghold on the day of the IPO, what did it know or could

19   have known on that day.

20        What plaintiffs argue is that there were constant

21   communications.  Those constant communications did not take

22   place or not pleaded to have taken place or the communications

23   that plaintiffs point to did not take place before the IPO.

24        THE COURT:  Thank you.

25        MR. THAU:  Thank you, your Honor.

1          THE COURT:  Who would like to be heard on behalf of

2     plaintiffs?

3          MR. STERN:  Me, your Honor.

4          THE COURT:  Thank you.

5          If we could start with just that last question posed

6     by counsel about -- again, I am just looking at the transcript

7     here -- about whether the constant communications that are

8     alleged, whether they are pleaded to have taken place before

9     the IPO.

10          MR. STERN:  Yes, your Honor.  And what the complaint

11     alleges is the defendants stated they were in near constant

12     communication.  They stated they were in daily communication.

13          THE COURT:  I am sorry.  Slow down a little bit.  It

14     can just be hard to follow.  Thank you.

15          MR. STERN:  Sorry, your Honor.

16          They stated that they were in near constant

17     communication.  They stated that they were in daily

18     communication.  They never limited those communications to post

19     IPO or after October 31, or anything like that.  So there is no

20     reason, given that we are under Rule 8, plausibility standard,

21     that the Court should read an ambiguous statement as referring

22     to them claiming that the communications only began after the

23     IPO.

24          THE COURT:  You agree that it is ambiguous, the

25     timing.

1              MR. STERN:  I agree that they didn't specify

2      explicitly that it was before the IPO, but I think the most

3      natural way to read the statement is that these were ongoing

4      communications of indefinite time.

5              I would say that if they had not been communicating

6      with MinerVA before the IPO, who was their largest supplier and

7      who was imminently supposed to deliver the miners that they

8      needed in order to operate as a company, that would be

9      negligent, highly negligent to not be in constant communication

10     with them.  When I order a package on Amazon, I can constantly

11     check when it's arriving, and this is a far more high-stakes

12     delivery than a personal Amazon package.

13             I would agree that the statement is not explicit, but

14     I think the most natural reading and the way that investors

15     would have understood it, assuming that Stronghold was a

16     responsible business, was that those communications had begun

17     before the IPO since they had been -- they had negotiated this

18     contract in April.  They had made several payments under the

19     contract.  It only makes sense to understand that statement as

20     they had been in this communication since before the IPO.

21             THE COURT:  You may proceed.

22             MR. STERN:  Thank you, your Honor.

23             As background, Stronghold Digital Mining is a

24     cryptocurrency startup with a unique business plan to use

25     coal-waste products to generate power that it would then use to

1      mine Bitcoin.

2           Because of this, the only way they could generate

3      revenue in any substantial way was if they had Bitcoin miners.

4      71 percent of those miners, in terms of total hash rate

5      capacity, was supposed to come from MinerVA.  So MinerVA was a

6      vitally crucial supplier to Stronghold.  As of the IPO, they

7      had very few miners.  So this delivery schedule was of crucial

8      importance to investors.

9           The first shipment was supposed to be just ten days

10     after the IPO.  The IPO was October 21, 2021, and the first

11     shipment was October 31, 2021.  Stronghold was in charge of

12     paying for shipping and selecting a shipper.  They hadn't --

13     and we know from the initial -- from when the first shipment

14     was made that it takes about three weeks to ship from China.

15     Therefore, by the time of the IPO, it was impossible for

16     MinerVA to meet the schedule that Stronghold included in the

17     registration statement.  We know this for several reasons.

18          First, the fact that Stronghold was in charge of

19     arranging shipping.  Defendant claimed for the first time in

20     reply in their memorandum of law that they only were in charge

21     of paying for shipping, not in charge of arranging for

22     shipping.  I think this is a distinction without a difference

23     because shipping was to be paid for at the time of shipping.

24     If you have not been asked to start paying for shipping, you

25     would realize that no shipment had been made.

1           In addition, their November 8 disclosure referred to

2      Stronghold's designated shipper, so that does indicate that

3      Stronghold was actually designating the company that was to

4      handle the shipping.

5           In addition, there is the fact that Stronghold didn't

6      make their final payment until October 26, and that payment was

7      due one month before.  Now, there doesn't seem to be any reason

8      that Stronghold would have delayed that payment unless they

9      already anticipated that the shipment wouldn't have arrived in

10     time.

11          THE COURT:  Can I follow up on the question about

12     timing.  The complaint cites a confidential witness who said

13     that -- let me get the language out.  One second.  I have it.

14     Who said that -- now I'm quoting:  In mid to late October 2021,

15     Charlie Talcott, who was the vice-president of Stronghold, said

16     that MinerVA, and now I'm quoting again, could not provide the

17     miners on the time frame represented or needed by Stronghold.

18          Did that predate the IPO or is it later?  Why should I

19     assume that that statement refers to Talcott's knowledge

20     pre-IPO?

21          MR. STERN:  If I can just grab the --

22          THE COURT:  Sure.

23          MR. STERN:  Sorry.  If you could -- I just want to

24     make sure I'm on the right paragraph.

25          THE COURT:  Let me scroll up.  Hold on.  75.

1          MR. STERN:  Yes, your Honor.  I believe our

2     confidential witness did not recall the exact timing, but the

3     IPO was October 21, and there is a five-business-day period

4     after the IPO which takes you to October 28, where defendants

5     would have had to correct, by a post-effective amendment, any

6     statement they learned to be inaccurate in the registration

7     statement.

8          So that gets you to October 28.  So while our

9     confidential witness was not sure exactly as of the timing, it

10    seems unlikely that this would have occurred -- that Talcott

11    would have just learned of this.

12         So to assume that this wasn't known as of the time of

13    the IPO, you'd have to assume:  First, that Talcott had only

14    just learned of it when he started talking about it at Panther

15    Creek; and, second, the statement had occurred towards the late

16    end of October of 2021.  It seems more likely that this was

17    something that happened before the IPO.

18         THE COURT:  You may proceed.

19         MR. STERN:  Thank you.

20         Another reason that Stronghold knew or could have

21    known that the miners were going to be delayed was that, on the

22    date of the IPO, MinerVA announced that it was purchasing

23    25,000 chips from AGM and these were needed to build the

24    miners.  According to the website The Block, these were

25    intended for -- these were intended for Stronghold.

1            Now, defendants claim that there is no reason to know

2   that MinerVA was using the parts to build for Stronghold

3   miners, but the article from The Block indicates that that's

4   what it was for.  And certainly because they were able to see

5   that article on the date of the IPO, they had the ability to

6   inquire with MinerVA and say, hey, we saw you are just buying

7   these chips now.  Are they for us or are they some other

8   business?  What's going on?  Given that there was already a

9   delay, it does raise a question about why they are buying these

10  new chips now and raises the question about whether the chips

11  had ever been purchased for the miners that were intended for

12  Stronghold.

13           One other reason that they knew, or could have known

14  as of the date of the IPO, that there was going to be a delay

15  was the fact that they didn't make their first payment, which

16  was supposed to be paid 30 days before the first shipment.

17  They didn't make that payment until October 26.

18           Now, defendants say, why would we have made that

19  payment at all if we knew there was going to be a material

20  delay in MinerVA's shipment?  The reason for that is, they were

21  desperate for miners.  As defendants discussed, there was a

22  global shortage of Bitcoin miners.  There are manufacturing

23  delays throughout China.  There wasn't any likely prospect that

24  they would be able to turn around and find some other vendor to

25  send them the miners.  All they had to do at this point, given

1    that they had already paid MinerVA so much money, was to make

2    the final payment and hope that eventually MinerVA would make

3    good.  They really just didn't have any other option at that

4    point.  They couldn't turn around and say -- and raise more

5    money and try to buy these miners from a third party.  They

6    really were locked into dealing with them, so it would have

7    been potentially even more disastrous for them not to make that

8    payment and abandon any hope of ever getting any miners from

9    MinerVA.

10            One thing I want to address is that defendants keep

11    referring to this as saying this case is ultimately about

12    whether MinerVA would breach.  We never alleged a breach of

13    contract in our complaint.  We never said that this case was

14    about a breach.  The word breach does not actually appear in

15    the complaint, I believe.  This is about whether the

16    anticipated delivery schedule would be adhered to, and the

17    complaint provides allegations that they weren't able to keep

18    to that delivery schedule.

19            Just to address as well the standard, the standard

20    under section 11 is a strict liability standard.  There is an

21    affirmative defense for due diligence for everyone other than

22    the registrant, which would lead to the question of, if it is

23    the pleading standard, which defendants contend is known or

24    should have known, why would you have an affirmative defense of

25    due diligence?  Due diligence is what you should have known,

1 and it's their burden to show what they should have known.  Due

2 diligence does not really make sense if the standard is already

3 that plaintiffs have to prove what they knew or should have

4 known.  Because if we prove they should have known it, they

5 didn't perform due diligence and it would have answered that

6 question already.  It doesn't make sense to have something

7 that's both an element and an affirmative defense.

8          I want to move on to materiality, and I want to

9 address the point that defendants keep saying that unless we

10 can show that it was a foregone conclusion, there was a

11 foregone conclusion of a problem, they had no obligation to

12 disclose.

13          Well, basically, *Levinson*, in describing the test of

14 materiality for contingent or even speculative events, and we

15 don't concede that this risk was speculative, stated that there

16 is a duty to disclose based on the probability magnitude

17 analysis.  So the idea that you don't have to disclose future

18 risks unless they are a foregone conclusion doesn't square with

19 Supreme Court precedent, probably the most important Supreme

20 Court precedent on determining falsity in the context of the

21 securities laws.

22          In terms of magnitude, the magnitude of a serious

23 delay was extremely high.  71 percent of Stronghold's miners,

24 in terms of capacity, were to come from MinerVA.  In terms of

25 probability, this isn't -- in terms of probability of a serious

1    problem, this isn't a case where this is an experienced

2    supplier who sent the miners before and had delivered before,

3    and if they have an initial delay, it's something that they

4    could say, you know what, it's probably fine.

5         Given that we know there are ongoing power outages in

6    China, there was difficulty sourcing supplies, any delay in the

7    schedule should have been seen as a serious warning that there

8    could be potential future serious problems in the future.

9         For that reason, defendants had a duty to disclose it

10    because it was material to investors.  And if defendants had

11    found out that MinerVA was unable to keep to its initial

12    schedule, as of the date of the IPO, it would have had a

13    serious effect on how investors would have viewed the viability

14    of the company.

15         THE COURT:  Weren't there disclosures about the risks,

16    the risk of delay?  The offering materials warned that the

17    power outages and production relocations could result in

18    cancellations or delays and may negatively impact our ability

19    to receive mining equipment on a timely basis or at all, right?

20         MR. STERN:  Yes.  Those disclosures were there, but

21    they didn't disclose that those disclosures had already

22    affected MinerVA.  For them to have missed that first shipment,

23    those delays must have already been affecting MinerVA as of the

24    date of the IPO.

25         So they are phrasing it in future and contingent terms

1    and not informing investors that those exact risk factors had

2    already impacted their largest supplier, their majority

3    supplier, super majority supplier.  In that context, those risk

4    disclosures were simply inadequate because they didn't warn of

5    a risk that had already transpired.

6            How much they knew about how bad the delay would be

7    would be one thing, but defendants can't seriously argue that

8    these delays weren't affecting MinerVA as of the date of the

9    IPO.

10           They keep saying, how could we have known, how could

11   we have known.  They are a customer.  They can ask MinerVA,

12   what's going on with the delays?  They can hire someone in

13   China and say go to the factory and see how things are looking,

14   are they having delays.

15           If they are already aware that this is an issue that's

16   affecting the industry in general, why is it unknowable to

17   them?  If they have this customer, can't they say, we are

18   hiring a lawyer in China to go down to your factory -- or a

19   manufacturing expert or someone in China to go down to your

20   factory and just see how things are looking and see how many

21   finished units you have and make sure that your assembly line

22   is moving along.

23           The case is talking about clairvoyance and uncertainty

24   and what another company is going to do or about company

25   decisions, which is something that's in people's heads.  This

1    is about what is happening in another company's factory, which

2    is something that you can go and visit, so it is a knowable

3    thing.

4           I hope that addressed the adequacy of the risk

5    disclosures.

6           THE COURT:  You may proceed.  Yeah.

7           MR. STERN:  Thank you.

8           Moving on from that, they make a statement about --

9    defendants made a statement that their confirmed purchase

10   orders show their ability to scale quickly.

11          Defendants claim puffery.  We believe it's not

12   puffery, for the simple reason that they made a specific

13   statement pointing to a specific fact about their business.

14   They had confirmed purchase orders.  And they were speaking to

15   an issue that was highly material to investors, the ability to

16   scale mining quickly.

17          This is another point that actually does overall

18   address materiality.  This was when Bitcoin was at an all-time

19   high.  So that ability to scale quickly is very important to

20   investors at this time.  This is a hot market.  If they had

21   been able to operate in that first quarter of 2021, when

22   Bitcoin prices were higher than they were subsequently, they

23   would have made a lot of profits that couldn't be replaced by

24   simply mining at a later date.

25          THE COURT:  Can you respond to defendants' argument

1    that the disclosure on March 29 of 2022 about MinerVA's failure

2    to deliver miners had effectively already been disclosed in

3    earlier communications by Stronghold, including in November

4    2021, and that the alleged corrective disclosure therefore

5    could not have caused plaintiffs' loss.

6         MR. STERN:  Yes, your Honor.

7         I think one thing to note is that we do not have to

8    establish -- again, this is a negative causation case.  They

9    put out bad news.  They did announce on November 30 that there

10    was a delay, but they deliberately downplayed that delay, which

11    blunted the effect of any drop and convinced investors that

12    there was no need to pull out because they made it sound as

13    though the problem wasn't serious and this was just a minor and

14    short-term delay.

15         To conclude as a matter of law that there is no way

16    that the decline in March of 2022 was causally related to their

17    misstatements, when they had been making these false

18    reassurances during that earlier period, we don't believe that

19    that, under the hybrid that they have establishing negative

20    causation, could show that the full truth had been revealed

21    earlier, because the full truth hadn't.  People didn't know the

22    full extent of the delays.  The investing public didn't learn

23    about exactly what had happened and how bad the situation was.

24         THE COURT:  Why don't you just make any final points.

25         MR. STERN:  Yes, your Honor.

 1          We also believe that the statements regarding the hash

 2   rates were materially misleading.  That hasn't really been

 3   addressed.  But, again, they admitted that they anticipated a

 4   90 percent of promise performance would be industry standard.

 5   So advertising the full 100 -- the full terahertz-per-second

 6   hash rate was misleading.

 7          We see from their disclosure about latest generation

 8   miners that they are referring to these slower and

 9   less-efficient miners that MinerVA had offered and not the most

10   efficient, not most high-speed ones.

11          THE COURT:  Let me just ask about that.  You argue

12   that defendants knew that the miners could not deliver the 100,

13   the THs.

14          MR. STERN:  Terahash per second.

15          THE COURT:  Terahash percentage.

16          MR. STERN:  Per second.

17          THE COURT:  Right.  Per second.  Sorry.  I misspoke.

18   Excuse me.

19          And you are relying on the March 29, 2022 disclosure

20   that the performance of MinerVA's miners has been below

21   expectations, with hash rates ranging from 50 percent to 70

22   percent of the expected capacity, compared to the 90 percent

23   plus for a standard performing machine.  That's from the

24   complaint at 81 and 146 and the opposition at 7.

25          Doesn't the expected 90 percent plus amount to 100

1   terahash per second that were supposed to be delivered?  Can

2   you explain to me, I guess, how that disclosure supports your

3   argument.

4           MR. STERN:  Sure, your Honor.

5           As it happens, the expected -- the promised terahash

6   per second was a hundred, so 90 percent is 90 terahertz per

7   second.  They promised a hundred terahertz per second per miner

8   on average.  They were saying -- I can't remember the exact

9   number, but basically the ratio of it came down so that it was

10  100 terahash per second per miner, so saying 90 percent

11  effective means 90 terahash, so the math just happens to work

12  out easily in this case, fortunately.

13          When they said they are only working -- when they said

14  they are only working at 50 percent to 70 percent, that means

15  about 50 terahash to 70 terahash.  When they say industry

16  standard of 90 plus, that means you're expecting 90 or a little

17  better from a miner with a sticker of a hundred.  So that's

18  where -- the percentages and the numbers are just the same in

19  this case because it was a promised rate of a hundred.

20          THE COURT:  Are you almost done?

21          MR. STERN:  Yes, your Honor.

22          The last thing I would say in terms of negative

23  causation, they talk about the price of Bitcoin.

24          Obviously, the price of Bitcoin and the price of

25  Stronghold didn't fall one to one on every day of the class

1    period.  In particular, on that March date, the price of

2    Bitcoin didn't fall much at all and the price of Stronghold

3    fell quite precipitously.  You cannot attribute that drop -- no

4    reasonable finder of fact would attribute that drop to the

5    decline in the price of Bitcoin.

6            If your Honor has any questions, I'm happy to answer

7    them.

8            THE COURT:  Thank you.

9            Just very, very brief rebuttal.

10           MR. THAU:  Your Honor, if I go too quickly, the

11   reporter can't understand me, but I will keep it quick.

12           THE COURT:  Then make fewer points.

13           MR. THAU:  Thank you, your Honor.

14           Reset, please.

15           The allegation in this complaint, your Honor, the

16   corrective disclosure that they allege is when Stronghold

17   disclosed that MinerVA was not delivering the 15,000 miners and

18   they were substandard.  The allegation in this complaint is not

19   that Stronghold misstated the timing of the first miner

20   delivery.  It's a distinction here.  The allegation is that the

21   prospectus was materially false and misleading because

22   Stronghold said MinerVA was going to deliver 15,000 miners.

23           Paragraph 10 of their complaint talks about delivery

24   quantities and deadlines are unachievable.  The corrective

25   disclosure goes to the 15,000.  I feel, your Honor, like we are

1    talking a lot about the delay in the November shipment, but

2    this case is about failure to deliver 15,000 miners.  That's

3    what they plead.  That's what they allege the corrective

4    disclosure is.

5         Counsel started offering all kinds of conjecture and

6    speculation as to why Stronghold make the $14.7 million payment

7    on October 26.  The most straightforward, logical explanation,

8    your Honor, is that on that date, five days after the IPO,

9    Stronghold believed that MinerVA was going to perform.  That's

10   why parties pay money.  That's why parties abide by agreements

11   because they believe their counterparty is going to perform.

12   That's straightforward.

13        Next, your Honor, you asked a straightforward question

14   about the confidential witness and the statement between mid to

15   the end of October.  I think it's fair to say, your Honor, if

16   plaintiffs knew that conversation took place before the IPO,

17   they would have pleaded it that way and they don't.

18        In fact, your Honor, there is no communication pleaded

19   in this amended complaint prior to the IPO.  Counsel can make

20   reference, well, it's fair to think that if someone talked at

21   the end of March, maybe they also talked in October.  It's

22   their burden, your Honor, to show that facts existed at the

23   time of the IPO that Stronghold knew or should have known about

24   delivery problems.  They don't plead facts about pre-IPO

25   communications which would have given Stronghold that knowledge

1   and that's important here.

2          Your Honor, we are not saying -- we are not making a

3   materiality argument.  We are all familiar with *Basic v.*

4   *Levinson*.  I ask that the Court look at the cases that we have

5   relied upon with respect to foregone conclusion and near

6   certainty.  We all know what materiality means.  I think there

7   is quite a different context here.

8          Here, your Honor, we are talking about plausibility,

9   and we are talking about plaintiff needs to make certain

10  allegations based on facts, with respect to facts that existed

11  at the time of the IPO.  Your Honor, they just can't do it.  In

12  the absence of those facts, it was not a foregone conclusion.

13  It was not a near certainty at the time of the IPO, it just was

14  not, and that's the standard that plaintiff has to meet, and

15  they can't, your Honor, in connection with inability to plead

16  facts prior to the IPO.

17         And, your Honor, finally, they don't discuss -- they

18  gloss over that the delivery date of October 31 was an

19  anticipated delivery date, Judge.  That's important.  The

20  prospectus says it's important.  The prospectus says it's

21  forward looking.  The prospectus says that it may not represent

22  what ultimately happens, but it does express what Stronghold

23  believed at that time.  They can continue to gloss over the

24  significance of anticipated.

25         They don't deal with the absence of facts pre-IPO.

 1    They don't deal with the common-sense argument, your Honor,

 2    that parties simply don't pay $14.7 million, and Stronghold is

 3    not a big company.

 4              If they believe, in their heart, that their

 5    counterparty is not going to perform, it's as straightforward

 6    as that, your Honor, and there is no reasonable argument

 7    plaintiffs make in opposition to that.

 8              THE COURT:  Thank you, all.  I am going to reserve

 9    decision.  I would like you to order the transcript of today's

10    proceedings so I can review it as soon as possible, but thank

11    you all for your advocacy today.

12              Have a nice evening.

13              (Adjourned)

14

15

16

17

18

19

20

21

22

23

24

25